950 P.2d 178

STATE of Hawai'i, Respondent–Appellee,

v.

Lloyd MALLAN, Petitioner–Appellant.

No. 15608.

Supreme Court of Hawai'i.

Jan. 30, 1998.

Linda C.R. Jameson, Deputy Public Defender, on the briefs, for petitioner-appellant.

Lori S. Nishimura, Deputy Prosecuting Attorney, on the briefs, for respondent-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice, with whom MOON, Chief Justice, joins.

We granted certiorari to review the memorandum opinion of the Intermediate Court of Appeals (ICA) filed on May 10, 1993. The central issue before us is whether the express right to privacy located in article I, section 6 of the Hawai'i Constitution [1] encompasses a right to possess and use marijuana [2] for recreational purposes. Because we believe that the right to privacy does not in-

---

1. Article I, section 6 of the Hawai'i Constitution provides:

    The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest. The legislature shall take affirmative steps to implement this right.

2. HRS § 712–1240 (1993) provides in relevant part:

    "Marijuana" means any part of the plant (genus) cannabis, whether growing or not, including the seeds and the resin and every alkaloid, salt, derivative, preparation, compound, or mixture of the plant, its seeds or resin, except that, as used herein, "marijuana" does not include hashish, tetrahydrocannabinol, and any alkaloid, salt, derivative, preparation, compound, or mixture, whether natural or synthesized, of tetrahydrocannabinol.

    Marijuana is also commonly spelled "marihuana" and "mariguana." See Black's Law Dictionary 967 (6th ed.1990). Such spelling differences, when used in this opinion, are not intended to be significant.

clude such a right, we affirm the ICA's decision.

## I. *BACKGROUND*

The facts of this case are not in dispute. On October 20, 1990, at approximately 10:15 p.m., Petitioner–Appellant Lloyd Mallan was arrested in the parking lot of the Waikīkī Shell after Honolulu police officers, attracted by the odor of burning marijuana, found a partially burnt marijuana cigarette in Mallan's automobile. Mallan was charged with promoting a detrimental drug in the third degree, in violation of Hawai'i Revised Statutes (HRS) § 712–1249 (1993).[3]

Mallan does not deny that he broke the law on the night in question:

[MALLAN:] I have a deep interest in music and I'd just seen the Honolulu Symphony concert and went back to my car and listened to the—turned on the radio and listened to a jazz tune that I hadn't heard for years, by Keith Jarrett. . . .

And I had a little bit of, of marihuana with me. And I thought as commemoration of my listening to Keith Jarrett, I would smoke a joint or whatever I had left, which was minimal.

And I was pursuing my sense of happiness and that it would enhance my appreciation of the music. . . .

. . . I thought I was in privacy. Nobody was around. It was after the concert and I had no place to go, really. And a voice [inside my head] said, "Don't do it," but I did it anyway.

Before trial, however, Mallan filed a motion to dismiss. In support of the motion, Mallan argued, *inter alia*, that the right to smoke marijuana is protected by the Hawai'i Constitution's right to privacy. At a subsequent hearing on the motion, the parties stipulated to the testimony of Mallan's expert witnesses. The witnesses would have testified that, in their opinion, marijuana is not addictive and that there is no proof that the use of marijuana is harmful to the user or to others. However, the witnesses would also have testified that the effects of marijuana have been the subject of debate. The experts would have further testified that, in their opinion, the studies concluding that marijuana has harmful effects are speculative and flawed. After oral argument on the motion, the trial court rejected Mallan's contentions. The trial court ruled that "possession and use of marihuana . . . is not protected under our right of privacy." The trial court ruled that "the possession of marihuana . . . does not rank as any kind of fundamental freedom" and that the statute need only be supported by a rational basis, not a compelling state interest. The trial court noted that the question whether marijuana has harmful effects is a controversial area. The trial court noted that, according to the stipulated evidence, some literature supports the conclusion that marijuana is harmful, while other literature supports the conclusion that it is harmless. Consequently, the trial court ruled that, in applying the rational basis test, the statute is constitutional.

The case then proceeded to trial, and the court found Mallan guilty. Mallan was sentenced to a fine of $50. Mallan filed a timely notice of appeal, and the case was assigned to the ICA. The ICA based its decision on our prior case law holding that the possession of marijuana for personal use is not protected by the right to privacy. *See State v. Bachman*, 61 Haw. 71, 595 P.2d 287 (1979); *State v. Renfro*, 56 Haw. 501, 542 P.2d 366 (1975); *State v. Baker*, 56 Haw. 271, 535 P.2d 1394 (1975). The ICA noted that *Renfro* and *Baker* were decided before article I, section 6 was added to the Hawai'i Constitution. The ICA further noted that, although *Bachman* was decided five months after article I, section 6 was ratified, the appellate briefs in *Bachman* were filed before ratification. Nevertheless, the ICA felt obligated to follow

---

**3.** HRS § 712–1249 (1993) provides in relevant part:

Promoting a detrimental drug in the third degree. (1) A person commits the offense of promoting a detrimental drug in the third degree if the person knowingly possesses any marijuana . . . in any amount.

(2) Promoting a detrimental drug in the third degree is a petty misdemeanor.
Although gender-neutral language was added in 1993, the statute is substantively the same as in 1990.

*Bachman* and, therefore, affirmed Mallan's conviction. Mallan subsequently applied to this court for a writ of certiorari, which we granted.

## II. STANDARD OF REVIEW

■ The scope of the right to privacy under article I, section 6 of the Hawai'i Constitution is a question of constitutional law. "We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard." *State v. Arceo*, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (internal quotation marks and citations omitted).

## III. DISCUSSION

Initially, we note that although our prior cases addressing the constitutionality of our marijuana possession statutes did address the right to privacy, *see Bachman, supra; Renfro, supra; Baker, supra,* those cases did not directly address article I, section 6. Thus, the specific question whether article I, section 6 encompasses a constitutional right to possess and use marijuana has yet to be answered by this court.

### A. Our Prior Privacy Case Law: Mueller, Kam, and Baehr

#### 1. Two Approaches

To date, our case law interpreting article I, section 6 has apparently established two distinct approaches to the right to privacy.[4] The first approach was applied by this court in *State v. Mueller*, 66 Haw. 616, 671 P.2d 1351 (1983), and later by the plurality in *Baehr v. Lewin*, 74 Haw. 530, 852 P.2d 44, *reconsideration granted in part*, 74 Haw. 650, 875 P.2d 225 (1993). Under this approach, "only personal rights that can be deemed 'fundamental' or 'implicit in the con-

cept of ordered liberty' are included in this guarantee of personal privacy." *Mueller*, 66 Haw. at 628, 671 P.2d at 1355 (quoting *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973)) (citations omitted). In determining which rights are fundamental, we must look

> to the "traditions and [collective] conscience of our people" to determine whether a principle is "so rooted [there] ... as to be ranked as fundamental." ... The inquiry is whether a right involved "is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions'...."

*Baehr*, 74 Haw. at 556, 852 P.2d at 57 (quoting *Griswold v. Connecticut*, 381 U.S. 479, 493, 85 S.Ct. 1678, 1686, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring)) (alterations in original). If a right is determined to be fundamental, it is "subject to interference only when a compelling state interest is demonstrated." Comm. Whole Rep. No. 15, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 1024 (1980). *See also Mueller*, 66 Haw. at 627, 671 P.2d at 1359. In the absence of a fundamental right, however, a statute need only satisfy the minimum rationality requirements of due process, *i.e.*, it must have a "rational basis." *Id.* at 628, 671 P.2d at 1359.

In the past, we have applied the *Mueller /Baehr* approach in rejecting claims that certain acts are protected by the right to privacy. In *Mueller*, our first case directly addressing the scope of article I, section 6, we held that prostitution is not protected by the right to privacy because the decision "to engage in sex for hire at home" is not a fundamental right nor is basic to ordered liberty. *Id.* at 628, 630, 671 P.2d at 1359, 1360. Similarly, in *Baehr*, the plurality held, in an opinion written by Justice Levinson:

---

4. We note that this opinion involves only the "personal autonomy" prong of the right to privacy. Article I, section 6 also protects privacy in the "informational" sense. The "informational" prong deals with issues such as disclosure of medical, financial, educational, or employment records. We have addressed the "informational" prong in a separate line of cases. *See, e.g., State*

*Organization of Police Officers (SHOPO) v. Society of Professional Journalists—University of Hawai'i Chapter*, 83 Hawai'i 378, 927 P.2d 386 (1996); *Painting Industry of Hawaii Market Recovery Fund v. Alm*, 69 Haw. 449, 746 P.2d 79 (1987); *Nakano v. Matayoshi*, 68 Haw. 140, 706 P.2d 814 (1985).

[W]e do not believe that a right to same-sex marriage is so rooted in the traditions and collective conscience of our people that failure to recognize it would violate the fundamental principles of liberty and justice that lie at the base of all our civil and political institutions. Neither do we believe that a right to same-sex marriage is implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it were sacrificed. Accordingly, we hold that the [plaintiffs] do not have a fundamental constitutional right to same-sex marriage arising out of the right to privacy or otherwise.

*Baehr*, 74 Haw. at 556–57, 852 P.2d at 57.

It should be noted that, in applying the *Mueller/Baehr* approach, we have tended to focus on "personal decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Mueller*, 66 Haw. at 627, 671 P.2d at 1359 (quoting *Carey v. Population Servs. Int'l*, 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977)) (internal quotation marks and ellipses omitted). A report from the 1978 Constitutional Convention's Committee of the Whole, "reflecting the consensus of the assembly," *id.* at 625, 671 P.2d at 1357, stated that the right to privacy "is similar to the privacy right discussed in [federal] cases such as *Griswold v. Connecticut*, 381 U.S. 479[, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147] (1973), etc." Comm. Whole Rep. No. 15, 1 Proceedings, at 1024. *Griswold* and *Eisenstadt* both involved contraception and *Roe* dealt with abortion. *See Griswold, supra; Eisenstadt, supra; Roe, supra.* Accepting the reasoning in *Mueller*, Justice Levinson wrote in *Baehr*: "We ultimately concluded in *Mueller* that the federal cases cited by the Convention's committee of the whole should guide our construction of the intended scope of article I, section 6." *Baehr*, 74 Haw. at 552, 852 P.2d at 55. Therefore, "[w]hile the outer limits of this aspect of privacy have not been marked[,]" *Mueller*, 66 Haw. at 627, 671 P.2d at 1359 (quoting *Carey*, 431 U.S. at 685, 97 S.Ct. at 2016), it is clear that the framers of article I, section 6 and our own decisions

have emphasized protection of intimate personal relationships such as those concerning marriage, contraception, and the family.

The second approach, adopted by this court in *State v. Kam*, 69 Haw. 483, 748 P.2d 372 (1988), is ultimately based on the United States Supreme Court's decision in *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). In *Stanley*, the Court held that the right to read or view pornographic material in the privacy of one's home is protected by the First Amendment. *Id.* at 565, 89 S.Ct. at 1248 ("If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in the privacy of his own house, what books he may read or what films he may watch."). In *Kam*, we accepted the reasoning in *Stanley*, but additionally based the right to read or view pornographic material within the home on article I, section 6. *Kam*, 69 Haw. at 493–94, 748 P.2d at 378–79. We held that the right "to read or view pornographic material in the privacy of one's home must be afforded the protection of the Hawaii Constitution article I, section 6[.]" *Id.* at 493, 748 P.2d at 378–79. Furthermore, we extended the principles in *Stanley* to include the "correlative right to *purchase* [pornographic] materials for ... personal use [at home]." *Id.* at 495, 748 P.2d at 380 (emphasis added). We reasoned that "[i]t is obvious that an adult person cannot read or view pornographic material in the privacy of his or her own home if the government prosecutes the sellers of pornography ... and bans any commercial distribution." *Id.* at 495, 748 P.2d at 379. Thus, under the *Stanley/Kam* approach, the right to privacy located in article I, section 6 encompasses the right to read or view pornographic material in the privacy of one's home, as well as the correlative right to purchase such materials for use in one's home. The State cannot interfere with these rights unless a compelling state interest is demonstrated. *Id.*

It should be noted that there are two significant aspects of the *Stanley/Kam* approach. First, the approach focuses squarely on *the home* as the situs of privacy. Rather than focusing on intimate relationships, as in the *Mueller/Baehr* approach, the *Stanley*

*/Kam* approach is tied to a specific *place*. *Stanley* repeatedly referred to the privacy of one's own home:

> Moreover, in the context of this case—a prosecution for mere possession of printed or filmed matter *in the privacy of one's home*—that right takes on an added dimension.... He is asserting the right to read or observe what he pleases—the right to satisfy his intellectual and emotional needs *in the privacy of his own home.* ... Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into *the privacy of one's own home.* ... As we have said, the States retain broad power to regulate obscenity; that power simply does not extend to mere possession by the individual *in the privacy of his own home.*

*Stanley*, 394 U.S. at 564, 565, 568, 89 S.Ct. at 1247, 1248, 1249 (emphases added). "The Constitution extends special safeguards to the privacy of the home, just as it protects other special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education." *United States v. Orito*, 413 U.S. 139, 142, 93 S.Ct. 2674, 2677, 37 L.Ed.2d 513 (1973). "The protection afforded by *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), is restricted to a place, the home. In contrast, the constitutionally protected privacy of family, marriage, motherhood, procreation, and child rearing is not just concerned with a particular place, but with a protected intimate relationship." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 66 n. 13, 93 S.Ct. 2628, 2640 n. 13, 37 L.Ed.2d 446 (1973). It is true that *Kam* extended the principles in *Stanley* to include the buying and selling of pornographic materials, and such commercial activities do not take place in the home. However, we also stated in *Kam* that the right to purchase pornographic materials is a "correl-

ative right" to the right established by *Stanley*. Thus, even though the material may be purchased outside the home, it still must be purchased for personal use within the home. Therefore, a crucial factor in the *Stanley /Kam* approach is its emphasis on the home.

The second aspect of the *Stanley /Kam* approach is that freedom of speech and freedom of the press are strongly implicated. Pornography and obscenity deal with printed or filmed matter and, consequently, raise First Amendment concerns. *Stanley* was based on the First Amendment, as applied to the states through the Fourteenth Amendment. *Stanley*, 394 U.S. at 568, 89 S.Ct. at 1249 ("We hold that the *First and Fourteenth Amendments* prohibit making mere private possession of obscene material a crime." (Emphasis added.)). Although *Kam* subsequently grounded the right to read or view pornographic material within the home on article I, section 6, we cannot ignore the fact that freedom of speech and freedom of the press are essential factors in the *Stanley /Kam* analysis.

### 2. The Present Case

In the present case, Mallan argues that the right to privacy in article I, section 6 encompasses the right to possess marijuana for personal use. We disagree. Applying the *Mueller /Baehr* approach, it is clear that the right to possess and use marijuana cannot be considered a "fundamental" right that is "implicit in the concept of ordered liberty." We cannot say that smoking marijuana is a part of the "traditions and collective conscience of our people." In Hawai'i, possession of marijuana has been illegal since 1931. *See* 1931 Haw. Sess. L. Act 152, § 12, at 155–56. In the rest of the United States, the possession and/or use of marijuana, even in small quantities, is almost universally prohibited.[5] Therefore, tradition appears to be in

---

5. *See, e.g.*, 21 U.S.C. §§ 802, 812, 844 (1994); Ala.Code § 13A–12–214 (1994); Ariz.Rev.Stat. Ann. § 13–3405 (Supp.1996); Ark.Code Ann. §§ 5–64–215, 5–64–401 (Michie 1993); Cal. Health & Safety Code § 11357 (West 1991); Colo.Rev.Stat. Ann. § 18–18–406 (1997); Conn. Gen.Stat. Ann. § 21a–279 (West 1994); Del.Code Ann. tit. 16, §§ 4701, 4714, 4754 (1995); D.C.Code Ann. §§ 33–522, 33–541 (1993); Fla. Stat. Ann. § 893.13 (West 1994); Ga.Code Ann.

§ 16–13–30 (1996); Idaho Code §§ 37–2705, 37–2732 (1994); Ill.Ann.Stat. ch. 720, para. 550/4 (Smith–Hurd Supp.1997); Ind.Code Ann. § 35–48–4–11 (Burns 1994); Iowa Code Ann. § 124.401 (West Supp.1997); Kan. Stat. Ann. §§ 65–4105, 65–4162 (Supp.1996); Ky.Rev.Stat. Ann. § 218A.990 (Michie 1991); La.Rev.Stat. Ann. § 40:966 (West 1992); Me.Rev.Stat. Ann. tit. 22, § 2383 (West 1992); Md.Code Ann. art. 27, §§ 279, 287 (1996); Mass. Gen. L. Ann. ch.

favor of the prohibition against possession and use of marijuana. Additionally, we have no reason to believe that the collective conscience of the people supports the possession and use of marijuana under the circumstances of this case. Furthermore, we cannot say that the principles of liberty and justice underlying our civil and political institutions are violated by marijuana possession laws. We dare say that liberty and justice can exist in spite of the prohibition against marijuana possession. Therefore, the purported right to possess and use marijuana is not a fundamental right and a compelling state interest is not required.

▆▆▆▆ Because the right to privacy is not implicated, HRS § 712–1249 need only survive the rational basis test.

Generally, where no fundamental rights or suspect classifications are involved, there is a due process violation only if there is no rational basis to sustain the challenged statute. . . . Under the rational basis test, we inquire as to whether a statute rationally furthers a legitimate state interest. Our inquiry seeks only to determine whether any reasonable justification can be found for the legislative enactment.

94C, § 34 (West 1997); Mich. Comp. Laws Ann. §§ 333.7403, 333.7404 (West 1992); Minn.Stat. Ann. § 152.027 (West Supp.1997); Miss.Code Ann. § 41–29–139 (1993); Mo. Ann. Stat. § 195.202 (Vernon 1996); Mont.Code Ann. § 45–9–102 (1995); Neb.Rev.Stat. § 28–416 (1995); Nev.Rev.Stat. § 453.336 (1995); N.H.Rev.Stat. Ann. §§ 318–B:2, 318–B:26 (1995); N.J.Rev.Stat. Ann. § 2C:35–10 (West 1995); N.M. Stat. Ann. § 30–31–23 (Michie 1997); N.Y. Penal Law § 221.05 (McKinney 1989); N.C. Gen.Stat. §§ 90–94, 90–95 (1996); N.D. Cent.Code § 19–03.1–23 (Supp.1997); Ohio Rev.Code Ann. § 2925.11 (Baldwin 1997); Okla. Stat. Ann. tit. 63, § 2–402 (West 1997); Or.Rev.Stat. § 475.992 (1995); Pa. Stat. Ann. tit. 35, §§ 780–102, 780–104, 780–113 (1993); R.I. Gen. Laws § 21–28–4.01 (Supp.1996); S.C.Code Ann. § 44–53–370 (Law. Co-op.1985 & Supp.1996); S.D. Codified Laws Ann. § 22–42–6 (Supp.1997); Tenn.Code Ann. § 39–17–418 (Supp.1996); Tex. Health & Safety Code Ann. § 481.121 (West Supp.1997); Utah Code Ann. § 58–37–8 (Supp.1997); Vt. Stat. Ann. tit. 18, § 4230 (Supp.1996); Va.Code Ann. § 18.2–250.1 (Michie 1996); Wash. Rev. Code Ann. § 69.50.401 (West Supp.1997); W. Va.Code §§ 60A–1–101, 60A–2–204, 60A–4–401 (1992); Wis. Stat. Ann. §§ 961.14, 961.41 (West Supp.1996); Wyo. Stat. §§ 35–7–1002, 35–7–1014, 35–7–1031, 35–7–1039 (1997).

*Estate of Coates v. Pacific Engineering,* 71 Haw. 358, 363–64, 791 P.2d 1257, 1260 (1990) (citations omitted). Furthermore, we have long held that: "(1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." *State Organization of Police Officers (SHOPO) v. Society of Professional Journalists—University of Hawai'i Chapter,* 83 Hawai'i 378, 389, 927 P.2d 386, 397 (1996) (citing *Pray v. Judicial Selection Comm'n,* 75 Haw. 333, 340, 861 P.2d 723, 727 (1993)). *See also Kam,* 69 Haw. at 496, 748 P.2d at 380; *Mueller,* 66 Haw. at 626–27, 671 P.2d at 1358. Thus, in the present case, Mallan has the heavy burden of demonstrating that HRS § 712–1249 lacks *any* rational basis. If Mallan fails to satisfy his burden, the statute is presumed to be constitutional and must be upheld.

▆▆▆▆ We believe that Mallan has failed to satisfy his burden. The stipulated evidence provided by Mallan's expert witnesses certainly support his argument that marijuana is not harmful. However, those experts

Although all of the above statutes prohibit the possession or use of marijuana, the penalties vary among jurisdictions. Most jurisdictions treat the possession or use of small quantities of marijuana as a misdemeanor or a petty misdemeanor. A few states, however, treat it as a violation rather than as a criminal offense.

Alaska Stat. §§ 11.71.060 and 11.71.190 (1996) proscribe the possession or use of small quantities of marijuana; however, the Alaska Supreme Court has held that the right to privacy in the Alaska Constitution protects the right to possess and use marijuana in the privacy of one's home. *See Ravin v. State,* 537 P.2d 494 (Alaska 1975); discussion *infra* part III.C. Nevertheless, Alaska's right to privacy does not protect the possession or use of marijuana in public. *Ravin,* 537 P.2d at 511; *Belgarde v. State,* 543 P.2d 206, 207 (Alaska 1975). Thus, even in Alaska, the possession or use of marijuana is proscribed, at least to a certain extent.

We note that, by statute, some states permit the possession and use of marijuana for medicinal purposes. *See, e.g.,* Cal. Health & Safety Code § 11362.5 (West Supp.1997); Mass. Gen. L. Ann. ch. 94C, § 34 and ch. 94D, §§ 1–3 (West 1997). However, the possession and use of marijuana for such purposes is not before us in the present case. *See infra* note 12.

would also have testified that the question whether marijuana has harmful effects is still controversial and that there are studies supporting the other side of the debate. "It is well settled that when a substance has been proscribed as harmful, the presumption of constitutionality applies although there are conflicting scientific views as to its harmful effects." *State v. Baker*, 56 Haw. 271, 276, 535 P.2d 1394, 1397 (1975). Thus, insofar as a genuine controversy exists and scientists have not reached a consensus as to the harmful effects of marijuana, we cannot say that Mallan has sufficiently rebutted the presumption of constitutionality attached to HRS § 712–1249 and that the statute lacks any rational basis. *See id.* at 278, 535 P.2d at 1398; *State v. Renfro*, 56 Haw. 501, 503, 542 P.2d 366, 368 (1975) (holding that a marijuana possession statute's presumption of constitutionality had not been sufficiently rebutted).[6] It is not our role to make an independent legislative determination as to the harmfulness of marijuana. Our role is to determine whether Mallan has overcome the presumption of constitutionality and has proven that the statute is not supported by any rational basis at all. This we cannot say.

█ It is also clear that the *Stanley/Kam* approach does not support Mallan's purported right to possess and use marijuana. The record indicates that Mallan was *not* in the privacy of his own home when he was arrested for possession of marijuana. Rather, he was sitting in an automobile parked in a public parking lot. Additionally, this case involves the possession of marijuana, not the possession of pornographic material. Therefore, neither of the two elements required under the *Stanley/Kam* approach have been met, and the right to privacy does not apply on this basis.

However, we note that because Mallan relies on *Kam* in arguing this case, he is apparently suggesting that we extend the *Stanley/Kam* approach beyond the home and beyond pornography. We decline to do so. *Stanley* itself limited its application to cases implicat-

ing First Amendment concerns. The Court noted:

> What we have said in no way infringes upon the power of the State or Federal Government to make possession of other items, such as narcotics, firearms, or stolen goods, a crime. Our holding in the present case turns upon the Georgia statute's infringement of fundamental liberties protected by the First and Fourteenth Amendments. No First Amendment rights are involved in most statutes making mere possession criminal.

*Stanley*, 394 U.S. at 568 n. 11, 89 S.Ct. at 1249 n. 11. Thus, by its own terms, *Stanley* rejected any application to drug possession cases. Furthermore, by attempting to sever *Stanley* and *Kam* from the concept of privacy within the home, Mallan appears to suggest that the right to privacy should protect a defendant any time he subjectively feels that he is "in privacy." In the present case, Mallan thought that he was "in privacy" when he was sitting in an automobile in a public parking lot. We are not prepared to extend the right to privacy this far. To do so would give "talismanic effect" to the phrase "in privacy"—an approach we have rejected in the past. *See Baehr*, 74 Haw. at 555, 852 P.2d at 57; *Mueller*, 66 Haw. at 630, 671 P.2d at 1360.

### B. Further Approaches to the Right to Privacy

Although, to date, our cases have recognized two approaches to the right to privacy, this does not mean that additional approaches cannot be adopted in the future. In *Mueller*, we were careful to note that "the outer limits of this aspect of privacy [*i.e.*, the personal autonomy prong] have not been marked[.]" *Mueller*, 66 Haw. at 627, 671 P.2d at 1359.

█ The approach taken in *Mueller* and *Baehr* was based on federal cases such as *Griswold*, *Eisenstadt*, and *Roe*. Similarly, the approach taken in *Kam* was based on *Stanley*, another federal case. Nevertheless, we are not limited to the federal interpretation

---

6. We note that, because of the adoption of article I, section 6, *Baker* and *Renfro* are not controlling on the right to privacy issue. However, they still constitute valid authority on the presumption of constitutionality.

of constitutional rights and have often extended the protections of the Hawai'i Constitution beyond those of the United States Constitution. *See, e.g., State v. Bowe,* 77 Hawai'i 51, 57, 881 P.2d 538, 544 (1994); *State v. Lessary,* 75 Haw. 446, 453–57, 865 P.2d 150, 154–55 (1994); *State v. Quino,* 74 Haw. 161, 170, 840 P.2d 358, 362, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993); *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58–59 (1974); *State v. Texeira,* 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967). "As the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawaii Constitution, we are free to give broader privacy protection than that given by the federal constitution." *Kam,* 69 Haw. at 491, 748 P.2d at 377. Moreover, unlike the federal constitution, our state constitution contains a *specific* provision *expressly* establishing the right to privacy as a constitutional right. Thus, our case law and the text of our constitution appear to invite this court to look beyond the federal standards in interpreting the right to privacy.

■ Consequently, applying the *Mueller /Baehr* approach and the *Stanley /Kam* approach to the facts of this case is simply an initial step in the analysis. The question remains whether we should adopt another, completely new approach not based on federal case law. The development of new approaches to the right to privacy will, of course, take place on a case-by-case basis, as different factual situations arise and new legal standards are formulated.[7] However, regardless of the direction in which our privacy jurisprudence evolves, it is clear, at present, that our right to privacy does not extend to the possession and use of marijuana.

"[W]e have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and that the fundamental principle in interpreting a constitutional provision is to give effect to that intent." *Convention Center Authority v. Anzai,* 78 Hawai'i 157, 167, 890 P.2d 1197, 1207 (1995) (internal quotation marks and citations omitted). Based on the committee reports and debates in the Constitutional Convention, we believe that the delegates adopting the privacy provision did not intend to decriminalize the possession and use of contraband drugs.

Nothing in the committee reports indicates that the delegates intended such a drastic step as the decriminalization of drugs for personal consumption. If the delegates had intended such a result, surely they would have placed an explicit reference in the committee reports. Instead, the committee reports contain no mention of the legalization of illicit drugs. *See* Stand. Comm. Rep. No. 69, in 1 Proceedings, at 674–76; Comm. Whole Rep. No. 15, in 1 Proceedings, at 1023–24.

A close reading of the convention debates reveals a sincere concern, perhaps even a strong fear, among the delegates that an express right to privacy might further impede the battle against illegal drugs.

> Now, what alarms me is that by putting in the language as it is right now—that the right to privacy "is recognized and shall not be infringed without the showing of a compelling state interest"—goes beyond our present statutory law and would in fact hinder law enforcement.... The result would then be that it would be virtually impossible, as I can see it, to stop criminal activity conducted in what can be considered a dwelling..... For instance, if a

---

7. One delegate to the Constitutional Convention stated:

> There was some mention that I previously discussed a case-by-case method, as filling out and giving meat to the language of the committee proposal....
>
> So it was the committee's intent to broaden this, broaden it by not laying out specifics; *we have to leave that to the courts,* I believe, and also to the legislature because I think the proposal says that the legislature shall look at it and begin

the filling-in process. And each of us individually may at some time require circumstances where we would want the right to privacy, and it'll be there in the Constitution in a separate section, not tied in or colored by the criminal procedure side, but a separate section that deals with civil rights. *And you'll go into court and hopefully give meat to this provision.*

1 Proceedings, at 361 (Delegate Weatherwax) (emphases added).

person were to manufacture cocaine, angel dust or what have you, if it's for the purpose of manufacturing for personal use, ... I don't see how anyone can say that there's a compelling state interest to go in there. This language seems to say that it's all right for a person to do anything he wants as long as we cannot show that someone else will be affected.

2 Proceedings, at 629–30 (Delegate Tam). In response, Delegate Hino reassured Delegate Tam that the privacy provision *was not intended to hinder law enforcement or protect criminals.*

I'd like to allay the fears of law enforcement officials and people connected with law enforcement that this provision will make it a little more difficult for the law to be enforced. This factor was recognized during our committee's deliberations.... [W]e proposed that this privacy provision be put in a separate section, of and by itself, to show that *it was not the intent of the committee to upset any kind of precedents on criminal justice or law enforcement procedures; that this privacy provision would refer to and protect the rights of noncriminals.*

*Id.* at 630 (Delegate Hino) (emphasis added). Other delegates raised similar concerns:

I feel that the greatest benefit in the long run in Hawaii shall be from the criminal element.... I honestly feel from my experience that this right to privacy is a protective device for these so-called professional criminals, who have become so sophisticated in their techniques and their planning.... And this type of right to privacy, as good as it is for all of us, somehow will have an insidious effect on a very serious concern in Hawaii today—the rising tide of crime.

*Id.* at 632 (Delegate Chung).

[I]f, as the previous delegate has said, smoking marijuana was one of the main reasons this has been proposed,[8] then I am in favor of deleting the committee re-

port—that portion of that.... The cops are having a hard enough time enforcing the state laws. Why make it harder for them and put more restrictions upon them, especially when crime today is the number one concern of the citizens of this State. I feel the present language in the Constitution is adequate to protect the rights of the individual. Let's not make it any more difficult for law enforcement people to do their job.

*Id.* at 641 (Delegate Kojima).

However, these concerns were allayed by the delegates in favor of the privacy provision, who asserted that the provision would not legalize the use of illicit drugs.

I don't think this amendment will have that much to do with promoting organized crime or drugs. I voted in favor of the privacy amendment previously, and not for the reasons that Delegate Hale evidently introduced it.... I really don't see the previous discussion [about the right to privacy promoting organized crime and drugs] applying in this situation as far as crime is concerned.

1 Proceedings, at 363 (Delegate O'Toole). Furthermore,

Delegate Taira ... emphasized that he saw nothing in the privacy provision that would stimulate or encourage the growth of organized crime or the use of drugs, as had been alluded. If that were so, he added, he would be very strongly against the provision.

*Id.* Finally:

I've heard a lot of talk about what this amendment could do, what it cannot do, its redundancy, etc. I am a lay person, never having graduated from college. I live with my people, of all ethnic groups, we live together. And this is easier to see, that the right of the people to privacy shall be recognized. It doesn't say that we encourage underworld activity, it doesn't say any-

---

8. One delegate, Delegate Hale, indicated that she had originally proposed the privacy provision for the purpose of legalizing marijuana. 1 Proceedings, at 356–58, 366; 2 Proceedings, at 639–40. However, her views were hotly debated by the other delegates. Thus, regardless of what Delegate Hale's personal interpretation of the privacy provision might have been, it was an interpretation that was not shared by her fellow delegates. *See infra* quotations in text.

thing about smoking *pakalolo*[9] in your bedroom, it just says that the "right of the people to privacy is recognized. . . ." *Id.* at 365 (Delegate De Soto). Thus, the delegates who spoke in favor of the privacy provision did so based on their understanding that the right to privacy would neither hinder law enforcement nor further criminal activity. Inasmuch as we are convinced that the delegates who adopted the privacy provision did not intend to legalize contraband drugs, we also believe that the voters who later ratified the privacy provision did not intend such a result.

Therefore, while this court might extend the scope of article I, section 6 in the future by adopting new standards and applying these standards to new situations, it is clear, at present, that the right to privacy in the Hawai'i Constitution does not extend to the possession and use of marijuana for recreational purposes.

### C. *Ravin v. State*

Mallan argues that we should follow the example of the Alaska Supreme Court in *Ravin v. State*, 537 P.2d 494 (Alaska 1975). In *Ravin*, the Alaska court held that the express right to privacy in the Alaska Constitution protects the right to possess and use marijuana in the privacy of one's home:

> [W]e conclude that citizens of the State of Alaska have a basic right to privacy in their homes under Alaska's constitution. This right to privacy would encompass the possession and ingestion of substances such as marijuana in a purely personal, non-commercial context in the home unless the state can meet is substantial burden and show that proscription of possession of marijuana in the home is supportable by achievement of a legitimate state interest.

*Id.* at 504. The reasoning the court applied in reaching this conclusion is highly instructive. The court first examined whether the right to possess or ingest marijuana constitutes a fundamental right that must be supported by a compelling state interest. *Id.* at 502. The court concluded that possession and ingestion of marijuana is *not* a funda-

mental right. *Id.* However, the court went on to address "the distinctive nature of the home as a place where the individual's privacy receives special protection." *Id.* at 503. The court noted:

> The privacy amendment to the Alaska Constitution was intended to give recognition and protection to the home. Such a reading is consonant with the character of life in Alaska. Our territory and now state has traditionally been the home of people who prize their individuality and who have chosen to settle or to continue living here in order to achieve a measure of control over their own lifestyles which is now virtually unattainable in many of our sister states.
>
> The home, then, carries with it associations and meanings which make it particularly important as the situs of privacy.

*Id.* at 503–04. Thus, the Alaska court took an approach very similar to our own *Stanley/Kam* approach and focused on the home as the situs of privacy. The court even cited *Stanley* as authority for its decision. *Id.* However, it should be noted that *Ravin* extends the *Stanley/Kam* approach beyond pornography to include possession of marijuana.

We reject Mallan's suggestion to adopt the *Ravin* analysis. Initially, we state the obvious: *Ravin* is a case from another jurisdiction and is in no sense binding upon us. Furthermore, *Ravin* was based, at least in part, on social and cultural factors unique to Alaska. In addition, as discussed *supra*, we are not inclined to extend the *Stanley/Kam* approach any further than the particular circumstances of *Stanley* and *Kam*. Moreover, as far as we can determine, Alaska stands alone in extending the right to privacy to include possession and use of marijuana. Other states that have considered the issue uniformly conclude that possession and use of marijuana is not protected. *See, e.g., State v. Murphy*, 117 Ariz. 57, 570 P.2d 1070 (Ariz. 1977); *Nat'l Org. for the Reform of Marijuana Laws (NORML) v. Gain*, 100 Cal.App.3d 586, 161 Cal.Rptr. 181 (1979); *Kreisher v.*

9. The term "paka lōlō" means "marijuana" in the Hawaiian language. Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 304 (1986).

*State*, 319 A.2d 31 (Del.1974); *Laird v. State*, 342 So.2d 962 (Fla.1977) *Blincoe v. State*, 231 Ga. 886, 204 S.E.2d 597 (1974); *State v. Kelly*, 106 Idaho 268, 678 P.2d 60 (App.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 296, 83 L.Ed.2d 231 (1984); *State v. Chrisman*, 364 So.2d 906 (La.1978); *Marcoux v. Attorney General*, 375 Mass. 63, 375 N.E.2d 688 (1978); *People v. Williams*, 135 Mich.App. 537, 355 N.W.2d 268 (1984); *State v. Kells*, 199 Neb. 374, 259 N.W.2d 19 (1977); *People v. Shepard*, 50 N.Y.2d 640, 431 N.Y.S.2d 363, 409 N.E.2d 840 (1980); *Miller v. State*, 458 S.W.2d 680 (Tex.Crim.App.1970); · *State v. Smith*, 93 Wash.2d 329, 610 P.2d 869, *cert. denied*, 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980). Finally, even if we were to adopt the *Ravin* analysis, Mallan's conviction would still be affirmed. *Ravin* was expressly based on privacy *within the home.* The record is clear that Mallan was sitting in an automobile parked in a public parking lot.

### D. *Response to Dissent*

At this time, we take the opportunity to respond to the arguments raised by the dissenting opinion. In effect, the dissent's reasoning decriminalizes the use and possession of virtually all contraband drugs used within the home or wherever a person believes he is "in privacy." The dissent's expansive interpretation circumvents the natural development of the right to privacy in two respects: (1) it removes from the developmental process the voice of the people as expressed by legislative action, and (2) it eschews careful case-by-case development of the right to privacy by the courts. The framers of this important right were mindful that it was not their role to define its reach; therefore, they properly entrusted this task to *both* the legislature and the courts.

> Where possible, we should only state broad principles and goals, and *let details develop through statute and case law.* For this reason we added, *"The legislature shall take affirmative steps to implement this right."*

1 Proceedings, at 355 (Delegate Hino) (emphases added). Thus, the reasoning of the dissent conflicts with the intent of the delegates who adopted article I, section 6.

Furthermore, the dissent argues that we have failed to address what it considers to be the core issue in this appeal, namely, the extent of the police power. Dissent op. at 454, 950 P.2d at 192. We believe that we have implicitly addressed the police power issue through our due process analysis.

■ The police power of the state has traditionally been described as "extend[ing] to the public safety, health, and welfare." *State v. Ewing*, 81 Hawai'i 156, 164, 914 P.2d 549, 557 (App.1996). *See also State v. Lee*, 55 Haw. 505, 513, 523 P.2d 315, 319 (1974). However, the textual basis for invalidating statutes that exceed the police power is somewhat obscure. Article III, section 1 of the Hawai'i Constitution provides:

> The legislative power of the State shall be vested in a legislature, which shall consist of two houses, a senate and a house of representatives. *Such power shall extend to all rightful subjects not inconsistent with this constitution or the Constitution of the United States.*

(Emphasis added.) Thus, our constitution starts from the proposition that the power of the legislature is extremely broad. The power of the legislature is constrained only if it is inconsistent with the state or federal constitutions. Nothing in the Hawai'i Constitution expressly mentions the police power as a restraint upon the legislature.

However, the Hawai'i Constitution does contain an express Due Process Clause in article I, section 5 ("No person shall be deprived of life, liberty or property without due process of law[.]"). In determining whether a statute conflicts with the Due Process Clause, we have applied two tests. If a fundamental right is implicated, the statute is subject to strict scrutiny. If, however, a fundamental right is not implicated, the statute is subject to the rational basis test.

■ We believe that the police power doctrine is based on the Due Process Clause and should be regarded as an aspect of the rational basis test. Under rational basis review, a statute must "rationally further a legitimate state interest." *Estate of Coates*, 71 Haw. at 363–64, 791 P.2d at 1260. A state interest is "legitimate" if it involves the

public health, safety, or welfare. Thus, the police power issue is subsumed within the rational basis test. In other words, under minimum rationality due process analysis, a statute must be rationally related to the public health, safety, or welfare. *See In re Applications of Herrick and Irish,* 82 Hawai'i 329, 349, 922 P.2d 942, 962 (1996) ("To establish [a] ... violation of substantive due process, an aggrieved person must prove that the government's action was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.").[10]

However, in applying the rational basis test, courts in modern times have given great deference to legislative enactments. Statutes are subject to a presumption of constitutionality and the burden of demonstrating that the statute lacks *any* rational basis lies with the challenger. In the present case, Mallan failed to meet his burden. Mallan's own witnesses would have testified that the harmful effects of marijuana are still controversial and that there are studies supporting both sides of the debate. Thus, Mallan could

not sufficiently rebut the presumption of constitutionality and could not satisfy his burden of proving the statute lacks any rational basis.[11]

The dissent, however, takes a much different approach. Instead of according HRS § 712–1249 the degree of deference associated with the rational basis test, the dissent scrutinizes the statute in a manner reminiscent of courts in the early part of this century. Rather than presuming that the statute is rationally related to the public health, safety, or welfare, and rather than placing the burden of proof on Mallan, the dissent applies a rigorous "harm to others" test. Dissent, at 509, 950 P.2d at 247.

The dissent's approach owes more to the approach taken in cases such as *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), than to the approach taken by modern courts. In *Lochner,* the United States Supreme Court invalidated a criminal statute regulating the work hours of bakeries. The Court held, based on the Due Process Clause of the Fourteenth Amendment, that the statute infringed upon liberty to

---

**10.** We note that this interpretation of the police power is not inconsistent with our prior case law. This court has often relied upon the federal standard described in ·*Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962):

> To justify the State in interposing its authority in behalf of the public, it must appear, first, that the interests of the public require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.

*Id.* at 594–95, 82 S.Ct. at 990. *See State v. Cotton,* 55 Haw. 148, 154–55, 516 P.2d 715, 719 (1973); *State v. Lee,* 51 Haw. 516, 517, 465 P.2d 573, 575 (1970). The *Goldblatt* standard is essentially the same as the rational basis test. Both require that the statute in question be supported by a public interest (*i.e.,* the public health, safety, or welfare) and both require only that a reasonable or rational relationship exist between the public interest and the statute's means of advancing that interest.

Furthermore, in *Goldblatt,* the Court expressly recognized that legislative enactments should be accorded a degree of deference. In describing the federal standard, the Court stated: "Even this rule is not applied with strict precision, for this Court has often said that 'debatable questions as to reasonableness are not for the courts but for the legislature....'" *Goldblatt,* 369 U.S. at 595, 82 S.Ct. at 990 (quoting *Sproles v. Bin-*

*ford,* 286 U.S. 374, 388, 52 S.Ct. 581, 585, 76 L.Ed. 1167 (1932)).

**11.** It should also be noted that our cases have held that the presumption of constitutionality applies to the police power. While it is true that certain statements in *Lee,* 51 Haw. at 521, 465 P.2d at 577, might be interpreted to the contrary, the cases following *Lee* clarified any possible ambiguity and held that the presumption of constitutionality applies to police power challenges. *See Renfro,* 56 Haw. at 503, 542 P.2d at 368; *Baker,* 56 Haw. at 278, 535 P.2d at 1398. Furthermore, in *Goldblatt,* the case upon which *Lee* was based, the United States Supreme Court stated unequivocally:

> Our past cases leave no doubt that appellants [who challenged the ordinance in question as an invalid exercise of the police power] had the burden on "reasonableness." *E.g., Bibb v. Navajo Freight Lines,* 359 U.S. 520, 529, 79 S.Ct. 962, 967, 3 L.Ed.2d 1003 (1959) (exercise of police power is presumed to be constitutionally valid); *Salsburg v. Maryland,* 346 U.S. 545, 553, 74 S.Ct. 280, 284, 98 L.Ed. 281 (1954) (the presumption of reasonableness is with the State); *United States v. Carolene Products Co.,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938) (exercise of police power will be upheld if any state of facts either known or which could be reasonably assumed affords support for it).

*Goldblatt,* 369 U.S. at 596, 82 S.Ct. at 991.

contract and was an improper exercise of the police power. *Id.* at 53, 58, 25 S.Ct. at 541, 543. The Court held:

> We think the limit of the police power has been reached and passed in this case. There is, in our judgment, no reasonable foundation for holding this to be necessary or appropriate as a health law to safeguard the public health or the health of the individuals who are following the trade of a baker.
>
> . . . .
>
> We think there can be no fair doubt that the trade of a baker, in and of itself, is not an unhealthy one to that degree which would authorize the legislature to interfere with the right to labor, and with the right of free contract on the part of the individual, either as employer or employ[ee].
>
> . . . .
>
> . . . We do not believe in the soundness of the views which uphold this law. On the contrary, we think that such a law as this, although passed on the assumed exercise of the police power, and as relating to the public health, or the health of the employ[ee]s named, is not within that power, and is invalid.

*Id.* at 58–61, 25 S.Ct. at 543–45. The close scrutiny of legislation that occurred in the *Lochner* era was eventually replaced by rational basis review, which applies to social and economic regulation unless a fundamental right is infringed. *See Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937). The Court discussed its shift away from the *Lochner* approach as follows:

> There was a time when the Due Process Clause was used by this Court to strike down laws which were thought unreasonable, that is, unwise or incompatible with some particular economic or social philosophy. In this manner the Due Process Clause was used, for example, to nullify laws prescribing maximum hours for work in bakeries, *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), outlawing "yellow dog" contracts, *Coppage v. Kansas,* 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed.

441 (1915), setting minimum wages for women, *Adkins v. Children's Hospital,* 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923), and fixing the weight of loaves of bread, *Jay Burns Baking Co. v. Bryan,* 264 U.S. 504, 44 S.Ct. 412, 68 L.Ed. 813 (1924). This intrusion by the judiciary was strongly objected to at the time, particularly by Mr. Justice Holmes and Mr. Justice Brandeis. Dissenting from the Court's invalidating a state statute which regulated the resale price of theatre and other tickets, Mr. Justice Holmes said,

> "I think the proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain."

And in an earlier case he had emphasized that, "the criterion of constitutionality is not whether we believe the law to be for the public good."

> The doctrine that prevailed in *Lochner, Coppage, Adkins, Burns,* and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that court do not substitute their social and economic beliefs for the judgment of the legislative bodies, who are elected to pass laws.

*Ferguson v. Skrupa,* 372 U.S. 726, 729–30, 83 S.Ct. 1028, 1030–31, 10 L.Ed.2d 93 (1963). In the present case, we applied the rational basis test to HRS § 712–1249. The dissent, however, would apparently discard the strict scrutiny/rational basis dichotomy of modern due process analysis in favor of the *Lochner* approach.

Most telling is the dissent's reliance on *Territory v. Kraft,* 33 Haw. 397 (1935). In *Kraft,* this court invalidated, based on its interpretation of the police power, a criminal statute regulating photographers. *See id.* at

400–01. The court relied on other cases striking down statutes regulating horseshoe businesses, accountants, employment agencies, and insurance contracts. *Id.* at 401–04. *Kraft*, a case decided in the 1930's, was not only based on *Lochner* era precedents, but also applied the same type of close scrutiny of legislation characteristic of the *Lochner* approach. The dissent in the present case, in relying on *Kraft*, appears to advocate a return to this approach.

■ It is worth remembering that we live under a carefully constructed constitutional system, and each branch of that system has its proper role. It is not within our role to usurp the responsibilities of the legislature. The lesson of the *Lochner* era was that courts must resist the temptation to encroach upon the domain of democratically elected legislatures. Unless fundamental rights are infringed, due process requires only that legislation survive rational basis review. Principles of due process and/or the police power should not be used as vehicles for importing a particular social philosophy into the Hawai'i Constitution. *See Lochner*, 198 U.S. at 65–74, 25 S.Ct. at 547–51 (Harlan, J., dissenting), 74–76, 25 S.Ct. at 546–47 (Holmes, J., dissenting).

For the foregoing reasons, we cannot agree with the dissenting opinion. The dissent's expansive reasoning abandons the careful and incremental development intend-

ed by the framers and leads to dangerous and unprecedented results. The right to privacy is not absolute, and there must be *reasonable* limits placed on activities that test constitutional boundaries. Additionally, the dissent's general methodology presents a significant danger. The dissent appears to advocate reviving a discredited approach that essentially amounted to judicial legislation. Such an approach is inconsistent with the proper role of the courts in our constitutional system. Therefore, we respectfully reject the dissent's reasoning.

## IV. CONCLUSION

Accordingly, we conclude that the right to privacy in article I, section 6 of the Hawai'i Constitution does not encompass a right to possess and use marijuana for recreational purposes.[12] Therefore, we affirm the ICA's decision and affirm Mallan's conviction of promoting a detrimental drug in the third degree.

LEVINSON, Justice, dissenting.

I dissent.

The core question presented by this appeal—which appears to escape the plurality and concurring opinions entirely—is whether, as a matter of constitutional law, the police power of the state extends to criminalizing mere possession of marijuana for personal use,[1] as proscribed by Hawai'i Revised Stat-

12. We note that our holding is limited to the possession and use of marijuana *for recreational purposes.* Mallan testified that he smoked marijuana on the night in question "in commemoration of [his] listening to Keith Jarrett," to "pursu[e] [his] sense of happiness," and to "enhance [his] appreciation of the music." Clearly, Mallan smoked marijuana for recreational purposes. Inasmuch as other possible purposes are not before us, we express no opinion, at this time, as to whether the right to privacy protects the possession and use of marijuana for other purposes.

1. The plurality mischaracterizes the "central issue before us" as being "whether the express right to privacy located in article I, section 6 of the Hawai'i Constitution encompasses a right to possess and use marijuana for recreational purposes." *See* plurality opinion at 440–441, 950 P.2d at 178–179 (footnotes omitted); *see also* concurring opinion at 510, 950 P.2d at 248. Having chosen to operate from the wrong premise, the plurality and concurring opinions finesse

the need to address the constitutional limits of the state's sovereign police power—a matter that Mallan placed directly at issue from the very beginning of his prosecution, *see infra* note 3, and that is extensively discussed *infra* in section I. As this opinion attempts to demonstrate, it is simply impossible to resolve the present appeal without facing up to the unavoidable interrelationship between the legitimate exercise of the state's police power and the parameters of article I, section 6 of the of the Hawai'i Constitution (1978). *See infra* section II. In this connection, and notwithstanding that article I, section 6 "was not intended to hinder law enforcement or protect criminals," *see* plurality opinion at 449, 950 P.2d at 187 (emphasis deleted), I would think it innocuous in the extreme to observe that this court is in the business of calling attention to constitutional constraints on the manufacture and enforcement of the criminal law.

It is also because the plurality and concurring opinions avoid the unavoidable that they fundamentally misconstrue the reasoning of this opin-

utes (HRS) § 712–1249 (1993).[2] Over twenty-five years ago, in *State v. Kantner*, 53 Haw. 327, 493 P.2d 306, *cert. denied*, 409 U.S. 948, 93 S.Ct. 287, 34 L.Ed.2d 218 (1972), three justices of this court—a majority—answered the same question, as it pertained to the predecessor statute, with an emphatic and unequivocal "No." For purposes of the question before us, the only constitutionally significant event to occur since *Kantner* has been the promulgation of article I, section 6 of the Hawai'i Constitution (1978), which has given an express and more expansive local home to the proposition—theretofore residing, for the most part, within the "penumbra" emanating from the federal Bill of Rights—that "[t]he right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest."

Because, in my view, article I, section 6 simply reinforces, to the point of definitively validating, the conclusion of the "*Kantner* trio," I would reverse the opinion of the Intermediate Court of Appeals (ICA),[3] vacate

Mallan's judgment of conviction, and remand to the district court for the entry of an order granting Mallan's motion to dismiss.

## I. THE METES AND BOUNDS OF THE STATE'S POLICE POWER

### A. *Underlying Principles*

"The term 'police power' connotes the time-tested conceptual limit of public encroachment upon private interests." *State v. Lee*, 51 Haw. 516, 517, 465 P.2d 573, 575 (1970) (quoting *Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962)). "It is often said that the police power is one of the least limitable of governmental powers. It is inherent in the sovereign, and all rights are possessed subject to it. Of course, the police power of the State is not absolute, but is subject to constitutional limitations." *W.H. Greenwell, Ltd. v. Department of Land and Natural Resources*, 50 Haw. 207, 209, 436 P.2d 527, 528–29 (1968) (citations omitted).

Prior to trial, [Mallan] filed a motion to dismiss (Motion) the charges on the grounds[, *inter alia*,] that (1) the prohibition against marijuana is an unjustifiable exercise of the State's police power; [and] (2) the right to smoke marijuana is protected by the Privacy Clause [*i.e.*, article I, section 6 of the Hawai'i Constitution]....

. . . .

... [T]he Motion was denied....

. . . .

We are aware that [*State v.*] *Baker* [, 56 Haw. 271, 535 P.2d 1394 (1975),] and [*State v.*] *Renfro* [, 56 Haw. 501, 542 P.2d 366 (1975),] were decided before the Privacy Clause was adopted and the decision in both cases was based at least in part on the court's conclusion that the privacy right under the 1968 constitution had not been elevated to the level of a first amendment right. *Renfro*, 56 Haw. at 503, 542 P.2d at 369. We are also aware that the privacy right under the Privacy Clause is equivalent to the first amendment right of free speech. Stand. Comm. Rep. No. 69, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978 at 675 (1980). Nevertheless, as the inferior court[,] we must follow the decision in [*State v.*] *Bachman* [, 61 Haw. 71, 595 P.2d 287 (1979),] that the possession of marijuana for personal use is not a protected activity under the Privacy Clause. Accordingly, we hold that HRS § 712–1249 is not unconstitutional.

*State v. Mallan*, No. 15608, mem. op. at 2, 5–6, 9 Haw.App. 655, 854 P.2d 815 (Haw.App. May 10, 1993) [hereinafter, "ICA's decision"].

---

ion, which does *not*, as the plurality opinion suggests, "decriminalize[ ] the use and possession of virtually all contraband drugs used within the home or wherever a person believes he is 'in privacy.'" *See* plurality opinion at 451, 950 P.2d at 189; *see also* concurring opinion at 510, 950 P.2d at 248. Rather, one could fairly infer from this opinion that the criminalization of the use and possession, in and of themselves, of any given contraband drug (in the home or elsewhere), if challenged on police power/privacy grounds, must pass constitutional muster under (1) the tests prescribed by *Territory v. Kraft*, 33 Haw. 397 (1935), *see infra* section I.A, *State v. Lee*, 51 Haw. 516, 465 P.2d 573 (1970), *see infra* section I.B, *State v. Cotton*, 55 Haw. 138, 516 P.2d 709 (1973), *see id.*, and a majority of the court in *State v. Kantner*, 53 Haw. 327, 493 P.2d 306, *cert. denied*, 409 U.S. 948, 93 S.Ct. 287, 34 L.Ed.2d 218 (1972), *see infra* section I.C, *and* (2) article I, section 6. *See infra* section II. The outcome of any particular challenge is by no means a foregone conclusion.

2. HRS § 712–1249 provides in relevant part:
   **Promoting a detrimental drug in the third degree.** (1) A person commits the offense of promoting a detrimental drug in the third degree if the person knowingly possesses any marijuana ... in any amount.
   (2) Promoting a detrimental drug in the third degree is a petty misdemeanor.

3. It would appear that the ICA's opinion virtually invites reversal, as indicated by its concluding paragraph:

Perhaps this court's earliest attempt to delineate the boundaries of the sovereign police power appears in *Territory v. Kraft*, 33 Haw. 397 (1935). The defendant in *Kraft* had deigned to sell, for thirty-five cents a copy, photographs that he had taken of a group including Franklin D. Roosevelt, President of the United States, and Joseph B. Poindexter, Governor of the Territory of Hawaii. The defendant was subsequently charged and convicted under a criminal statute—Act 103—that prohibited a person from "practicing or holding [himself] out as competent to practice photography for profit" without having "passed an examination and received an official certificate." *Id.* at 408.

This court reversed the defendant's conviction and struck down the statute as "an unconstitutional encroachment upon the liberty of the citizen to choose and pursue an innocent occupation." *Id.* at 408. In doing so, the *Kraft* court described the contours of the police power in the following fashion:

> The primary question ... presented by the appeal is whether by the passage of Act 103 the legislature exceeded the powers conferred upon it. More specifically the question is, Was it within the constitutional power of the legislature to exclude from the practice of photography for profit all persons who had not complied with the provisions of the Act? The answer to this inquiry depends on the nature of photography—whether as an occupation it is innocent and innocuous or whether it is infected with some quality that might render it dangerous to the morals, the health, the comfort[,] or the welfare of those who constitute the public. If the latter is true[,] it is within the police power of the legislature to place upon it the regulations and restrictions contained in the Act. If[,] on the other hand[,] the practice of photography is *harmless and without detriment to the public welfare* [,] it was beyond the power of the legislature to restrict it to those having a certificate of proficiency.
>
> ... The police power is limited to enactments which have reference to the public health or comfort, or to the safety or welfare of society....
>
> ....

It is unquestionably true that *the police power* of the State has an ever-widening horizon. It is nevertheless not boundless[,] and its exercise is still under the control of certain classic principles of constitutional law. It *cannot infringe upon the guaranteed right of the citizen to life, liberty[,] or property and the pursuit of happiness unless[,] in the exercise of this right[,] the public health, safety[,] or welfare is imperiled.* ...

... Happily for all, the fundamental guaranties of the Constitution cannot be freely submerged if and whenever some ostensible justification is advanced and the police power invoked.... The liberty mentioned in [the fourteenth amendment to the United States Constitution] means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; [and] to pursue any livelihood or avocation.... *[T]he police power of the State is not unlimited, and is subject to judicial review, and[,] when exerted in an arbitrary or oppressive manner[,] such laws may be annulled as violative of rights protected by the Constitution.* ... The mere fact that a court may differ with the legislature in its views of public policy, or that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference, unless the act in question is unmistakably and palpably in excess of legislative power....

....

So long as the police power is confined to its legitimate purpose and is not through some fallacy of logic given a specious recognition[,] it is of inestimable value; otherwise[,] there is danger of its becoming an evil. There is as great peril to the public in its injudicious extension as in its injudicious restriction. In other words, as a servant of the people it is invaluable[,] but as their master it might become intolerable.

*Id.* at 400–06 (citations and internal quotation marks omitted) (emphases added). *See also State v. Shigematsu,* 52 Haw. 604, 607, 483 P.2d 997, 999 (1971) (citing *Kraft* with approval for the proposition that "in the exercise of its police power the State may curtail or restrict acts of individuals *unless the curtailments or restrictions unreasonably infringe upon the fundamental personal rights of individuals*" (emphasis added)); *cf. Lee,* 51 Haw. at 517, 465 P.2d at 575 (" 'To justify the state in [thus] interposing its authority in behalf of the public, it must appear, first, that the interests of the public [generally, as distinguished from those of a particular class] require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals.' " (Quoting *Goldblatt,* 369 U.S. at 594, 82 S.Ct. at 990 (quoting *Lawton v. Steele,* 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894)).)) (Brackets in original.).

Thus, the *Kraft* analysis (which is as authoritative today as it was over sixty-two years ago) instructs that the prerogative of the state to *criminalize* conduct through the exercise of the police power, while having an "ever-widening horizon," is nevertheless constrained, by its very nature and without more, by "certain classic principles of constitutional law," including the following: (1) it may not proscribe conduct that is merely "innocent," "innocuous," or "harmless"; (2) its reach is limited to the proscription of conduct that imperils "the public health, safety[,] or welfare"; and (3) it may not be "exerted in an arbitrary . . . manner[.]"

Implicit in the *Kraft* analysis is an acceptance of the centrality of the prevention of "harm to others" as a prerequisite objective of the state's invocation of the police power to criminalize conduct. In this respect, *Kraft* echoes the core thesis of the political philosopher John Stuart Mill's seminal tract:

> . . . [T]he only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent *harm to others.* His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because, in the opinion of others, to do so would be wise, or even right. These are good reasons for remonstrating with him, or reasoning with him, or persuading him, or entreating him, but not for compelling him, or visiting him with any evil in case he do otherwise. To justify that, the conduct from which it is desired to deter him, must be calculated to *produce evil to some one else.* The only part of the conduct of any one, for which he is amenable to society, is that which concerns *others.* In the part which merely concerns himself, his independence is, of right, absolute. Over himself, over his own body and mind, the individual is sovereign.
>
> . . . .
>
> . . . The acts of an individual may be hurtful to others, or wanting in due consideration for their welfare, without going the length of violating any of their constituted *rights.* The offender may then be justly punished by opinion, though not by law. As soon as any part of a person's conduct *affects prejudicially the interests of others,* society has jurisdiction over it, and the question whether the general welfare will or will not be promoted by interfering with it, becomes open to discussion. But there is no room for entertaining any such question when a person's conduct affects the interests of no persons besides himself, or needs not affect them unless they like (all the persons concerned being of full age, and the ordinary amount of understanding.) . . .
>
> . . . .
>
> . . . When, by conduct . . . , a person is led to violate a *distinct and assignable obligation to any other person or persons,* the case is taken out of the self-regarding class, and becomes amenable to moral disapprobation in the proper sense of the term. . . . In like manner, when a person disables himself, by conduct purely self-regarding, from the performance of some *definite duty incumbent on him to the public,* he is guilty of a social offence. No person ought to be punished simply for being drunk; but a soldier or a policeman

should be punished for being drunk on duty.[4] *Whenever, in short, there is definite damage, or a definite risk of damage, either to an[other] individual or to the public, the case is taken out of the province of liberty, and placed in that of . . . law.*[5]

But with regard to the merely contingent, or, as it may be called, constructive injury which a person causes to society, by conduct which neither violates any specific duty to the public[ ] nor occasions perceptible hurt to any assignable individual except himself[,] the inconvenience is one which society can afford to bear, for the sake of the greater good of human freedom. . . .

John Stuart Mill, *On Liberty* 22, 135, 145–47 (The Legal Classics Library 1992) (1859) (emphases added).

In his exhaustive and definitive four-volume treatise, *The Moral Limits of the Criminal Law,*[6] Professor Feinberg refines the Millian "harm to others" principle (embedded in the *Kraft* analysis) as follows:

4. Hence, the analogous distinction between the criminalization of mere possession of marijuana for personal consumption, *see* HRS § 712–1249, *supra* note 2, on the one hand, and driving under the influence of drugs in violation of HRS § 291–7(a) (1993), on the other. HRS § 291–7 provides in relevant part:

   **Driving under the influence of drugs.** (a) A person commits the offense of driving under the influence of drugs if the person operates or assumes actual physical control of the operation of any vehicle while under the influence of any drug which impairs such person's ability to operate the vehicle in a careful and prudent manner. The term "drug" as used in this section shall mean any controlled substance as defined and enumerated on schedules I through IV of chapter 329.
   HRS § 329–14 (1993 & Supp.1996) provides in relevant part:
   **Schedule I.**(a) The controlled substances listed in this section are included in Schedule I.
   . . . .
   (d) Any material, compound, mixture, or preparation which contains any quantity of the following hallucinogenic substances . . . :
   . . . .
   (25) Tetrahydrocannabinols[.]
   "Tetrahydrocannabinol" is "[the] chemical . . . that is the principal active component in cannabis, or marijuana." *Taber's Cyclopedic Medical Dictionary* 1843 (16th ed.1989). HRS § 329–1 (1993) defines "[m]arijuana" in relevant part to mean "all parts of the plant (genus) Cannabis whether growing or not; the seeds thereof; the

. . . [I]t is legitimate for the state to prohibit conduct that causes serious private harm, or the unreasonable risk of such harm, or harm to important public institutions or practices. In short, state interference with a citizen's behavior tends to be morally justified when it is reasonably necessary (that is, when there are reasonable grounds for taking it to be necessary as well as effective) to prevent harm or the unreasonable risk of harm to parties other than the person interfered with. . . . This principle . . . can be called "the harm to others principle" or "the harm principle" for short. . . .

. . . Clearly not every kind of act that causes harm to others can rightly be prohibited, but only those that cause avoidable and substantial harm. Since the effect of legal coercion may itself be harmful to the interests of the actor it restrains, one would think that only the prevention of still more serious harms to others could justify its infliction. . . . So the harm prin-

resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or resin."

5. We can . . . understand[ ] "liberty" simply as the absence of legal coercion. When the state creates a legal statute prohibiting its citizens from doing X on pain of punishment, then the citizens are no longer "at liberty" to do X. . . . We can think of every possible act as so related to a penal code that it must either be (1) required (a duty), (2) merely permitted (one we are "at liberty" to do or forbear doing), or (3) prohibited (a crime). Where coercive law stops, there liberty begins. The citizen's zone of liberty, therefore, corresponds to the second class, since (1) and (3) are alike in directing coercive threats at him.

Joel Feinberg, *The Moral Limits of the Criminal Law: Harm to Others* 7 (Oxford Univ. Press 1984).

6. *The Moral Limits of the Criminal Law* may constitute the most comprehensive and rigorous philosophical dissection of its subject matter to date. It consists of four volumes: (1) Joel Feinberg, *Harm to Others* (Oxford Univ. Press 1984); (2) Joel Feinberg, *Offense to Others* (Oxford Univ. Press 1985); (3) Joel Feinberg, *Harm to Self* (Oxford Univ. Press 1986); and (4) Joel Feinberg, *Harmless Wrongdoing* (Oxford Univ. Press 1988). I will hereinafter refer to the individual volumes of Professor Feinberg's treatise by their particular titles.

ciple must be made sufficiently precise to permit the formulation of a criterion of "seriousness," and also, if possible, some way of grading types of harms in terms of their seriousness. Without these further specifications, the harm principle may be taken to invite state interference without limit, for virtually every kind of human conduct can affect the interests of others for better and worse to *some* degree, and thus would properly be the state's business.

. . . .

... Since an invasion of the *interest in liberty* is a harm, it follows that all legal prohibitions, insofar as they narrow options, cause some harm which must be taken into account in the calculations of the legislator. The legislative invasion of citizens' interests in liberty can be justified by the harm principle only if necessary to prevent the greater harm still that would be caused to victims of the proscribed conduct. But the interest in liberty plays a relevant role in these calculations only to the extent that it would actually be invaded by the contemplated legislative action. . . .

Joel Feinberg, *Harm to Others* 11–12, 217 (Oxford Univ. Press 1984) (emphases in original).

The bottom line of my discussion of the *Kraft* analysis is the inescapable conclusion that, wholly separate and apart from any consideration of the constitutional right to privacy, the "harm to others" principle is a long-established circumscription that limits the exercise of the state's police power in

Hawai'i for the purpose of criminalizing conduct.

B. *State v. Lee, "Direct" Harm To Others As The "Default Mode" Regarding The Limits Of The Police Power, And The Putative Constitutional "Right To Be Let Alone"*

1. *The "Lee majority"*

Roughly thirty-five years after *Kraft*, in *State v. Lee, supra*,[7] a split but benchmark decision, this court not only significantly amplified its existing "police power" jurisprudence, but also laid the groundwork—without ever using the term—for the future emergence of an expressly recognized constitutional right to privacy. Lee had been convicted of violating HRS § 286–81(1)(A) (1968), which, *inter alia,* mandated that the operator of a motorcycle wear a safety helmet.[8] Lee then appealed from the judgment sustaining the constitutionality of the statute. On appeal, Lee argued

that the first precondition ... to the exercise of the police power by the legislature ..., namely, [that] "it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference[,]" ha[d] not been met. He contend[ed] that other members of the public at large [we]re not affected in a deleterious manner, if indeed at all, by the conduct regulated by this statute; that the only realistic effect of the statute [wa]s to compel motorcyclists to take precautionary measures so that they [would] not harm themselves; [and] that harm to self or harm to a particular class

7. In 1970, when *Lee* was decided, this court was comprised of Chief Justice Richardson and Justices Marumoto, Abe, Levinson, and Kobayashi. Justice Kobayashi was disqualified from hearing the appeal, and Circuit Court Judge Masato Doi was assigned to replace him. This fact is significant in light of the territory staked out by Justice Kobayashi within the range of positions taken later by the justices in *Cotton* and *Kantner, supra,* both of which are discussed *infra* in this opinion.

8. HRS ch. 286, part IV (1968), entitled "safety equipment," consisted of HRS §§ 286–81 and 286–82. HRS § 286–81 provided in relevant part:

**Motorcycle, motor scooter, etc.; protective devices.** No person shall:

(1) Operate a motorcycle ... on any highway in the State unless he ... wears (A) *a safety helmet securely fastened with a chin strap;* (B) safety glasses, goggles, or a face shield, in the case of a motorcycle ... that is not equipped with windscreens or windshields; and (C) any other protective devices required by rules and regulations adopted by the state highway safety coordinator.

(Emphasis added.) HRS § 286–82, entitled "[p]enalty," provided that "[w]hoever violates this part shall be fined not more than $1,000 or imprisoned not more than one year, or both." For the relevant subsequent legislative history of HRS § 286–81, *see infra* note 9.

is not within the public interest and is outside the scope of the police power to legislate in the public interest.

*Lee,* 51 Haw. at 517, 465 P.2d at 575. By contrast, the prosecution maintained

that decreasing fatalities and injuries from motorcycle accidents does impinge *directly* on the public interest in three respects: (1) economic impact: (a) lessens [the] burden on public agencies such as hospitals, medical[,] and ambulance facilities; (b) reduces addition to the public assistance roles [sic] of disabled motorcyclists and their dependents or survivors; (2) "flying missile theory": loose stones on the highway or fallen objects may strike the motorcyclist on the head, thus causing him to lose control and become a menace to other vehicles on the highway; (3) the increase in *fatalities and serious injuries* is so alarming, so widespread[,] and of such grave dimension that it threatens the very fabric of society.

*Id.* at 517–18, 465 P.2d at 575 (emphases added).

The *Lee* majority took notice of the legislature's expressly stated purpose in first enacting HRS § 286–81:

Deaths of persons and injuries to them and damage to property with the other losses suffered on account of highway traffic accidents are of grave concern to the State and its citizens as well as to the federal government. The legislature finds and declares that it is in the public interest that the State initiate, coordinate[,] and accelerate every available means to decrease the fatalities, injuries, damages[,] and losses resulting from highway traffic accidents.

*Id.* at 518, 465 P.2d at 575 (quoting 1967 Haw. Sess. L. Act 214, § 1 at 257). Armed with this legislative history, the *Lee* majority declared that,

where the legislature has clearly stated its purpose, we are reluctant to attribute other purposes, unless the facts underlying such other purposes are clearly and convincingly shown. In this case the legislature has not alluded to either "economic impact" or the "flying missile theory", there was no evidence introduced by the [prosecution] to substantiate either argu-

ment, and the claimed facts are not susceptible to judicial notice.

*Id.* at 518–19, 465 P.2d at 575. Consequently, the *Lee* majority regarded itself as being

squarely faced with the issue whether the legislature may constitutionally regulate the conduct of an individual so as to require him to protect himself from physical injury and[/]or death; that is, *whether physical harm to self is a proper subject of public interest and thus subject to the police power of the legislature.*

*Id.* at 519, 465 P.2d at 575–76 (emphasis added). In the *Lee* majority's view, the issue before it went "to the very heart of the nexus between the individual and the state: where does the public interest begin?" *Id.* at 519, 465 P.2d at 576.

Having thus framed the issue, and taking judicial notice of (1) the "National Uniform Standards for State Highway Safety Programs," H.R. Doc. No. 138, 90th Cong., 1st Sess. (1967), which "set up the motorcycle safety helmet as a minimum standard to which state highway safety programs must conform," (2) certain published statistics of the New York Department of Motor Vehicles, and (3) data promulgated by the Michigan State Police, *id.* at 519–20, 465 P.2d at 576, the *Lee* majority engaged in the following analysis:

In our opinion[,] these statistics fairly show that motorcycle accidents are significantly more dangerous than motor vehicle accidents; that there is an enormous increase in motorcycle registrations; [and] that there is a corresponding enormous increase in the number of deaths and injuries due to motorcycle accidents. The question is whether the accelerating rate of deaths and injuries due to motorcycle accidents[,] coupled with the increase in motorcycle registrations[,] has reached such proportions and the class of motorcycle users has become so large and widespread that *the continued viability of our society requires that they protect themselves from physical injury or death*—in short, *is the public interest generally affected?*

We hold that it is.

We wish to make it clear that this holding is limited to this case. *We start from the proposition that where an individual's conduct, or a class of individuals' conduct, does not directly harm others[,] the public interest is not affected and is not properly the subject of the police power of the legislature.* However, where the legislature has determined that the conduct of a particular class of people recklessly affects their physical well-being and that the consequent physical injury and death is so widespread as to be of grave concern to the public[,] and where the incidence and severity of the physical harm has been statistically demonstrated to the satisfaction of the court, then the conduct of that class of people affects the public interest and is properly within the scope of the police power. *Of course, where the conduct sought to be regulated is in furtherance of a specific constitutional right, a different situation arises.*

. . . .

We hold that HRS § 286–81(1)(A) and the regulations promulgated pursuant to it are within the proper exercise of police power.

*Id.* at 521–22, 465 P.2d at 576–77 (emphases added).[9]

9. In *Cotton, see supra* note 7, this court reaffirmed the holding of *Lee* by a three-to-two majority. In light of the position that he had taken earlier in *Kantner*, discussed extensively *infra* in section I.C.1, it is particularly noteworthy that Justice Levinson authored the majority opinion. It is likewise noteworthy that the *Cotton* majority makes no mention of *Kantner* whatsoever. For present purposes, the following language of the majority opinion in *Cotton* is relevant:

We accept now, as we did in *State v. Lee, supra,* the fundamental tenet that the relationship between the individual and the state leaves no room for regulations which have as their purpose and effect *solely* the protection of the individual from his own folly. But to say that a motorcycle helmet law has as its primary objective the protection of the wearer from head injuries is not to say that *ipso facto* it is unconstitutional. There may be significant *secondary* harms to society as a whole which it is the purpose of the statute to remedy and which, if realistic, bottom the statute in policies which are constitutionally acceptable.

A wide range of possible justifications for mandatory helmet laws have been articulated by courts and commentators. . . . While the "flying missile" and "modelling" theories are arguable justifications for mandatory helmet laws, they are inherently implausible and hence highly disingenuous. We prefer to rest our analysis on the "public ward" and "broad social impact" theories, the elements of which present the only realistic justifications for the law in question.

Both theories maintain that though helmet laws are directed on a primary level toward protecting the individual from head injuries, on a secondary level they protect much broader social interests. Viewed without limit, of course, "secondary harm" arguments could justify an impermissibly wide range of governmental interference with private liberties. *See, e.g., State v. Lee, supra* at 524, 527, 465 P.2d at 578, 579–80 (Abe, J., dissenting). . . .

. . . .

With the great danger of primary harm to helmetless cyclists as well as the rationality of helmet wearing as a safeguard . . . statistically supported, the magnitude of secondary harms of the nature indicated above is sufficiently great to justify the law at issue in this case. . . . [W]e refer to the statement in *Lee* that "this holding is limited to this case." 51 Haw. at 521, 465 P.2d at 577. . . .

*Cotton,* 55 Haw. at 139–41, 516 P.2d at 710–11 (emphases in original) (footnote omitted).

Joined by Justice Kobayashi in dissent, Justice Abe adhered to the position that he had taken in *Lee,* reiterating that

I cannot agree that the protection of an individual from himself is within the legitimate police power; otherwise, there would be no restriction or limitation to this power, and the State could regulate an individual's life, his way of living, and even his way of thinking. *The statute is not concerned with the preservation of public safety, health, order, morals, or welfare; and though the headgear requirement may be beneficent, nevertheless, it is unconstitutional because it attempts to infringe upon and stifle the fundamental personal right of liberty, under which each individual may act as he sees fit to preserve his own safety if he does not harm others in doing so.*

The fact that the general public may consider it foolhardy to ride a motorcycle without a safety helmet is alone insufficient basis or justification for defining the non-use of a helmet a criminal offense. I believe that our State Constitution affords one the privilege of making a fool of himself if he so desires, so long as his action does not bring significant harm to the general public. *Id.* at 147–48, 516 P.2d at 714–15 (Abe, J., dissenting) (emphasis added).

In the end, the legislature apparently agreed with Justice Abe. In 1977, HRS 286–81(1) was amended, *inter alia,* to delete the requirement that an adult operator of a motorcycle wear a safety helmet. 1977 Haw. Sess. L. Act 183, § 1 at 389. Not only does the legislative history indicate "that the fatality rate nationwide ha[d] remained constant with the accident rate, both before and after the introduction of helmet laws," Sen. Stand. Comm. Rep. No. 226, in 1977 Senate Journal, at 953, but also, consistent

How, then, did the analysis of the *Lee* majority augment this court's assessment of the scope of the state's police power to criminalize conduct, as articulated earlier in *Kraft?* First, it is of critical significance that the majority opinion in *Lee* in no way diverged from any of the core tenets of the *Kraft* analysis. *See supra* section I.A.

Second, the *Lee* majority not only pledged continued allegiance to the "harm to others" principle, but also tightened it further. Specifically, in order for the "public interest" (*i.e.*, the public health, safety, and welfare) to be "generally affected," the *Lee* majority highlighted that the conduct of an individual—or a class of individuals—must "*directly* harm others" (emphasis added); if it does not, then "the public interest is not affected and [it] is not properly the subject of the police power of the legislature."

Thus, third, the *Lee* majority clarified that individual conduct, which entailed the foreseeable and likely risk of "physical harm" to the actor and no one else, could generally affect "the public interest" and therefore be "properly within the scope of the police power" only if the following conditions were satisfied: (a) the legislature "determined that the conduct of a particular class of people recklessly affect[ed] their physical well-being"; (b) there was (i) "consequent physical injury and death" (ii) that was "so widespread as to be of grave concern to the public"; and (c) "the incidence and severity of the physical harm has been statistically demonstrated to the satisfaction of the court."

Fourth, however, the *Lee* majority imposed a significant caveat on the foregoing clarification: "where the conduct sought to be regulated is in furtherance of a specific constitutional right, a different situation arises." I suggest that this can only mean that the exercise of the police power in order to criminalize conduct that furthers an enumerated, fundamental constitutional right is

subject to *more* rigorous constitutional scrutiny than that employed by the *Lee* majority.[10]

### 2. *Justice Abe's dissent and the "right to be left alone"*

Dissenting in *Lee*, Justice Abe introduced the construct of "the right to be let alone" into this court's analytical conversation, thereby firing the functional equivalent of "the shot heard 'round the state," the reverberations of which would ultimately transfigure the scope of liberty afforded by the Hawai'i Constitution. Because "the right to be let alone" is itself the cornerstone of a jurisprudential "unified field theory" (to mix the foregoing metaphor), it is useful to set out Justice Abe's position at some length:

> As stated by the majority of the court, the issue of this case is whether the legislature may constitutionally regulate the conduct of a person for his own safety. I disagree with the majority opinion and I would hold the provision ... requiring [Lee], a motorcyclist, to wear a helmet for his own safety unconstitutional.
>
> . . . .
>
> I agree with the majority that the safety helmet requirement is aimed at preventing a further increase in the toll highway accidents have taken of the state's citizens based on the legislative finding that highway travel presents a special hazard for motorcyclists. However, no matter how beneficent or humane the purpose of the statute, it cannot be upheld unless it is a legitimate exercise of its police power for the public order, safety, health, morals[,] or welfare.
>
> I believe *our State Constitution specifically recognizes one's right to be let alone*. Article I, § 2 provides:
>
> > "All persons are free by nature and are equal in their inherent and inalien-

---

with Justice Abe's argument, "that the primary objective of the safety helmet is to prevent injuries, *not to promote safety*. Testimony ... revealed that the safety helmet did little to promote the safe operation of motorcycles." Hse. Stand. Comm. Rep. No. 838, in 1977 House Journal, at 1693 (emphasis added). To this day, the statute

no longer requires the use of a safety helmet. HRS § 286–81(1) (Supp.1996).

10. In this connection, it should be emphasized that, as of 1970, the Bill of Rights of the Hawai'i Constitution did not yet contain an express fundamental right to privacy.

able rights. Among these rights are the enjoyment of life, liberty and the pursuit of happiness, and the acquiring and possession of property. These rights cannot endure unless the people recognize their corresponding obligations and responsibilities."

*There is no question that an individual has a fundamental constitutional right to be let alone—liberty to do as he pleases— but, of course, subject to reasonable restriction under the police power.*

Here, one's right to be let alone on a public highway is being infringed in that a motorcyclist is required to wear a safety helmet on pain of criminal punishment for his failure to do so. *I believe that the statute in question should not be upheld as a reasonable exercise of police power[,] although the purpose is laudable[,] because the act is essentially a personal safety measure.*

. . . .

It appears that the majority, in upholding the constitutionality of the statute, is adopting the concept that an individual's liberty—the right to be let alone—may be abridged or infringed by legislative act which may be deemed for the "best interest" of that individual. *I believe this principle or concept that a state may determine what is in one of its citizen's "best interest" and may compel him to follow that course of action under pain of criminal punishment[ ] unreasonably infringes upon one's fundamental liberty. My opinion is that a state may only legislate where the "general welfare" is affected, that is, where others are harmed or likely to be harmed.*

*I believe the right of liberty—the right to be let alone—gives one the right to determine for himself what is for his "best interest[.]"* . . .

Now, the majority having upheld the statute, it would appear that our legislature[,] along the same reasoning[,] could require drivers and passengers in motor vehicles to wear seat belts and shoulder straps, under pain of criminal punishment for their failure to do so. Also, it could

require individuals who may use public streets and highways at nights to wear certain clothing manufactured from materials having reflectory characteristics for their personal safety.

Then why can't the legislature enact criminal legislation prohibiting the smoking of cigarettes or other tobacco products, or restricting or regulating foods to be consumed, for example, non-fattening food products to prevent obesity?

Are we ready to forfeit our individual liberty to a point where legislative discretion is to be the only bar to the determination as to what one may or may not do under the definition of "best interest"?

I submit that[,] once a step is taken that the protection of an individual from himself is within the legitimate exercise of the police power, there is no limit to this power[,] and a state can entirely regulate one's life and his way of living.

As I have stated, the statute is beneficent and humane, without doubt, and even eminently sensible and wise; nonetheless, I believe it is unconstitutional because it attempts to infringe upon and stifle fundamental personal liberties for one's own safety and is not concerned with the preservation of public order, safety, health, and morals, or for the public welfare.

. . . [T]he fact[, in and of itself,] that the general public considers it foolhardy to ride a motorcycle without a safety helmet . . . should not be used as a criterion for defining the non-use of a helmet a criminal offense.

As stated by Justice Barham in his dissent in *Everhardt v. City of New Orleans*, 253 La. 285, 300, 217 So.2d 400, 405 (1968):

"Although laws have been validly enacted to protect the legally incompetent from their own acts, some of the persons who disregard the most elementary forms of self-preservation are, unfortunately, not legal incompetents, but only fools; and

'. . . a fool must follow his natural bent '(Even as you and I!)' " [11]

11. Justice Barham's observation brings to mind the following homily:

*Lee*, 51 Haw. at 524–28, 465 P.2d at 578–80 (Abe, J., dissenting) (emphases added) (some ellipsis points in original and some added).

I suggest that the "Abe thesis" can be distilled into the following propositions: (1) the "inherent and inalienable right" of "liberty" is given express constitutional recognition, *see* article I, section 2 of the Hawai'i Constitution; (2) liberty, insofar as it empowers an individual "to do as he [or she] pleases," *see supra* note 4, is synonymous with the "right to be let alone"; (3) the right to be let alone "gives one the right to determine for himself [or herself] what is for his [or her] 'best interest'"; (4) the right to be let alone is "subject to reasonable restriction under the police power"; (5) the police power of the state can only be exercised for the preservation of *public* order, safety, health, morals, or welfare, *i.e.*, for the "general welfare," which is affected "where others are harmed or likely to be harmed"; (6) the "concept that a state may determine what is in one of its citizen's 'best interest' and may compel him [or her] to follow that course of action under pain of criminal punishment[ ] unreasonably infringes upon [the citizen's] fundamental liberty" because the state may enact criminal legislation only "where the 'general welfare' is affected"; (7) accordingly, legislative enactments intended to compel purely *personal* safety, health, morals, or welfare, under pain of criminal punishment, constitute unreasonable exercises of the state's police power; and (8) such legislative enactments are therefore unconstitutional.

As the foregoing illustrates, the "Abe thesis" superimposes a limiting gloss on the *Lee* majority's analysis of the scope of the state's police power to criminalize conduct. But, as will shortly become apparent, the "Abe thesis" also profoundly affected this court's first foray into the constitutionality of the state's marijuana laws, as well as the subsequent conceptualization and adoption of an express state constitutional "right to privacy."

### C. State v. Kantner, The First Glimmer Of A State Constitutional Right To Privacy, The State's Police Power, The Post–Kantner Marijuana Cases, "Reality Control," And A Strong Dose Of Nepenthe [12]

#### 1. State v. Kantner, The Abe Thesis Revisited, And The Pre–1978 State Constitutional Right To Privacy

This court's first foray into the constitutionality of the state's marijuana laws occurred in two consolidated appeals, ultimately reported in a landmark package of opinions as *State v. Kantner, supra*, 53 Haw. 327, 493 P.2d 306, *cert. denied*, 409 U.S. 948, 93 S.Ct. 287, 34 L.Ed.2d 218 (1972). The *Kantner* appellants had been convicted of violating HRS § 329–5 (Supp. 1969)—a statute preceding the current statutory scheme entitled "Offenses related to drugs and intoxicating compounds," set forth in HRS ch. 712, part IV, of which HRS § 712–1249 is a component—, which provided in relevant part:

> Additional acts prohibited; penalty. No person shall knowingly … possess … any narcotic drug as defined by section 329–1 except as provided in this chapter. Any person found guilty of … the foregoing act[ ] shall be imprisoned at hard labor

"… Supreme Court Justice Jackson …, at the … age of 62, suffered a severe heart attack while serving on the Supreme Court. As Solicitor General Sobaloff recalled in his memorial tribute, Jackson's 'doctors gave him the choice between years of comparative inactivity or a continuation of his normal activity at the risk of death at any time.' Characteristically, he chose the second alternative, and suffered a fatal heart attack shortly thereafter. No court interfered with his risky decision. A similar decision, though in a lighter vein, is described in a limerick entitled 'The Lament of a Coronary Patient':
> My doctor has made a prognosis
> That intercourse fosters thrombosis
> But I'd rather expire
> Fulfilling desire

Than abstain, and develop neurosis.
Few courts, I suspect, would interfere with that decision…."
Joel Feinberg, *Harm to Self* 376 n.7 (Oxford Univ. Press 1986) (quoting Alan M. Dershowitz, *Psychiatry in the Legal Process: A Knife That Cuts Both Ways*, 4 *Trial* 29 (1968)).

12. "Nepenthe" means "a drug or drink, or the plant yielding it, mentioned by ancient writers as having the power to bring forgetfulness of sorrow or trouble," or, more broadly, "anything inducing a pleasurable sensation of forgetfulness." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 958 (1989).

not more than five years for the first offense and imprisoned at hard labor not more than ten years for any subsequent offense; provided that, *every person who possesses any marijuana, except as otherwise provided by law, shall be punished by imprisonment for not more than one year, or for not less than one year nor more than five years.*

(Emphasis added.) HRS § 329-1, in turn, defined "narcotic drug" to include "[m]arihuana." As indicated in the plurality opinion announcing this court's judgment, "[t]he sole issue presented [was] the constitutionality of the statutory scheme for the control of the possession of marihuana." *Kantner,* 53 Haw. at 328, 493 P.2d at 307.

*Kantner* is remarkable for having generated four separate opinions. Chief Justice Richardson's plurality opinion, in which Justice Marumoto joined, announced the judgment of the court affirming the *Kantner* appellants' convictions. Justice Abe concurred separately in the judgment, thereby creating the majority favoring affirmance. Justices Levinson and Kobayashi each filed a dissenting opinion. Because the *Kantner* quaternary reveals the conceptual perspective of every member of the court regarding the constitutional permissibility of criminalizing the mere possession of marijuana, it serves as a window into this court's collective mind at the time the issue was first raised. For that reason, it is important to examine each perspective in some detail.

The Richardson/Marumoto plurality opinion began its analysis by asserting that the "[a]ppellants concede that the State may properly regulate the possession of marijuana under the police power." *Id.*[13] The *Kantner* appellants' alleged concession thus permitted the Richardson/Marumoto plurality to avoid reaching the very issue that is before us in the present matter. The plurality then characterized the "thrust" of the *Kantner*

appellants' argument as being that "that the State ha[d] so *unreasonably and irrationally exercised* its police power that the present statutory scheme for the prohibition of possession of marihuana violate[d] the constitutional guarantees of equal protection and due process of law," inasmuch as "[u]ncontroverted evidence showed that in some respects marihuana was unlike the opiates and other drugs within the scientific definition of the word 'narcotic'." *Id.* at 328–29, 493 P.2d at 307–08 (emphasis added). The Richardson/Marumoto plurality opinion dispatched the *Kantner* appellants' position with the following orthodox equal protection/due process analysis:

Proceeding from the proposition that marihuana is not a narcotic scientifically defined, appellants contend that the defining of the term narcotic so as to include marihuana and the inclusion of marihuana within the same class as the more harmful narcotic drugs is so unreasonable and arbitrary as to violate the constitutional guarantees of equal protection and due process of law.

The legislature has a broad power to define terms for a particular legislative purpose, and the courts, as a general rule of construction, are bound to follow legislative definitions of terms rather than commonly accepted dictionary, judicial or scientific definitions. We think the requirements of due process place some limitations on the manner in which a legislature may use words. If we believed that the use of the word narcotic to include marihuana were so misleading as to confuse legislators in their law-making activities or to confuse persons of common understanding in their effort to determine whether the possession of marihuana constitutes a crime, it would clearly be our duty to declare the unconstitutionality of the statute.[14] Inasmuch as the word

---

13. The Richardson/Marumoto plurality was apparently claiming that the *Kantner* appellants had assumed, for purposes of their appeals, that the state's police power extended to the criminalization of possession of marijuana for personal consumption. As indicated in Justice Levinson's dissenting opinion, *see infra,* such was not the case.

14. Due process of law requires that a penal statute state with reasonable clarity the act it proscribes and provide fixed standards for adjudging guilt, or the statute is void for vagueness. Statutes must give the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct.

"narcotic" in popular usage includes marihuana, it is no violation of the guarantee of due process of law for the legislature to employ such usage over the more precise usage favored by the scientific community.

We think that appellants' contentions concerning the legislative classification of marihuana are untenable. Appellants contend that the legislature has placed the offenses of possession of marihuana and the possession of narcotics, scientifically defined, within the same legislative classification. We disagree; the legislature has provided for markedly different penalties for possession of marihuana as opposed to narcotics, scientifically defined.... Appellants' main contention concerning classification is the argument that the properties of the drugs alcohol and marihuana are so similar that a provision for a penalty for the possession of marihuana in a case where there is none made for possession of alcohol violates the constitutional guarantee of the equal protection of the laws. The issue then is not whether marihuana is more like alcohol than heroin but whether there are sufficient dissimilarities between alcohol and marihuana to support different legislative treatments. We think alcohol and marihuana are sufficiently dissimilar to justify dissimilar legislative treatment. Alcohol is a drug about which much is

known concerning the long-term effect on the human body; of marihuana, much less is known. On that basis alone, treatment dissimilar to that given alcohol is justified, at least until scientific research conclusively establishes the long-term effects of the drug marihuana. Since it is presumed that statutes are constitutional,[15] and since the party attacking the statute must show with convincing clarity that the statute is unconstitutional, the absence of sound scientific data concerning the long-term effects of marihuana renders appellants' burden insurmountable.

. . . .

With respect to appellants' argument that the use of marihuana involves an issue of "fundamental liberty" and, hence, a different standard of review should be applied to the statute, we do not think that appellants have established that the interest of the individual in possessing and using marihuana is within the class of interests to which the state and federal constitutions accord the highest degree of protection.[16] ... We doubt ... that use of a mind-altering drug, *absent an intimate connection with a "preferred freedom"*, requires the standard of review which appellants suggest. Our reading of *Griswold v. Connecticut*, 381 U.S. 479, 85

State v. Gaylord, 78 Hawai'i 127, 138, 890 P.2d 1167, 1178 (1995) (quoting State v. Tripp, 71 Haw. 479, 482, 795 P.2d 280, 282 (1990)) (internal citations omitted).

15. "Such presumptive constitutionality does not apply for purposes of equal protection analysis in the case of statutes, which on their face classify on the basis of suspect categories such as race or sex. See Baehr v. Lewin, 74 Haw. 530, 571–72, 852 P.2d 44, 63–64, reconsideration granted in part, 74 Haw. 650, 875 P.2d 225 (1993)." State v. Lee, 75 Haw. 80, 91 n. 4, 856 P.2d 1246, 1254 n. 4 (1993).

Gaylord, 78 Hawai'i at 137 n. 18, 890 P.2d at 1177 n. 18 (brackets deleted).

16. "Whenever a denial of equal protection of the laws is alleged, as a rule our initial inquiry has been whether the legislation in question should be subjected to 'strict scrutiny' or to a 'rational basis' test." Nakano v. Matayoshi, 68 Haw. 140, 151, 706 P.2d 814, 821 (1985) (citing Nagle v. Board of Educ., 63 Haw. 389, 392, 629 P.2d 109, 111 (1981)). This court has applied "strict scrutiny" analysis to "'laws classifying on the basis

of suspect categories or impinging upon fundamental rights expressly or impliedly granted by the [c]onstitution,'" in which case the laws are "'presumed to be unconstitutional unless the state shows compelling state interests which justify such classifications,'" Holdman v. Olim, 59 Haw. 346, 349, 581 P.2d 1164, 1167 (1978) (citing Nelson v. Miwa, 56 Haw. 601, 605 n. 4, 546 P.2d 1005, 1008 n. 4 (1976)), and that the laws are "narrowly drawn to avoid unnecessary abridgments of constitutional rights." Nagle, 63 Haw. at 392, 629 P.2d at 111 (citations omitted).

By contrast, "[w]here 'suspect' classifications or fundamental rights are not at issue, this court has traditionally employed the rational basis test." Id. at 393, 629 P.2d at 112. "Under the rational basis test, we inquire as to whether a statute rationally furthers a legitimate state interest." Estate of Coates v. Pacific Engineering, 71 Haw. 358, 364, 791 P.2d 1257, 1260 (1990). "Our inquiry seeks only to determine whether any reasonable justification can be found for the legislative enactment." Id. Baehr, 74 Haw. at 571–72, 852 P.2d at 63–64 (brackets in original) (footnote omitted).

S.Ct. 1678, 14 L.Ed.2d 510 (1965)[,] leads us to conclude ... that *there is no fundamental guarantee protecting the use and possession of euphoric drugs.* ... As we read *Griswold, supra,* the test of whether an activity may be considered to rest under the "penumbra" of a preferred freedom is that the activity in question must be essential, not merely desirable, for the exercise of the specifically enumerated rights.

· Affirmed.

*Id.* at 329–34, 493 P.2d at 308–10 (citations and footnotes omitted) (emphases added).

Accordingly, by casting the *Kantner* appellants' argument as a due process/equal protection attack on the reasonableness and rationality of the state's disparate treatment of alcohol and marijuana under its police power to criminalize conduct, the Richardson/Marumoto analysis was able to take the following form: (1) it was unnecessary to consider whether the state's police power extended to the criminalization of the mere possession of marijuana for personal consumption because the *Kantner* appellants had allegedly conceded *arguendo* that the state possessed such power; (2) HRS § 329-5 was not so "misleading" as to "confuse" the average person regarding its scope and therefore did not deprive the *Kantner* appellants of due process of law; and (3) with respect to the *Kantner* appellants' equal protection claim, (a) the use of marijuana did not implicate a "fundamental liberty," which would necessitate subjecting HRS § 329-5 to strict scrutiny review, because the "use of a mind-altering drug," not being "essential"—as opposed to merely "desirable"—to the exercise of a "specifically enumerated" constitutional right, did not "rest under the 'penumbra' of a preferred freedom" (*i.e.,* was not ancillary to the exercise of an expressly enumerated fundamental constitutional right), (b) HRS § 329-5 was therefore presumed to be constitutional, (c) the *Kantner* appellants failed to overcome the "insurmountable" burden of overcoming the presumption—alcohol being

"a drug about which much is known" and marijuana a drug about which "much less is known"—by virtue of their inability to prove that there were "sufficient dissimilarities between alcohol and marijuana to support different legislative treatments," and (d) therefore, alcohol and marijuana were, *in fact,* "sufficiently dissimilar to justify dissimilar legislative treatment." [17]

Concurring separately in *Kantner,* Justice Abe took a very different tack:

It is conceded by the appellants that the regulation of the use of marijuana is a reasonable and legitimate exercise of the police power of the State. However, they contend that the inclusion of marijuana in the narcotic drug statute, HRS Ch. 329, is unreasonable and violates the Due Process Clauses ·of the United States Constitution and the Hawaii State Constitution. The appellants presented this question as the sole issue on appeal.

. . . .

I believe that the more interesting and pertinent issue raised by the Due Process and Equal Protection Clauses is not whether marijuana is a "narcotic," but whether marijuana is, like narcotics, sufficiently harmful to the general welfare that the possession of marijuana may be prohibited in the same way possession of the narcotics is prohibited. However, the only argument made by the appellants is that marijuana is not technically a "narcotic," and cannot be included in a statutory scheme with true narcotics. Thus, it is unnecessary to reach other issues raised by the Equal Protection Clause and the Due Process Clause. However, inasmuch as other justices today have reached some of those issues, I will briefly outline my thoughts.

. . . .

*I do not agree* with Chief Justice Richardson *that one does not enjoy the fundamental constitutional right to smoke marijuana.* I stated in the dissent in *State v.*

---

**17.** It seems to me that there is something peculiar, to say the least, about a judicial thought process that rationalizes the criminalization of marijuana possession, in the face of the non-criminalization of alcohol possession, on the *sole* basis that it is not known whether the effects of marijuana consumption are as potentially catastrophic as the effects of alcohol consumption are known to be.

*Lee,* 51 Haw. 516, 465 P.2d 573 (1970), that I believed that *under Art. I, Sec. 2 of the Hawaii State Constitution one has a fundamental right of liberty to make a fool of himself as long as his act does not endanger others, and* that *the state may regulate the conduct of a person under pain of criminal punishment only when his actions affect the general welfare—that is, where others are harmed or likely to be harmed. Thus, I believe that the right to the "enjoyment of life, liberty and the pursuit of happiness" includes smoking of marijuana, and one's right to smoke marijuana may not be prohibited or curtailed unless such smoking affects the general welfare.*

... Truthfully, I cannot say whether those who claim that the use of marijuana is harmful are correct or those who take the opposite view are correct.

. . . .

Of course, in my opinion, *the finding that marijuana is harmful to the user does not authorize the State under its police power to prohibit its use under threat of punishment.* Under the doctrine I stated in the dissent in [*Lee* ], *the State must prove that the use of marijuana is not only harmful to the user but also to the general public before it can prohibit its use.* However, the appellants have conceded both in the trial court and on appeal that the State may regulate the use of marijuana under its police power. Thus, under the record of this case the State was not required to prove this point. It would be unreasonable for this court therefore to hold that, in spite of this concession in the proceedings, the State should have met its burden of proof on this point.

Therefore, under the record of this case, I am compelled to affirm the judgment of the trial court.

*Kantner,* 53 Haw. at 334, 336–39, 493 P.2d at 311–13 (Abe, J., dissenting) (footnote omitted) (emphases added).

It is apparent from the foregoing analysis that the "Abe thesis," first articulated in *Lee,* was imported directly into the concurring opinion in *Kantner.* Thus, Justice Abe clearly expressed his position that, by virtue of the fundamental right to "the enjoyment of life, liberty and the pursuit of happiness" enshrined in article I, section 2 of the Hawai'i Constitution, "one does ... enjoy the fundamental constitutional right to smoke marijuana," whether or not such conduct is harmful to the user, because "the state may regulate the conduct of a person under pain of criminal punishment only when his actions affect the general welfare—that is, where others are harmed or likely to be harmed." Smoking marijuana being protected by the fundamental constitutional right of "liberty," the burden lay on the state to "prove that the use of marijuana is not only harmful to the user[,] but also to the general public before it can prohibit its use." However, because— and *only* because—the *Kantner* appellants allegedly "conceded both in the trial court and on appeal that the State may regulate the use of marijuana under its police power," Justice Abe deemed it "unreasonable," under the circumstances, to penalize the state for failing to "have met its burden of proof on this point."

Two key points, diametrically opposed to the view expressed in the Richardson/Marumoto plurality, are implicit in Justice Abe's *Kantner* analysis. First, insofar as smoking marijuana was protected by a fundamental constitutional right—the right of "liberty"—, HRS § 329–5 was neither presumed to be constitutional nor subject to mere "rational basis" review. *See infra* section II.A.1. That being the case, second, the statute was presumptively unconstitutional and subject to a kind of "strict scrutiny" review, the state bearing the burden of proving that the police power extended to the criminalization of marijuana possession on the basis that consumption of the drug was not only harmful to the user, but also to the general public. *See id.*

Justice Levinson, who was a member of the *Lee* majority and would in *Cotton, see supra* note 8, soon craft the "significant-secondary-harms-to-society" exception to the "harm to others" principle, filed a dissenting opinion in *Kantner.*[18] He would have held

---

**18.** It is obvious from his dissenting opinion in

*Kantner* that Justice Levinson did not perceive

HRS § 329–5 to be unconstitutional as an impermissible infringement of the fundamental constitutional rights of "personal autonomy"[19] and privacy. He also challenged the notion that the appellants had waived the question of the constitutional limits of the state's authority to criminalize particular conduct pursuant to the police power. Thus, Justice Levinson would have reversed their convictions. Because it presaged the later codification of the express fundamental right to privacy in article I, section 6 of the Hawai'i Constitution (1978), I quote Justice Levinson's opinion at length:

> The crucial issue in this case is whether a person has a constitutionally protected right purposely to induce in himself, in private, a mild hallucinatory mental condition through the use of marihuana. I believe that there is such a right and that it is founded upon the constitutional rights to personal autonomy and privacy, guaranteed by article I, sections 2 and 5[20] of the Hawaii Constitution as well as by the due process clause of the fourteenth amendment of the Federal Constitution. I believe that HRS § 329–5 (Supp.1971) violates both constitutions because it unreasonably infringes upon these rights and, therefore, I would reverse.
>
> . . . .
>
> In our system of law[,] the personal autonomy and privacy of individuals is afforded the highest consideration. The very concept of limited government evinces

any significant "secondary harms" to society attendant to the private consumption of marijuana.

19. When applied to individuals the word "autonomy" has four closely related meanings. It can refer either to the *capacity* to govern oneself, which of course is a matter of degree; or to the *actual condition* of self-government and its associated virtues; or to an *ideal of character* derived from that conception; or (on the analogy to a political state) to the *sovereign authority* to govern oneself, which is absolute within one's own moral boundaries (one's "territory," "realm," "sphere," or "domain"). . . .

. . . [W]here I . . . use the word "autonomy" in what follows I intend it simply to mean "personal sovereignty". . . . Now we can proceed to examine carefully the analogy between sovereign nations and "sovereign persons."

. . . .

. . . In the case of personal autonomy, no attempt to adjudicate "boundary disputes" can even be made until agreement is reached on the conceptual question of what a "personal domain" is.

The easiest answer is the one that takes the territorial metaphor most seriously. . . . Perhaps the personal domain . . . consists simply of a person's body. We do speak of an inviolate right which is infringed whenever another person inflicts a harmful or offensive contact on one's body without one's consent—an unwanted caress, a slap, a punch in the nose, a surgical operation, or even a threatening move that provokes the reasonable apprehension of such contacts. That must be part of what we mean by personal autonomy. After all, we speak of "bodily autonomy," and acknowledge its violation in cases of assault, battery, rape, and so on. But surely our total autonomy includes more than simply our bodily "territory," and even in respect to it, more is involved than simple immunity to uninvited contacts and invasions.

. . . .

Even discretionary control of body, privacy, and landed property together do not exhaust a plausible conception of personal autonomy. The kernel of the idea of autonomy is the right to make choices and decisions—what to put into my body, what contacts with my body to permit, where and how to move my body through public space, how to use my chattels and physical property, what personal information to disclose to others, what information to conceal, and more. . . . *Put compendiously, the most basic autonomy-right is the right to decide how to live one's life* . . . .
Joel Feinberg, *Harm to Self* 28, 48, 53–54 (Oxford Univ. Press 1986) (some emphasis in original and some added).

20. Article I, section 5 of the Hawai'i Constitution (1968), now renumbered as article I, section 7, provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures *and invasions of privacy* shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons of things to be seized or the communications sought to be intercepted.
(Emphasis added.) The words "invasions of privacy" were added to article I, section 5 (now article I, section 7) by the 1968 Constitutional Convention. *State v. Roy*, 54 Haw. 513, 518, 510 P.2d 1066, 1069 (1973) (Levinson, J., concurring). The Convention's Standing Committee Report No. 55 stated: "The proposed amendment is intended to include protection against indiscriminate wire-tapping *as well as undue government inquiry into and regulation of those areas of a person's life which is [sic] defined as necessary to insure 'man's individuality and human dignity.'* " *Id.* (Some emphasis added and some in original.)

a desire to free persons from the unbounded control of the State, in order that they may most productively pursue their own life goals. Perhaps the best articulation of the values inherent in American constitutional law was given by Mr. Justice Brandeis in his now famous dissenting opinion in *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928), quoted with approval in *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969):

> The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure, and satisfactions of life are to be found in material things. They sought to protect Americans in their *beliefs*, their *thoughts*, their *emotions* and their *sensations*. They conferred, as against the Government, *the right to be let alone*—the most comprehensive of rights and the right most valued by civilized men. ( [E]mphasis added[.] )

*This right to personal autonomy lies at the heart of our system of government.* Some of its component ideas find expression in the constitutional guarantees of free speech, press, assembly, religion and freedom from unreasonable searches and seizures. These guarantees uphold the dignity of the individual and protect his right to develop in accordance with the inward forces which make him a unique human being. As important as these enumerated rights are, however, it would be grave error to hold that they exhaust the limits on the power of government to invade the individual's right to freedom of thought and action. The framers of the United States Constitution recognized that individual freedom is not susceptible to full definition by verbal enunciation and thus warned in the ninth amendment:

> The enumeration in the Constitution[ ] of certain rights, shall not be construed to deny or disparage others retained by the people.

Mr. Justice Goldberg[,] in his concurring opinion in *Griswold v. Connecticut*, 381 U.S. 479, 494, 85 S.Ct. 1678, 1687, 14 L.Ed.2d 510 (1965), expressed the belief that this amendment afforded proof that *due process of law encompasses a fundamental personal right of privacy.* Accord *State v. Abellano*, 50 Haw. 384, 386, 441 P.2d 333, 335 (1968) (concurring opinion of Levinson, J.). *In Hawaii[,]* there can now be no doubt that *the right of privacy exists as a basic safeguard of individual liberty* since it has been given substantive expression in article I, section 5 of the State Constitution.

This constitutional right to privacy encompasses more than just freedom from government surveillance. It guarantees to the individual the full measure of control over his own personality consistent with the security of himself and others. This freedom to choose one's own plan of life is essential to the pursuit of happiness and the enjoyment of life and thus finds additional protection in article I, section 2 of the Hawaii Constitution. *See State v. Shigematsu*, 52 Haw. 604, 610, 483 P.2d 997, 1000 (1971). In the instant case, the State's infringement upon this right of personal autonomy becomes apparent when one understands the nature of marihuana and the reasons for its use.

It is now universally recognized by modern authorities on the subject that marihuana is not a drug of addiction; that is, unlike narcotic drugs, marihuana does not produce physical dependence in the user which compells [sic] its continued use. The individual who uses marihuana does so from choice,[21] in the pursuit of various

---

21. ... The person who chooses to grow and use his own marijuana, like the more common social smokers who buy the drug, deliberately assumes a risk to his health for the sake of the pleasure of smoking pot. What makes this case interesting is that in the present state of medical knowledge, no one knows exactly, or even approximately, what that risk is. There have been some experi-

ments that suggest that various disorders are associated with the active ingredients in marijuana, and perhaps "it stands to reason" that a lifetime of inhaling smoke might damage the lungs. But hardly a soul is alive who has spent an actual lifetime of heavy pot-smoking. No one knows which frequency of usage is excessive, which moderate, which harmless. No one can

goals which may include the relief from tension, the heightening of perceptions, and the desire for personal and spiritual insights. In short, marihuana produces experiences affecting the thoughts, emotions and sensations of the user. These experiences being mental in nature are thus among the most personal and private experiences possible. For this reason[,] I believe that the right to be let alone protects the individual in private conduct which is designed to affect these areas of his personality, so long as such conduct does not produce detrimental results.

This principle that the State's power to restrain private conduct is limited by the need to show social injury was recognized by this court in *State v. Lee*, 51 Haw. 516, 521, 465 P.2d 573, 577 (1970):

> [W]here an individual's conduct, or a class of individuals' conduct, does not directly harm others[,] the public interest is not affected and is not properly the subject of the police power of the legislature.

In the *Lee* case, the court went on to announce a narrow exception to the above general rule. The State may also act to protect a large class of individuals from harm to themselves, but only where such harm has been compellingly demonstrated to the satisfaction of the court. *State v. Lee, supra.* Because the State has failed to establish that the private, personal use of marihuana harms either the user or society, *I would hold that the prohibition of HRS § 329-5 (Supp.1971) unreasonably infringes upon the appellants' rights to personal autonomy.*

. . . .

... Under the standard laid down in *State v. Lee, supra,* mere speculation cannot form a valid basis for the government's use of its police power to protect a person from his own actions. . . .

... Thus, *I would hold that the State has failed to demonstrate sufficient justification for its intrusion into the privacy of the individual with respect to the personal use of marihuana.* The State cannot prevail except under the test described by Mr. Justice Goldberg in his concurring opinion in *Griswold v. Connecticut*, 381 U.S. 479, 497, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510 (1965):

> In a long series of cases[,] this court has held that *where fundamental personal liberties are involved, they may not be abridged by the States simply on a*

---

cite statistical "probabilities" to the beginning user to apprise him of his chances. No one knows how the myriad of other variables in *modes* of usage, age, sex, general condition, and genetic disposition, affect the risks. In short, pot smoking is risk-taking under conditions of almost total ignorance. It is no doubt reasonable to suppose that some risk is involved—that heavy usage is more dangerous *ceteris paribus* [*i.e.*, all other things being equal] than no usage—but beyond that, accurate risk assessments are impossible.

Nevertheless, there is an important way in which the unavoidably ignorant person's decision to use this possibly dangerous drug, even to use it regularly, might still be voluntary. . . . If it is as voluntary as possible, . . . it may well be "voluntary enough."

The person who has all the relevant knowledge available about the risks of pot-smoking does shoulder the risk quite voluntarily, provided also that he has an accurate knowledge, at a higher level, of the scope and limits of his first-level knowledge. If he knows the little that current science can tell him, and knows how little that is; if he knows that conclusive evidence of the connection between nicotine and lung cancer did not accumulate until the first heavy-smoking generation had been at it for thirty years, and that there are as yet no comparable data about the effects of prolonged marijuana usage, but that such evidence could very well turn up; if he knows that there are already suspected links, based on inconclusive studies, between *some* amount of pot-usage and a variety of physical ailments, from loss of male hormone to diminished brain-function, and that the trend has been for the discovery of more and better confirmed connections of these kinds, then he has all the relevant information there is. If, given all that, he is still willing to take a chance, we have to admit that he knows what he is doing, and that his decision was not simply based on a mistake. It was made in ignorance, as Aristotle would say, but not "by reason of ignorance." Unavoidable ignorance is to some degree an element of all risk-taking, but to know which factors are unknown is itself to have knowledge of a relevant kind, contributing to responsible decision-making. All we need to assure ourselves of in assessing voluntariness is that the risk-taker knows exactly what the risk is that he is taking, and his ignorance is a vital component of that risk.
Feinberg, *Harm to Self* at 160–61 (emphasis in original).

*showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. "Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling,"* Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480. *The law must be shown "necessary, and not merely rationally related, to the accomplishment of a permissible state policy."* McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222. *See Schneider v. Irvington,* 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155.

In his concurring opinion, my Brother Abe recognizes that the State would ordinarily bear the burden of proving that the use of marihuana is harmful to the general public in order to justify prohibiting its use through the exercise of the police power. He argues, however, that since the appellants conceded that the State may regulate the use of marihuana, the State was relieved of its obligation to prove social harm. Apparently, he believes that the issue of the State's power to prohibit was not controverted, and that, therefore, the State was not put on notice that it had to prove social harm as part of its case.

The record, however, belies this argument. *The appellants specifically distinguished in their brief between the State's power to regulate the use of marihuana (as in the case of such substances as alcohol and tobacco) and its power to prohibit altogether. Regulation and prohibition are not coextensive.* Furthermore, the State's presentation in the circuit court was replete with attempts to prove a nexus between the use of marihuana and harm to the user as well as a propensity toward anti-social behavior and the commission of crime. The circuit court repeatedly refused to limit the controversy to the reasonableness of the classification of marihuana as a narcotic. The suggestion that the State was relieved of its obligation to establish social harm is unrealistic.

. . . .

Finally, it should be stressed that the analysis I have adopted does not seek to establish this court as a super-legislature, exercising veto power over the wisdom and value of legislative policies. *See Griswold v. Connecticut, supra* at 512, 85 S.Ct. at 1697 (Justice Black's dissenting opinion). Any criticism which attempts to deter courts from inquiring into the constitutionality of laws must distinguish between legislation which seeks to regulate economic and social relationships and that which intrudes into the purely private sphere of human life. In the former instance[,] courts rightfully grant the legislature wide latitude for experimentation in the promotion of the general good. But, where the State endeavors to intrude into the individual's private life and regulate conduct having no public significance, it is the duty of the courts to offer a haven of refuge where the individual may secure vindication of his right to be let alone. *Kantner,* 53 Haw. at 339–47, 493 P.2d at 313–18 (Levinson, J., dissenting) (footnotes and some citations omitted) (some emphases and brackets in original and some added).

Even the most cursory inspection reveals the congruity of Justice Levinson's position in *Kantner* with that taken by Justice Abe in his concurring opinion; indeed, Justice Levinson's dissent largely adopts the "Abe thesis," albeit in somewhat different language. Like Justice Abe, Justice Levinson perceived a constitutionally protected right to the personal possession of marijuana. Like Justice Abe, Justice Levinson viewed the right as being derivative of a penumbral but fundamental constitutional "right to be let alone," which was housed, among other places, in article I, section 2 of the Hawai'i Constitution. Rather than denominating the right to be let alone as the constitutional right of "liberty," however, Justice Levinson described it as, variously, the right to "personal autonomy" and to "privacy"—terms that he employed synonymously.

For both Justices Abe and Levinson, the fundamental constitutional right of liberty/personal autonomy/privacy acted as a buffer against the state's unwarranted exercise of the police power. Justice Levinson reaf-

firmed the *Lee* court's commitment to the proposition that, "where an individual's conduct ... does not directly harm others[,] the public interest is not affected and is not properly the subject of the police power of the legislature," subject only to the caveat that "[t]he State may also act to protect a large class of individuals from harm to themselves, but only where such harm has been compellingly demonstrated to the court." Thus, because the personal consumption of marijuana was protected by a fundamental constitutional right—the right to liberty/personal autonomy/privacy—, Justices Abe and Levinson were united in the view that HRS § 329–5 was neither presumed to be constitutional nor subject to mere "rational basis" review. Rather, Justice Levinson echoed Justice Goldberg's position that "where fundamental personal liberties" were involved (*i.e.*, where there was "a significant encroachment upon personal liberty"), "the State may prevail only upon showing a subordinating interest which is compelling" and "necessary, and not merely rationally related, to the accomplishment of a permissible state policy."

Applying the foregoing analysis to *Kantner*, Justice Levinson, similarly to Justice Abe, would therefore have held "that the prohibition of HRS § 329–5 ... unreasonably in fringe[s] upon the appellants' rights to personal autonomy," inasmuch as the State had failed "to establish [both] that the private, personal use of marihuana harms either the user or society" and that there was a "sufficient justification for its intrusion into the privacy of the individual with respect to the personal use of marihuana." Moreover, in rebutting the Richardson/Marumoto plurality's position that the *Kantner* appellants had waived the issue whether the state's police power extended to the criminalization of marijuana possession, Justice Levinson highlighted a significant corollary to his holding, *i.e.*, the critical distinction between the exercise of the police power to criminalize conduct through outright prohibition, on the one hand, and the state's less drastic power merely "to regulate the use of marihuana (as in the case of such substances as alcohol and

tobacco)," on the other. As he noted, it was self-evident that "[r]egulation and prohibition are not coextensive." *See supra* note 4.

In his separate dissent, rounding out the *Kantner* quaternary, Justice Kobayashi—a former Hawai'i Attorney General—likewise emphasized the fundamental difference between the invocation of the police power to *regulate* and the state's power to *criminalize* private conduct.[22] Indeed, Justice Kobayashi readily acknowledged that, "[j]ust as it is a valid exercise of the State of Hawaii's police-power to regulate the sale, use, and possession of such commodities as alcohol and tobacco, it ·is axiomatic that the regulation of marijuana is also a valid state activity." *Kantner*, 53 Haw. at 347, 493 P.2d at 318 (Kobayashi, J., dissenting). In his view, however, "our present method of regulating marijuana—inclusion of marijuana within the classification of criminally proscribed narcotics—is unreasonable and unconstitutional in violation of the due process and equal protection clauses of the [f]ourteenth [a]mendment." *Id.* Accordingly, noting that "[w]e have in the past[,] in reviewing statutory classifications[,] recognized that it is the duty of this court to see that the legislature does not seek to achieve noble ends by unconstitutionally arbitrary means," Justice Kobayashi concluded that, "[e]ven if I felt that the legislature's present treatment of marijuana achieved a noble end, which I do not, HRS § 329–5, which proscribes the use of narcotics and classifies marijuana as a narcotic, .must be regarded as an unconstitutionally arbitrary legislative declaration *tantamount to an abuse of the state's police-power." Id.* at 347–48, 493 P.2d at 318 (citation and internal quotation marks omitted) (emphasis added).

Thus, while Justice Kobayashi ultimately grounded his *Kantner* dissent in considerations of due process and equal protection, the conceptual underpinnings of his opinion echoed the insistence of Justices Abe and Levinson that the state make a showing, as a precondition to the exercise of the state's police power to criminalize, (1) that the per-

---

22. In this connection, it bears repeating that, just short of two years later, Justice Kobayashi declared his express allegiance to the "Abe thesis"

by joining in the dissent in *Cotton*. *See supra* notes 7 and 9.

sonal consumption of marijuana, *per se*, entail "direct harm to others," or, at the very least, (2) that a compelling demonstration could be made that a large class of individuals was recklessly affecting its physical well-being through conduct—which was so widespread as to be of grave concern to the public—causing physical injury and death:

> Presumptively the statutory purpose sought to be attained by including marijuana within the classification of proscribed narcotic drugs stems from the following reasons: 1) that marijuana's use is per se harmful to the user, 2) that the use of marijuana is a stepping-stone to more serious drugs, 3) that the effects of consuming marijuana are sufficiently related to the effects of consuming narcotics, [and] 4) that the use of marijuana leads to criminal activity. These postulations have simply not been borne out. The findings from the evidence adduced indicate that none of the above rationale[s] bear[ ] a reasonable relation to the inclusion of marijuana within the narcotic classification.
>
> . . . .
>
> The use of marijuana does not cause the social ills that the legislature has attempted to guard against. *It is the present status of the law classifying marijuana as a narcotic and proscribing its use as a narcotic that is responsible for the social harm created.* Organized crime is greatly benefitted by the fact that possessing, using, and trafficking in marijuana have been made illegal. Marijuana's illegality merely adds another weapon to the armory of the underworld for the exploitation of society. . . .
>
> It is suggested that a more reasonable and rational approach in this area would be to regulate marijuana in a manner similar to that of alcohol or tobacco. In this way[,] the abusive use of marijuana, not its reasonable use, would be given criminal sanctions.[23] Such a change of the law in this area would instill the respect of society that is needed for the preservation of

criminal justice and prospectively decrease the criminalization of our younger generation.

*Id.* at 348–49, 352–53, 493 P.2d at 318, 320 (emphasis added).

The overarching irony of the *Kantner* quaternary is that it was only because the Richardson/Marumoto plurality and the Abe concurring opinion took the position that the appellants had conceded *arguendo* that the state's police power extended, *per se*, to the criminalization of marijuana possession that the *Kantner* appellants lost their appeal and thereby changed constitutional history. In light of the combined positions of Justices Abe, Levinson, and Kobayashi, discussed *supra*, it is apparent that, but for the appellants' alleged concession, HRS § 329–5 would have been struck down as unconstitutional by this court, HRS § 712–1249, as subsequently enacted in 1972, would not have applied to the possession of marijuana, and Mallan would have had the right to be let alone on October 20, 1990 and to tell the state to mind its own business.

2. *Baker, Renfro, Bachman, "reality control," and the "dumbing" of state constitutional analysis regarding the limits of the state's police power*

During the eight-month period from December 1973 to August 1974, a majority of the members of this court retired—a turn of events that profoundly altered the center of gravity of this court's approach to the marijuana laws. On December 28, 1973, Justices Marumoto and Abe retired and were replaced by Justices Ogata and Menor. In addition, Justice Levinson retired on August 31, 1974, resulting in a ten-month vacancy in this court's fifth seat.[24] It was during the vacuum created by Justice Levinson's retirement that Justice Lewis [25] rejoined this court for the limited purpose of hearing and deciding *State v. Baker*, 56 Haw. 271, 535 P.2d 1394 (1975).

---

23. *See supra* note 4.

24. Justice Kidwell filled Justice Levinson's position on July 1, 1975.

25. Ironically, Justice Levinson had earlier replaced Justice Lewis, who retired on May 8, 1967.

a. *"doublethink" and nepenthe—*
*State v. Baker*

In *Baker,* a consolidated appeal, multiple defendants had been charged with unlawful possession of marijuana in any amount under the recently enacted HRS § 712–1249 (Supp. 1974)—the very statute at issue in the present matter. *See supra* note 2. The defendants moved to dismiss the charges on constitutional grounds. Obviously anchoring its analysis in the Abe/Levinson/ Kobayashi views as expressed in *Kantner*—by virtue of which, in combination, a majority of this court had deemed the predecessor statute to HRS § 712–1249 to be an unconstitutional exercise of the state's police power—, the district court

> placed on the State the burden of showing clearly and convincingly that the possession of marijuana[,] in violation of [HRS § 712–]1249 constitute[d] a harm either to the individual or the community. It held [that] the State had not met this burden and that [HRS § 712–]1249 violated the due process clauses of the State and United States Constitutions.

*Baker,* 56 Haw. at 276, 535 P.2d at 1397. Accordingly, the district court "held the statute unconstitutional insofar as it related to the possession of marijuana," *id.* at 273, 535 P.2d at 1395, and dismissed the charges. The prosecution appealed.

Interestingly, it was left to retired Justice Lewis to author the *Baker* court's majority opinion. As she saw it, "t[he] primary question on appeal [was] whether the trial court's reversal of the ordinary presumption of constitutionality was error." *Id.* at 276, 535 P.2d at 1397 (footnote omitted). Following this beacon, the *Baker* majority ruled in relevant part as follows:

> Defendants contend that the State's interest in proscribing marijuana is "patently de minimis and does not warrant the application of a penal sanction to the mere possession of marijuana for personal use."

In this argument[,] scant attention is paid to the presumption of constitutionality.[26]

We first consider the State's interest in proscribing marijuana. For reasons which will appear, we do not distinguish at this point between commercial distribution[,] on the one hand, and possession for personal use, on the other. As the second part of our consideration of this matter[,] we proceed to the question of whether the legislature was warranted in making mere possession of marijuana a petty misdemeanor, with the concomitant penal sanctions prescribed for that offense.

It is well settled that when a substance has been proscribed as harmful, the presumption of constitutionality applies although there are conflicting scientific views as to its harmful effects. This rule has been applied in marijuana cases. As stated in *United States v. Kiffer,* 477 F.2d 349 (2d Cir.1973):

> * * * recent discussions of this issue suggest that the present state of knowledge of the effects of marijuana is still incomplete and marked by much disagreement and controversy. * * * It is true that the rationalization for the criminalization of marihuana has shifted over time. * * * This, however, does not negate the possibility that the justification now principally relied upon may have some merit. (pp. 353–354).
>
> * * * [T]he question before us is a narrow one. It is whether it can fairly be said that Congress acted irrationally in prohibiting the commercial distribution of marihuana. We believe that the answer to that question is no. * * * (p. 355).
>
> . . . .

We hold, as was held in *Kiffer, supra,* that the presumption of constitutionality applies and has not been rebutted. . . . Accordingly, at least so far as commercial distribution is concerned, marijuana may be proscribed.

---

**26.** It is small wonder that the district court paid "scant attention . . . to the presumption of constitutionality," inasmuch as, only three years previously, two members of the *Kantner* court had expressly (and a third by clear implication) deemed the presumption inapplicable to the criminalization of possession of marijuana for personal consumption. *See supra* section I.C.1. In this regard, the district court was merely following what was, in fact, the only clear and governing precedent extant in this jurisdiction at the time.

While defendants have not been charged with distribution, the charge of possession under [HRS § 712–]1249 brings before the court the question of the reasonable relation of this section to the object of the legislation as shown by the statute as a whole. It long has been established that[,] as part of its scheme to prohibit the sale of intoxicants within its borders, a state may adopt such measures as are reasonably appropriate or needful to render exercise of that power effective[,] including criminalization of mere possession of the prohibited product for personal use....

In holding that the State had the burden of showing "clearly and convincingly" that the prohibited activity constituted "a harm either to the individual or to the community[,]" the [district] court below began with the premise that: "It is a fundamental right of liberty of a human being to conduct himself in a manner which neither harms himself nor others." To so approach the issue in this case is to begin with the wrong end of the stick.[27] ...

... [A]s stated in *Crane v. Campbell,* [245 U.S. 304, 38 S.Ct. 98, 62 L.Ed. 304 (1917)]:

... [T]he right to hold intoxicating liquors for personal use is not one of those fundamental privileges of a citizen of the United States which no State may abridge.[28] A contrary view would be incompatible with the undoubted power to prevent manufacture, gift, sale, purchase or transportation of such articles—the only feasible ways of getting them. An assured right of possession would necessarily imply some adequate

method to obtain not subject to destruction at the will of the State. 245 U.S. at 308, 38 S.Ct. at 99.

More recently, in *Stanley v. Georgia,* 394 U.S. 557, 567–568, 89 S.Ct. 1243, 1249–1250, 22 L.Ed.2d 542 (1969), the Supreme Court of the United States considered, in an obscenity case, the proposition that "prohibition of possession * * * is a necessary incident to statutory schemes prohibiting distribution." It held that, because first amendment rights were involved in that case, mere private possession of obscene material could not be made a crime. The court carefully distinguished the type of statute which is before us, saying in footnote 11:

What we have said in no way infringes upon the power of the State or Federal Government to make possession of other items, such as narcotics, firearms, or stolen goods, a crime. *Our holding in the present case turns upon the Georgia statute's infringement of fundamental liberties protected by the First and Fourteenth Amendments.*[29] No First Amendment rights are involved in most statutes making mere possession criminal.

... [T]he holding in *Stanley* is inapplicable to a statute prohibiting the possession of marijuana....

*While our State Constitution has a right of privacy provision,*[30] *we do not find in that provision any intent to elevate the right of privacy to the equivalent of a first amendment right.*[31] The intention was

---

27. In this respect, I submit that the *Baker* majority was dead wrong. The district court, to its great credit, assiduously adhered to (1) the *Kraft* analysis (which, as I have indicated, this court has not repudiated to this day), *see supra* section I.A, as further refined by the majority opinion in *Lee, see supra* section I.B.1, (2) the "Abe thesis," which was first enunciated in *Lee, see supra* section I.B.2, later expanded in *Kantner, see supra* section I.C.1, and then expressly endorsed by Justice Kobayashi in *Cotton, see supra* notes 7 and 9, and (3) Justice Levinson's analysis in *Kantner, see supra* section I.C.1, in approaching the issue before it.

28. This is a perfect illustration of the "fallacy of trivialization," discussed *infra* in section II.B.1.

29. As will become clear *infra* in section II.A, this sentence is critical to an understanding of the intended scope of article I, section 6 of the Hawaiʻi Constitution (1978), which expressly codified the fundamental right to privacy.

30. The *Baker* majority cited to article I, section 5 of the Hawaiʻi Constitution (1968), now renumbered as article I, section 7. *See supra* note 20.

31. If (as the district court had obviously read *Lee, Cotton,* and *Kantner* to signify) there *were* "a fundamental right of liberty [*i.e.,* personal autonomy/ privacy] of a human being to conduct himself in a manner which neither harms himself nor others" that *was* "elevate[d] ... to the equivalent of a first amendment right," then the *Baker*

to "effectively protect the individual's wishes for privacy as a legitimate social interest," including protection against "undue government inquiry * * * and regulation." [ (Citing Stand. Comm. Rep. No. 55, *reprinted in* 1 Proceedings of the 1968 Constitutional Convention at 233–34.) ] By the plain wording of the constitution[,] the right of privacy is protected only against *unreasonable* invasion.

Alaska has added to its constitution, as a separate section of its bill of rights, [article I, section 22,] a provision that:

> The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section.[32]

In *Gray v. State*, 525 P.2d 524, 527–528 (Alaska 1974), the Supreme Court held that[,] under this amendment[,] a statute which impinges upon the right of privacy "may be upheld only if it is necessary to further a compelling state interest." Reviewing a conviction for selling marijuana, ... the court placed on the prosecution the burden of showing a compelling state interest to support the statute prohibiting the *sale* of marijuana. The case was remanded for an evidentiary hearing.

... We find nothing in our constitution or its history that leads to that conclusion.

The presumption of constitutionality applies.

In citing *United States v. Kiffer, supra,* 477 F.2d 349 (2d Cir.1973), *we are not unmindful of* that portion of the opinion which considers the *"argument * * * that[,] in the absence of compelling justification, the police power does not extend so far as to permit the Government to protect an individual against himself and that the concern for public health and safety is relevant only insofar as the actions of one individual may threaten the well-being of others."* (477 F.2d at 354.) ... With all respect, we do not agree. And the holding in our own case of *State v. Kantner,* 53 Haw. 327, 493 P.2d 306 (1972), is not a precedent here,[33] because the only issue in *Kantner* was whether the legislature could include marijuana in the definition of a "narcotic drug," it being conceded in that case that the State may properly regulate the possession of marijuana under the police power.

We hold that a statute proscribing the commercial distribution of harmful substances may sweep within its ambit, as an enforcement measure, the possession of the substance for personal use.[34] That [HRS § 712–]1249 is such an enforcement measure is made abundantly clear by the provision limiting the offense to *unlawful* possession.[35] And since the issue here is

---

majority would presumably have viewed the district court as having begun with the correct "end of the stick." Thus, in promulgating article I, section 6 of the Hawai'i Constitution (1978), the delegates to the 1978 constitutional convention repudiated the *Baker* majority's view of the degree of "elevation" enjoyed by the state constitutional right to privacy. *See infra* section II.A.

**32.** Article I, section 22 of the Alaska Constitution is, of course, identical in all material respects, to article I, section 6 of the Hawai'i Constitution (1978).

**33.** This statement is coy game playing. By summarily dismissing *Kantner* as inapposite, the *Baker* majority conveniently juked its way around (1) Justices Abe and Levinson's reliance upon article I, section 2 of the Hawai'i Constitution as a source of the fundamental constitutional right to liberty/personal autonomy/privacy and the correlative "right to be let alone," (2) the "Abe thesis," which mirrored the argument perceived in *Kiffer,* and, as noted *infra,* (3) the fact that three members of the *Kantner* court believed that the criminalization of the possession of marijua-

na for personal use exceeded the state's police power.

**34.** As will be seen *infra* in sections II.A and B.2, this holding has been substantially qualified by the promulgation of article I, section 6 of the Hawai'i Constitution (1978) and this court's decision in *State v. Kam,* 69 Haw. 483, 748 P.2d 372 (1988).

**35.** As originally enacted, HRS § 712–1249(1) proscribed the possession of marijuana in any amount only if done "knowingly *and unlawfully.*" *Baker,* 56 Haw. at 273, 535 P.2d at 1395 (emphasis added). In 1975, as part of a global revision, the statute was amended to delete the phrase "and unlawfully." *See* 1975 Haw. Sess. L. Act 163, § 6(k) at 359.

> Every offense of promoting drugs [had previously been] defined as "knowingly" and "unlawfully" possessing or distributing certain drugs and compounds. Such definition ma[de] the "unlawfulness" of the defendant's conduct an element of the crime which must

the possession of contraband, *State v. Cotton*, 55 Haw. 138, 516 P.2d 709 (1973), ... and *State v. Lee*, 51 Haw. 516, 465 P.2d 573 (1970), the motorcycle helmet ... cases, are inapplicable.

[36]

*Baker*, 56 Haw. at 276–82, 535 P.2d at 1397–1401 (footnotes, some citations, and some internal quotation marks omitted) (some emphases added and some in original). Based substantially on the foregoing analysis, the *Baker* majority reversed the district court's orders dismissing the charges and remanded for further proceeding s. *Id.* at 284, 535 P.2d at 1402.

As I will attempt to demonstrate, the majority opinion in *Baker* effected a deconstruction and reconstruction of this court's jurisprudential "past" that is utterly Orwellian in its scope and methodology. Indeed, the *Baker* majority literally "went by the book":

> The Party said that Oceania had never been in alliance with Eurasia. He, Winston Smith, knew that Oceania had been in alliance with Eurasia as short a time as four years ago. But where did that knowledge exist? Only in his own consciousness, which in any case must soon be annihilated. And if all others accepted the lie which the Party imposed—if all records told the same tale—then the lie passed into history and became truth. "Who controls the past," ran the Party slogan, "controls the future; who controls the present controls the past." ... All that was needed was an unending series of victories over your own memory. "Reality control," they called it; in Newspeak, "doublethink."
>
> ....
>
> ... The past not only changed, but changed continuously....

be proven by the prosecution.... The word "unlawfully" has been deleted from the description of every offense in Part IV, Chapter 12 of the Penal Code. The result is that the elements of the offense of promoting will be (1) to knowingly (2) distribute or possess (3) the dangerous, harmful or detrimental drugs.... Sen. Stand. Comm. Rep. No. 590, in 1975 Senate Journal, at 1057–58.

> ... Perhaps a lunatic was simply a minority of one. At one time it had been a sign of madness to believe that the earth goes round the sun; today, [it was a sign of madness] to believe that the past is unalterable. He might be alone in holding that belief, and if alone, then a lunatic....

George Orwell, *Nineteen Eighty–Four* 35–36, 79–80 (Harcourt, Brace and Company 1949) (emphasis deleted).

The *Baker* majority's first and core feat of "doublethink" was its declaration that, in beginning with the premise that "[i]t is a fundamental right of liberty of a human being to conduct himself in a manner which neither harms himself nor others," the district court had begun "with the wrong end of the stick." *Baker*, 56 Haw. at 278–79, 535 P.2d at 1398. With this one dismissive sweep of the judicial hand, the *Baker* majority was able to finesse the implicit premise of *Kraft*, which at the time had remained fundamentally intact for forty years (and continues to remain so), that, wholly separate and apart from any consideration of the enumerated constitutional rights of individuals, the "harm to others" principle circumscribed the exercise of the state's police power to criminalize conduct. *See supra* section I.A. In doing so, the *Baker* majority avoided the need to acknowledge the augmentation of the *Kraft* analysis in *Lee*, namely, that in order for the public health, safety, and welfare to be "generally affected," an individual's conduct must "directly harm others" and that, if it does not, the "public interest is not affected" and it "is not properly the subject of the police power of the legislature." *See supra* note 27 and section I.B.1.

That the *Baker* majority was fully aware that the state's police power is not constitutionally boundless is apparent from its oblique reference to the "Abe thesis," albeit in

**36.** Inasmuch as obscene material, being unprotected by either the first amendment to the United States Constitution or article I, section 4 of the Hawai'i Constitution, *see infra* section II.B.2, is presumably "contraband," this court's later analysis in *Kam* highlights the clear applicability of *Lee* and *Cotton* to the *Baker* court's analysis. The *Baker* court merely chose to turn a blind eye to the relevance of those two cases, which should have been obvious at the time. *See supra* section I.B.1.a.

the guise of quoting the United States Court of Appeals for the Second Circuit in *Kiffer. Baker*, 56 Haw. at 281, 535 P.2d at 1400. But by the flippant comment that, "[w]ith all respect," it "d[id] not agree" with the characterization of the "Abe thesis" in *Kiffer*, the *Baker* majority performed its second feat of "doublethink"—avoiding the need to deal on the merits with (1) the "Abe thesis," as first articulated in. *Lee, see supra* section I.B.2, later expanded in *Kantner, see supra* section I.C.1, and expressly endorsed by Justice Kobayashi in *Cotton, see supra* notes 7 and 9, or (2) Justice Levinson's analysis in *Kantner, see supra* section I.C.1.

Which brings us to the *Baker* majority's third—and most monumental—feat of "doublethink." By proclaiming *Kantner* "not a precedent" (or, in the Orwellian vein, an "unprecedent") "because the only issue in *Kantner* was whether the legislature could include marijuana in the definition of a 'narcotic drug,' it being conceded ... that the State may properly regulate the possession of marijuana under the police power," *Baker*, 56 Haw. at 282, 535 P.2d at 1400, the *Baker* majority managed to ignore the unignorable: that, a mere three years previously, a *three-member majority* of the *Kantner* court (which represented the only outcome-dispositive and controlling authority on the subject in this jurisdiction) had agreed that, as a matter of constitutional law, the police power of the state did *not* extend to the criminalization of mere possession of marijuana for personal use. *See supra* section I.C.1.

Thus did the *Baker* majority spin gold into straw and render untrue the truth that "*two plus two make four. If that is granted, all else follows.*" *Nineteen Eighty–Four* at 81 (emphasis in original).

If the *Baker* majority was towing "the Party's" line, it did not, however, send Justice Kobayashi to Room 101. Rather, in the face of the "doublethink" permeating the majority opinion, he preserved Winston Smith's belief that "[b]eing in a minority, even a minority of one, [does] not make you mad. There [is] truth and there [is] untruth, and if you cl[i]ng to the truth even against the whole world, you [are] not mad.... 'Sanity is not statistical[.]'" *Nineteen Eighty–Four*

at 219. "Concurring" and dissenting, he wrote in relevant part:

> ... [I]n my opinion, the real question is whether, on the record, the [defendant] adduced evidence showing that the substantive provisions of the statute are arbitrary and capricious and void under the due process clause of the Hawaii State Constitution and the Constitution of the United States.
>
> In the trial below the [defendant] filed a motion to dismiss the charge filed against him and contended:
>
> 1. The statute is unconstitutional on the ground of unlawful assertion of police power.
>
> 2. The statute violates the constitutional guarantee of privacy.
>
> In support of the first contention[,] the [defendant] stated:
>
>> The present state of scientific knowledge indicates that marijuana use has no effects on the individual that leads directly to harm to others. At most it can be argued that possession of marijuana is harmful to the possessor. Even assuming arguendo that possession of marijuana is harmful for the possessor, it cannot be statistically demonstrated by the [State] that the consequent physical injury is so widespread as to be of such grave concern to the public as to effect the public interest generally....
>
> (*See State v. Lee*, 51 Haw. 516, 521, 465 P.2d 573, 577 (1970) for appropriate test).
>
> In support of the second contention, the [defendant] argued:
>
>> The right to personal privacy ... [is] a fundamental substantive constitutional right.... *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); [t]he use of marijuana is a private act which is protected by this substantive right to privacy; [t]he actual use of marijuana involves no one other than the user....
>
>> ....
>
> In contrast[ ] with the minimum but controversial findings of possible harm to the individual in the use of marijuana, and [with] the total lack of findings that mari-

juana use would cause the user to directly or indirectly harm others, the proof of the harmful effects of two publicly accepted drugs—alcohol and tobacco—is well documented.

The harmful effects of alcohol are numerous[.]

. . . .

Tobacco is one of the most physiologically damaging substances used by man.

. . . .

History shows that nation after nation, and several states in the United States[,] tried to curb the use of tobacco by criminalizing the cultivation, possession[,] and use of tobacco. However, criminalization had no effect in reducing and/or eliminating the use of tobacco. Record shows that tobacco acquired a greater number of addicts, notwithstanding the penal consequences.

The history of the criminalization of the production, distribution, and consumption of alcohol is well documented in the tragic period of the prohibition era of 1920–1933. Alcohol prohibition was not repealed because alcohol is a harmless drug. Prohibition was repealed because it failed to discourage the consumers of alcohol, and, it created a monster in the form of organized crime syndicates controlling distribution of alcohol with its attendant violence.

Upon consideration of the record, notwithstanding *United States v. Kiffer*, 477 F.2d 349 (2d Cir.1973)[,] cited by the majority of the court, I am compelled to conclude that *the statute in question constitutes an arbitrary and capricious exercise of police powers by the [state].* I premise my opinion on the following reasons:

1. There is no conclusive proof that marijuana is a detrimental drug;

2. There is no proof that mere possession of marijuana harms the individual possessor;

3. *There is no proof that mere possession of marijuana would cause the possessor to directly harm others;*

4. *Any possible harm to the individual in the use of marijuana is merely debatable;*

5. *There is no proof that mari[j]uana use leads the user to harm others;*

6. *It cannot be statistically demonstrated that the consequent physical and/or mental injury through the use of marijuana is so widespread as to affect the public interest generally;*

7. Marijuana has not been proven to be an addictive drug; [and]

8. *There is no evidence of any secondary harm to society resulting from any harm to the user of marijuana.*

. . . .

In *State v. Cotton*, 55 Haw. 138, 516 P.2d 709 (1973), the court stated at 139, 516 P.2d at 710:

We accept . . . the fundamental tenet that the relationship between the individual and the state leaves no room for regulations which have as their purpose and effect *solely* the protection of the individual. . . .

The proscription of possessing marijuana is, at best, solely to protect the individual user of marijuana.

In my opinion, however, the real purpose of the criminalization of possession of marijuana is simply to perpetuate society's (majority of) prejudice against marijuana; a prejudice which I believe is based mainly upon inaccurate information. Clearly, the only confirmed harm of marijuana is, not in marijuana per se, but the laws which criminalize[ ] the possessor. The lives and careers of many thousands of possessors have been damaged or destroyed irrationally and oppressively. The interest of society generally has been seriously harmed by the unnecessary criminalization of a large segment of the people. Organized crime or crimes have been fostered by the act of the [state] in proscribing the possession of marijuana.

In the exercise of [the state's] police powers, the law is clear:

To justify the state in [thus] interposing its authority in behalf of the public, it must appear, first, that the interests of

the public [generally, as distinguished from those of a particular class] require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.... *Goldblatt v. Hempstead,* 369 U.S. 590, 594–95, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962); *Lawton v. Steele,* 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894).

In my opinion[,] the statute prohibiting the possession of marijuana fails to meet the above test. *Mere debatable possible harm of marijuana on the individual user does not justify the [state] in interposing its authority in behalf of the public. Assuming arguendo [that] justification exists in proscribing the possession of marijuana, the means used to discourage the individual possession of marijuana is not reasonably necessary.* The means used has not only failed to accomplish the purpose[,] but is irrational and unduly oppressive upon the individual marijuana users.

It is ironic, indeed, that the inexplicable moral code of the majority of society accords the stamp of moral approval of two of the most harmful drugs—tobacco and alcohol—by permitting the cultivation or manufacture, the distribution, and the general use thereof, without criminal penalties, except in extreme specific instances. Yet, in the case of marijuana, where there is no conclusive proof of its harmful effects, and where the possible harm is merely debatable, and further where there is no evidence showing that marijuana use or possession ... causes the user or possessor to harm others, the state totally proscribes, with criminal penalties, the mere possession of marijuana.

I would affirm the result of the trial court's judgment for the reasons stated. *Baker,* 56 Haw. at 285, 288–92, 535 P.2d at 1402, 1404–06 (Kobayashi, J., concurring and dissenting) (some brackets, ellipsis points, and emphasis in original and some added) (footnotes omitted).

With respect to this court's collected jurisprudence in *Kraft, Lee, Cotton,* and the *"Kantner* trio" regarding the limits of the state's police power, it is apparent from the foregoing that Justice Kobayashi was, in substance, making the following plea to the *Baker* majority: "But it did exist! It does exist! It exists in memory. I remember it. You remember it." *Nineteen Eighty–Four* at 251. And it is equally apparent that the *Baker* majority was responding (albeit disingenuously), as did the diabolical O'Brien of George Orwell's imagination: "I do not remember it." *Id.*

b. *"progressive teleologic regression"—Renfro and Bachman* [37]

Six months to the day after *Baker,* this court handed down its three-to-two split decision in *State v. Renfro,* 56 Haw. 501, 542 P.2d 366 (1975).[38] The *Renfro* defendants had been convicted of promoting a detrimental drug in the first degree (a class C felony), in violation of HRS § 712–1247(1)(e), for having "knowingly and unlawfully ... possesse[d] ... 2.2 pounds or more [of] marijuana." [39]

---

37. "Progressive teleologic regression" is a term describing

the tendency of the schizophrenic to return to the level of the primary process or primary cognition in an attempt to deal with a world and self-image that are grotesque, threatening, and terrifying. The regressing is teleologic in that it is purposeful, as when an inner threat is changed into a threat from the outside world that can be defended against. But unlike other types of regression, schizophrenic regression is progressive because it usually fails in its purpose and still further regression is necessary until, finally, the process may lead to complete dilapidation.

Robert J. Campbell, M.D., *Psychiatric Dictionary* 619 (7th ed.1996).

38. Although Justice Kidwell had joined the court by the time *Renfro* was filed, *see supra* note 24, the matter was apparently argued prior to his appointment, and he therefore did not participate in deciding the appeal. Thus, Circuit Court Judge Sodetani was assigned to hear *Renfro* by reason of the vacancy created by Justice Levinson's retirement.

39. HRS § 712–1247 (1993), as amended, now provides in relevant part:

**Promoting a detrimental drug in the first degree.** (1) A person commits the offense of promoting a detrimental drug in the first degree if the person knowingly:
. . . .
(e) *Possesses* one or more preparations, compounds, mixtures, or substances of an aggre-

On appeal, they attacked the constitutionality of the statute, *inter alia*, on the grounds "that the section exceed[ed] the legitimate police power of the State" and "violate[d] the constitutional right to privacy." *Renfro*, 56 Haw. at 502, 542 P.2d at 368.

In a majority opinion, authored by Chief Justice Richardson and joined by Justices Ogata and Menor, this court affirmed the defendants' convictions. Its relevant analysis consisted of the following:

> In the recent case of *State v. Baker*, 56 Haw. 271, 535 P.2d 1394 (1975), this court upheld the constitutionality of section 1249 of the Penal Code....
>
> ... [T]he holding in *Baker* is immediately dispositive of two arguments raised by [the defendants], namely, the claims that a proscription of the possession of marijuana exceeds the State's police power and that such a proscription violates the right of privacy.
>
> We held in *Baker* that criminalization of the possession of marijuana is within the legislature's police power. We reasoned that recent scientific studies questioning the harmfulness of marijuana have not sufficiently rebutted the presumption of constitutionality attaching to the legislature's proscription. 56 Haw. at 276–78, 535 P.2d at 1397–98. The scientific studies of marijuana are still too inconclusive to compel the conclusion that the legislature has acted arbitrarily or irrationally in treating marijuana as a substantial danger to society.
>
> *Baker* also held that the constitutional right of privacy does not prevent the legislature from proscribing the possession of marijuana for private use. The court noted that neither the federal nor Hawaii constitutions has elevated the right of privacy to the equivalent of a first amendment right.[40] Therefore, in the face of the presumptively rational legislative finding that marijuana poses a serious harm to society, the right of privacy must give way.
>
> ....

> We agree both with the holding in *State v. Kantner, supra,* that "... there is no fundamental guarantee protecting the use and possession of euphoric drugs" (53 Haw. at 333, 493 P.2d at 310) and with the analogous holding in *State v. Baker, supra,* that the particular right-of-privacy values attaching to the possession of marijuana for personal use are not in themselves fundamental constitutional rights comparable to the rights guaranteed by the first amendment (56 Haw. at 280–83, 535 P.2d at 1399–1401). Therefore we apply the rational basis test in this case, rather than a "strict scrutiny" or "compelling state interest" standard of review.
>
> ... We hold—at least for the present while scientific knowledge about marijuana remains incomplete—that it is not irrational for the legislature to regard marijuana as threatening a degree of harm substantial enough to warrant imposition of ordinary criminal sanctions, including imprisonment, for the possession of marijuana.

*Renfro*, 56 Haw. at 502–03, 505 n. 9, 506, 542 P.2d at 368–70 & n. 9 (some ellipsis points in original and some added) (footnotes omitted).

What is particularly striking about the majority opinion in *Renfro* is its mantraesque, rote quality. Although the constitutional constraints—established in *Kraft* and *Lee*—on the state's police power were acknowledged in theory, they seem essentially to have atrophied to a null set. Indeed, the *Renfro* majority opinion virtually turns the *Kraft/Lee* analysis on its head. Gone was the proposition, from which "we start," "that where an individual's conduct, or class of individuals' conduct, does not directly harm others[,] the public interest is not affected and is not properly the subject of the police power of the legislature." *Lee*, 51 Haw. at 521, 465 P.2d at 577. And in the face of a legislative determination "that the conduct of a particular class of people recklessly affects their physical well-being and that the consequent physical injury and death is so widespread as to be of grave concern to the public," *id.*, not only was it no longer re-

---

gate weight of *one pound* or more, containing any marijuana[.]

(Emphases added.)

40. *See supra* notes 29 and 31 and *infra* section II.A.

quired, as a precondition of the state's exercise of the police power, that "the incidence and severity of the physical harm [be] *statistically demonstrated to the satisfaction of the court*," *id.* (emphasis added), but the diametric opposite seemed to have become the case: if the incidence and severity of the physical harm was "inconclusive," *see Renfro,* 56 Haw. at 503, 542 P.2d at 368, and the state of "scientific knowledge" was "incomplete," *see id.* at 506, 542 P.2d at 370, then the legislature could exercise the police power in whatever way it wanted.

In short, the *Renfro* majority seemed to have completely forgotten the "direct harm to others/statistically demonstrated secondary social harm" circumscription of the constitutional exercise the state's police power so carefully explicated in *Kraft* and *Lee.* That being so, it is little wonder that the *Renfro* majority regarded the constitutional right of privacy—if it really believed there was one at all, having *never* found an instance in which it took precedence over anything else—as being of such minor, non-fundamental importance that individual privacy was invariably obliged to "give way," *see Renfro,* 56 Haw. at 503, 542 P.2d at 369, to legislative whim and speculation.

Justice Kobayashi, having written himself blue in the face in *Kantner* and *Baker,* contented himself with a one-sentence dissent: "I dissent for the reasons stated in my dissent in *State v. Baker,* 56 Haw. 271, 535 P.2d 1394 (1975)." *Renfro,* 56 Haw. at 507, 542 P.2d at 370 (Kobayashi, J., dissenting). Significantly, however, Justice Kobayashi's reasoning in *Baker* had apparently persuaded Circuit Court Judge Sodetani, who therefore joined in the *Renfro* dissent. *See supra* note 38. Accordingly, as in *Kantner,* the Hawai'i marijuana possession laws escaped constitutional oblivion by a single vote.

On December 29, 1978, Justice Kobayashi—the last of the "*Kantner* trio"—retired

from this court. Three months later, on February 28, 1979, Justice Kidwell (who had replaced Justice Levinson, *see supra* note 24) did likewise. It was under these conditions, on May 21, 1979, that a unanimous Hawai'i Supreme Court—consisting of Chief Justice Richardson, Justices Ogata and Menor, Retired Justice Marumoto (who, seven years earlier, had joined the plurality opinion in *Kantner*), and Circuit Court Judge Kato—handed down a per curiam opinion in *State v. Bachman,* 61 Haw. 71, 595 P.2d 287 (1979).[41]

Like Mallan and the *Baker* defendants (and, pursuant to the predecessor statute, the *Kantner* defendants before them), Bachman was convicted of the knowing possession of marijuana in any amount, in violation of HRS § 712-1249(1). *See supra* note 2. And like Mallan and the defendants in *Baker* and *Kantner,* Bachman, among other things, "assert[ed] the unconstitutionality of the statute." *Bachman,* 61 Haw. at 72, 595 P.2d at 287. Not surprisingly, with Justices Abe, Levinson, and Kobayashi gone from the scene and Judge Sodetani safely relegated to his circuit court bench, this court wasn't giving an inch. So it was that this court dispatched Bachman's constitutional claim with the following pithy analysis: "We find [Bachman's] contention to be without merit. What we said in *State v. Baker,* 56 Haw. 271, 535 P.2d 1394 (1975), and *State v. Renfro,* 56 Haw. 501, 542 P.2d 366 (1975), is still determinative of this issue." *Id.* at 72, 595 P.2d at 287-88 (footnote omitted).

To all intents and purposes—and with *Kraft, Lee, Cotton,* and *Kantner* still intact but as if they had never been written (that is, as if they were "unprecedents")—, the state's police power was now perceived as boundless and the penumbral, fundamental constitutional right to liberty/personal autonomy/privacy all but moribund. Then came the results of the 1978 Constitutional Convention and, with it, the rekindling of the flame.

41. The appellate briefs in *State v. Bachman,* 61 Haw. 71, 595 P.2d 287 (1979), were filed before the Privacy Clause was stated as a separate provision of the Hawaii State Constitution in 1978. The right to privacy at that time was included in article I, § 5, which was renumbered to article I, § 7 in 1978 and made applicable only in criminal cases. Stand. Comm. Rep. No. 69, in 1

Proceedings of the Constitutional Convention of Hawaii at 674 (1980). The appellate briefs asserted that the statute violated the defendant's fundamental right to ingest marijuana in the privacy of his own home for his own enjoyment and for medicinal purposes.

ICA's decision at 6 n.6.

## II. THE BIRTH OF AN EXPRESS, FUNDAMENTAL CONSTITUTIONAL RIGHT TO PRIVACY AND ITS AFTERMATH

### A. The 1978 Constitutional Convention

In 1976, pursuant to article XV, section 2—now denominated article XVII, section 2, *see Hawai'i State AFL–CIO v. Yoshina*, 84 Hawai'i 374, 376 & n. 2, 935 P.2d 89, 91 & n. 2 (1997) (noting that, while originally "ratified by plebiscite on November 7, 1950" as article XV, section 2, the section was renumbered in 1978 as article XVII, section 2)—of the Hawai'i Constitution,[42] the voters mandated the convocation of the 1978 Hawai'i Constitutional Convention. *Hart v. King*, 470 F.Supp. 1195, 1196 (D.Haw.1979). The 1978 Constitutional Convention ultimately "presented to the electorate ... 34 amendments, all of which were passed by the necessary constitutional margin[.]" *Id.* (footnote omitted). ·

#### 1. Standing Committee Report No. 69

In order to accomplish its task, the 1978 Constitutional Convention organized into standing committees, one of which—the Committee on Bill of Rights, Suffrage and Elections (CBRSE)—produced Committee Proposal No. 15, which "covered [a]rticle I of the State Constitution," *i.e.*, the state's Bill of Rights. Comm. Whole Rep. No. 15, *reprinted in* 1 Proceedings of the Constitutional Convention of Hawai'i of 1978 (1980) [hereinafter, 1 Proceedings] at 1023. Committee Proposal No. 15 provided in relevant part:

> RESOLVED, that the following be agreed upon as amending Article I of the State Constitution.
>
> . . . .
>
> 6. Article I is amended by adding a new section to be appropriately designated and to read:

42. "The relevant language of article XVII, section 2, which has remained largely unchanged since it was [originally] drafted by the delegates to the Constitutional Convention of 1950 and ratified by plebiscite in both 1950 and 1959," *Yoshina*, 84 Hawai'i at 376, 935 P.2d at 91, provides in relevant part:

### RIGHT TO PRIVACY

> Section 6. The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest. The legislature shall take affirmative steps to implement this right.

Comm. Prop. No. 15, *reprinted in* 1 Proceedings at 825, 826–27 (emphasis in original).

Article I, section 6, as adopted by the 1978 Constitutional Convention and ratified by the voters, was, of course, unchanged from the CBRSE's proposed language. In a footnote, Committee Proposal No. 15 directed that, "[f]or background, discussion and rationale on the amendments proposed herein, refer to Stand. Comm. Rep. No. 69[and] Com. Whole Rep. No. 15 . . . ." *Id., reprinted in* 1 Proceedings at 826. Standing Committee Report No. 69 explained in detail the CBRSE's intent with respect to Proposal No. 15—and, in particular, article I, section 6 as recommended in it—, and Committee of the Whole Report No. 15 commented extensively on Standing Committee Report No. 69. In this context, we have long recognized that " 'a constitutional provision must be construed in connection with other provisions of the instrument, and also in the light of the circumstances under which it was adopted and the history which preceded it[.]' " *Yoshina*, 84 Hawai'i at 376, 935 P.2d at 91 (quoting *Carter v. Gear*, 16 Haw. 242, 244 (1904), *aff'd*, 197 U.S. 348, 25 S.Ct. 491, 49 L.Ed. 787 (1905)) (brackets in original).

Therefore, a close examination of both Standing Committee Report No. 69 and Committee of the Whole Report No. 15 is critical to an accurate understanding of the framers' intent regarding the scope of the express right to privacy, as codified in the new article I, section 6. Standing Committee Report No. 69 stated in relevant part:

> CONSTITUTIONAL CONVENTION
> **Section 2.** The legislature may submit to the electorate at any general or special election the question, "Shall there be a convention to produce a revision of or amendments to the Constitution?" If any nine-year period shall elapse during which the question shall not have been submitted, the lieutenant governor shall certify the question, to be voted on at the first general election following the expiration of such period.

Your Committee on Bill of Rights, Suffrage, and Elections ... begs leave to report as follows:

. . . .

Your Committee agreed to amend [a]rticle I to include a separate and distinct section devoted entirely to the right to privacy. Your Committee strongly believes that a new section on the right to privacy is warranted despite the inclusion within [a]rticle I, [s]ection 5 [now article I, section 7, *see supra* note 19], of a prohibition against unreasonable invasions of privacy.

The committee proposal reads as follows:

### "RIGHT TO PRIVACY

"*Section. The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest. The legislature shall take affirmative steps to implement this right.*" [ (Emphasis in original.) ]

In 1968 the Constitution was amended to include the prohibition against unreasonable invasions of privacy, but its inclusion within a section patterned after the [f]ourth [a]mendment right against unreasonable searches and seizures and the debate during the 1968 constitutional convention have engendered some confusion as to the extent and scope of the right. Although it appears clear that the proponents of the concept saw the right as broader than one limited to protection against invasions of privacy in criminal cases, the convention devoted most of the debate to the relationship between the proposed amendment and concern over wiretapping. This has led the Hawaii supreme court to state that the privacy right emanated from a concern over extensive use of electronic surveillance, thus limiting the right to privacy by implying that it did not encompass the concept of a right to personal autonomy. *State v. Roy,* 54 Haw. 513, 510 P.2d 1066 (1973). Thus it may be unclear whether the present privacy provision extends beyond the criminal area. Therefore, your Committee believes that *it would be appropriate to* retain the privacy

provision in [a]rticle I, [s]ection 5, but limit its application to criminal cases, and *create a new section as it relates to privacy in the informational and personal autonomy sense.*

*Your Committee is aware that the right of privacy has meaning varying in degree and nature, and case law may not be clear as to the extent and scope of the rights. Therefore, your Committee wishes to explicitly state the intent of your Committee as to the scope and nature of the right.*

Your Committee believes that *the right of privacy encompasses the common law right of privacy or tort privacy.* This is a recognition that the dissemination of private and personal matters, be it true, embarrassing or not, can cause mental pain and distress far greater than bodily injury. For example, the right can be used to protect an individual from invasion of his private affairs, public disclosure of embarrassing facts, and publicity placing the individual in a false light. In short, *this right of privacy includes the right of an individual to tell the world to "mind your own business."*

Another area of concern that may be alleviated by this right is the issue of *informational privacy,* or the ability of a person to control the privacy of information about himself. There has been a trend in modern-day society to require that a person complete forms detailing information about himself. There is often a legitimate need for government or private parties to gather data about individuals, but there is danger of abuse in the use and/or dissemination of such information. The danger of inclusion of inaccurate data being retained in some computer bank, thereby affecting the life of an individual, is inherent in our modern day, but the right to privacy should insure that at the least an individual shall have the right to inspect records to correct misinformation about himself.

Perhaps the most important aspect of *privacy* is that it *confers upon people the most important right of all—the right to be left alone.* As Justice Brandeis said in his now celebrated and vindicated dissent

in *Olmstead v. U.S.*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928):

"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."

It gives each and every individual the right to control certain highly personal and intimate affairs of his own life. *The right to personal autonomy, to dictate his lifestyle, to be oneself are included in this concept of privacy.* As Justice Abe stated in his concurring opinion in *State v. Kantner*, 53 Haw. 327, 493 P.2d 306 (1972): *each person has the "fundamental right of liberty to make a fool of himself as long as his act does not endanger others, and that the state may regulate the conduct of a person under pain of criminal punishment only when his actions affect the general welfare—that is, where others are harmed or likely to be harmed."*

Whether an individual's desire to engage in a particular activity is protected by this aspect of the right to privacy (the right to personal autonomy) will remain a matter for the courts. *For example*, it has been held that society has no legitimate interest in the hairstyle of a person attending a public educational institution. *Other cases have included* certain marital, sexual and reproductive matters within this right, thereby insuring freedom of choice in these matters.

It should be emphasized that *this right* is not an absolute one[,] but, *because similar to the right of free speech, it is so important in value that it can be infringed upon only by the showing of a compelling state interest. If the State is able to show a compelling state interest, the right of the*

*group will prevail over the privacy rights or the right of the individual. However, in view of the important nature of this right, the State must use the least restrictive means should it desire to interfere with the right.*

Your Committee expects that at times the interests of national security, law enforcement, the interest of the State to protect the lives of citizens or other similar interests will be strong enough to override the right to privacy. *It is not the intent of your Committee to grant a license to individuals to violate the right of others[,] but rather to grant the individual full control over his life, absent the showing of a compelling state interest to protect his security and that of others.* Thus[,] it is expected that in certain situations the interest of the State will rise to such an intensity that it will be deemed a compelling state interest. *For example*, in the case of dissemination of information about individuals, law enforcement officials would not be restricted in sharing information about suspected wrongdoers, or the press may be justified in writing about certain personal matters of public figures. Further, it should be noted that the committee does not intend to prohibit one department of the state government from obtaining data kept in another department, as happened in Alaska. Your Committee does not believe that exchanging and sharing of information between separate components of government should be prohibited. Your Committee is concerned about abuses such as using such data for illegitimate purposes or revealing it to the public when no legitimate public interest is involved. Thus, your Committee does not envision closing off access to court records or public records already subject to "sunshine" laws but feels that this amendment would be useful in prohibiting abuse, misuse or unwarranted revelations of highly personal information. However, your Committee strongly believes that in a day when outside forces seek to learn more and more about an individual and control more and more about an individual's life, this amendment is necessary.

The importance of *this amendment* is that it *establishes that certain rights deserve special judicial protection from majority rule.* It recognizes that there will always be a dynamic tension between majority rule, which is the basis of a democratic society, and *the rights of individuals to do as they choose,* which *is the basis of freedom,* and your Committee believes that this amendment recognizes the high value that individuality has in society. *Your Committee, by equating privacy with the [f]irst [a]mendment rights, intends that the right be considered a fundamental right and that interference with the activities protected by it be minimal.*

Stand. Comm. Rep. No. 69, *reprinted in* 1 Proceedings at 671, 673–75 (emphases added).[43]

In parsing the CBRSE's explication of the intended scope of the new article I, section 6, one is struck by its familiarity—that is, by the fact that nothing in it is new and, indeed, that it has all been said, quite expressly, before. Put baldly, Standing Committee Report No. 69 represents nothing less than a clear reaffirmation of the interrelationship between the legitimate domain of the state's police power, on the one hand, and the individual's fundamental constitutional right to liberty/personal autonomy/privacy, on the other, as progressively conceptualized by this court in *Kraft, Lee,* and *Cotton,* and as refined by the "Abe thesis" (to which Justice Kobayashi also adhered in *Cotton* and substantially endorsed in *Kantner* ) and Justice Levinson's analysis in *Kantner.*

For present purposes, a correct understanding of Standing Committee Report No. 69 is therefore essential for a number of reasons. As a foundational matter, the CBRSE's express approval and incorporation by reference of Justice Abe's statement in *Kantner* that each person has the

fundamental right of liberty to make a fool of himself so long as his act does not endanger others, and that the state may regulate the conduct of a person under pain of criminal punishment only when his actions affect the general welfare—that is, where others are harmed or likely to be harmed

reflects the resurrection of the proposition—first perceived by this court in *Kraft,* amplified in *Lee* and *Cotton,* and all but forgotten in *Baker, Renfro,* and *Bachman*—that, wholly separate and apart from any consideration of the constitutional right to privacy, the "harm to others" principle is a circumscription that limits the exercise of the state's police power to criminalize conduct in Hawaiʻi.

Moreover, the CBRSE expressed the clear intention that "the right to be let alone," as first described by Justice Brandeis in *Olmstead* and later invoked by Justices Abe and Levinson in *Lee* and *Kantner,* was to be "the most important aspect" of the right of privacy guaranteed by the new article I, section 6. To underscore the point, the CBRSE articulated its opinion that "the right to be left alone," which article I, section 6 would "confer[ ] upon people," was "the most important right of all." And, insofar as the right to be left alone also gave to "each and every individual . . . [t]he right to personal autonomy, to dictate his [or her] lifestyle, and to be oneself," or, put another way, "the right[ ] of individuals to do as they choose," the CBRSE clarified that the cluster of rights codified in article I, section 6 would, in and of itself, further constrain and limit the state's exercise of the police power.

In this connection, the CBRSE emphasized that "[w]hether an individual's desire to engage in a particular activity is protected by this aspect of the right to privacy ( [*i.e.,*] the right to personal autonomy)," on the one

---

**43.** . . . Article I, section 6 . . . "relates to privacy in the informational and personal autonomy sense." Stand. Comm. Rep. No. 69, *reprinted in* 1 Proceedings at 674. In promulgating article I, section 6, the Convention intended "that privacy [be] treated as a fundamental right for purposes of constitutional analysis." Comm. Whole Rep. No. 15, *reprinted in* 1 Proceedings at 1024. The newly and expressly codified right of privacy

included: (1) "the right of an individual to tell the world to 'mind your own business' "; (2) "the right to be left alone"; and (3) "[t]he right to personal autonomy to dictate [one's] lifestyle, [and] to be oneself." Stand. Comm. Rep. No. 69, *reprinted in* 1 Proceedings at 674.

*State v. Wallace,* 80 Hawaiʻi 382, 393 n. 12, 910 P.2d 695, 706 n. 12 (1996) (brackets in original).

hand, or whether "society has [a] legitimate interest" in criminalizing the activity through the exercise of the police power, on the other, "will remain a matter for the courts." Obviously, the "examples" enumerated in Standing Committee Report No. 69 are only that—nonexclusive examples by way of illustration; it *should* go without saying (but nevertheless needs saying) that "the hairstyle of a person attending a public educational institution" and "certain marital, sexual[,] and reproductive matters . . . insuring freedom of choice" are merely representative of the "cases" that are "included" within the universe of "activity" that lies outside the state's police power to criminalize.

Thus, with respect to *any* given "activity," the issue whether it falls within the ambit of the right to privacy "in the personal autonomy sense," entailing no harm or likelihood of harm to others, is omnipresent. If the activity falls within the foregoing ambit, "the individual" is granted "full control over his [or her] life," and the activity is *not* subject to the state's police power to criminalize. When this class of activity is at issue, the following views of Professor Feinberg are germane:

> The best way to put this point, I think, is to say that personal sovereignty is not just another interest, subject to balancing tests when in conflict with another interest. Sovereignty cannot be put on the interest-balancing scales at all. Personal sovereignty places an absolute duty on lawmakers not to cross its boundaries. To "weigh" such a duty against mere interests brings to mind Laurent Frantz's remark in a similar context: "One's need for a new car can be balanced against the other uses to which the same money might be put but not against 'Thou shalt not steal'." Still, voluntarily risked injuries, deaths, broken backs, and broken hearts, are evils of *some* kind, even though not violations of rights or grounds for grievance, and the prevention of any evil is a relevant reason for any action. That should not be denied. The point is rather that this reason is "trumped" by personal sovereignty on the other side, and therefore is "as if naught" when compared with the absolute principle governing the self-regarding realm. If not

taken too seriously, a mathematical analogy might help. A moderate or even large finite number is as if naught when compared with an infinite one.

> The need to prevent an evil then is always a relevant reason in support of a criminal prohibition. But very little is being said for a reason when it is allowed to be relevant, unless it is also acknowledged to be cogent or compelling, a "good reason" with more than mere minimal weight. The need to prevent harm to others is always a *good* reason for criminal prohibitions. So much is a central tenet . . . of "moral common sense." When the harm to be prevented is great enough, . . . preventing harm to others will not just be a good reason but a decisive one. We can say of the harm and offense principles then that they always state relevant reasons, always state good reasons, and frequently state decisive reasons for criminalization. When one considers that interference with people's liberty is always a good reason *against* legal coercion (so says the presumption in favor of liberty), one can appreciate how very good a reason in general the prevention of harm to others is. . . . Preventing likely setback to the actor's own interest, on the other hand, while always a relevant reason in the sense explained above, never becomes a good reason for interfering with fully voluntary conduct, because in the latter case it crosses the boundaries of the actor's self-regarding domain and violates [his or] her autonomy, not just [his or] her liberty.

Joel Feinberg, *Harmless Wrongdoing* 322–23 (Oxford Univ. Press 1988) (footnoted citation omitted) (emphases in original). Or, put succinctly:

> There is no such thing as a "trivial interference" with personal sovereignty; nor is it simply another value to be weighed in a cost-benefit comparison. In this respect, if not others, a trivial interference with sovereignty is like a minor invasion of virginity; the logic of each concept is such that a value is respected in its entirety or not at all.

Joel Feinberg, *Harm to Self* 94 (Oxford Univ. Press 1986). If, on the other hand, society has "a legitimate interest" in the activity because it actually entails harm or likelihood of harm to others, then (for the reasons, among others, discussed above by Professor Feinberg) the individual is not granted "full control," and the activity *is* subject to the state's police power to criminalize.

Within the context of performing the foregoing analysis, the CBRSE declared that the individual's right to privacy, as codified in the new article I, section 6, was on a par with (as distinguished from identical to) the first amendment right of free speech and, therefore, "so important" (*i.e.,* so "fundamental") that it cannot be infringed "absent the showing of a compelling state interest to protect [the individual's] security and that of others." This proposition is profoundly significant for at least two reasons. First, for purposes of article I, section 6 "privacy/personal autonomy" analysis, it is the right to be let alone, *per se,* that is fundamental and *not* any particular "activity" subsumed within that right; thus, the constitutional question is *never* whether there is a "fundamental right" to engage in the activity itself, but, rather, whether the particular activity falls within the protection of the fundamental constitutional right to privacy.[44]

Second, because "the 'privacy concept' embodied in article I, section 6 is to be 'treated as a fundamental right,'" *Baehr,* 74 Haw. at 551, 852 P.2d at 55 (quoting *State v. Kam,* 69 Haw. 483, 493, 748 P.2d 372, 378 (1988)), the constitutionality of a statute impinging upon the right to privacy "in the personal autonomy sense" is not subject merely to "rational basis" review, but, rather, to "strict scrutiny."

When government action denies a fundamental right, in order to uphold that governmental action as constitutional, "a court must find, in balancing the state interest furthered by the government action against the harm to be suffered by the affected individual, that the state interest is a compelling one. . . ." In determining whether the state interest is a compelling one, a court will review that government action with strict scrutiny. The strict scrutiny standard of review means that the government action is not entitled to the usual presumption of validity, that the government must carry a heavy burden of justification, that the government must demonstrate that its program has been structured with precision and is tailored narrowly to serve legitimate objectives[,] and that it has selected the least drastic means for effectuating its objectives.

*McCloskey v. Honolulu Police Dept.,* 71 Haw. 568, 576, 799 P.2d 953, 957 (1990) (citations and internal quotation signals omitted) (some brackets and ellipsis points added and some omitted). Accordingly, for example, to the extent that HRS § 712–1249 infringes the fundamental constitutional right to privacy in the personal autonomy sense, it is "presumed to be unconstitutional unless the state shows compelling state interests" justifying the infringement and that the statute is "narrowly drawn to avoid unnecessary abridgments of constitutional rights." *Cf. Baehr,* 74 Haw. at 572, 852 P.2d at 63–64 (citations, internal quotation marks, and footnote omitted).

In short, just as Standing Committee Report No. 69 resurrected this court's analysis in *Kraft, Lee,* and *Cotton,* as well as the positions advanced by the "*Kantner* trio," it likewise repudiated our "analyses" in *Baker, Renfro,* and *Bachman.*

2. *Committee of the Whole Report No. 15*

The CBRSE's Committee Proposal No. 15, as explicated in Standing Committee Report No. 69, was referred to the entire 1978 Constitutional Convention, sitting as a committee of the whole, which considered the proposal on September 8 and 9, 1978. Comm. Whole Rep. No. 15, *reprinted in* 1 Proceedings at 1023. "[H]aving fully debated and considered the proposal," *id.,* the Convention issued Committee of the Whole Report No. 15. As it pertained to the adoption of the new article I, section 6, as recommended by the CBRSE,

---

**44.** This distinction is key to an understanding of what I have dubbed the "fallacy of trivializa-tion." *See infra* section II.B.1.

the entirety of Committee of the Whole Report No. 15 stated as follows:

Your Committee also discussed the ramifications of the adoption of section 6 of Com. P. No. 15. Section 6 would amend [a]rticle I of the Constitution to include a separate and distinct section on the right to privacy.

To make clear its intent, your Committee would like to *reiterate and elaborate on certain matters contained in Stand. Comm. Rep. No. 69.* Should this section of the proposal be approved by the electorate, the Constitution will have two provisions related to privacy. However, the provisions are not to be construed as identical in intent. The privacy provision within [a]rticle I, [s]ection 5 [now redenominated article I, section 7] should be construed in light of the language in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), regarding reasonable expectation of privacy. Privacy as used in this sense is not a fundamental right but a test of whether the prohibition against unreasonable searches and seizures applies.[45]

*By amending the Constitution to include a separate and distinct privacy right, it is the intent of your Committee to insure that privacy is treated as a fundamental right for purposes of constitutional analysis.* Privacy as used in this sense concerns the possible abuses in the use of highly personal and intimate information in the hands of government or private parties but is not intended to deter the government from the legitimate compilation and dissemination of data. More importantly, *this privacy concept encompasses the notion that in certain highly personal and intimate matters, the individual should be afforded freedom of choice absent a compelling state interest.* This right is *similar* to the privacy right discussed in cases *such as Griswold v. Connecticut,* 381 U.S.

479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), *etc.* It is a right that, though unstated in the federal Constitution, emanates from the penumbra of several guarantees in the Bill of Rights. Because of this, there has been some confusion as to the source of *the right* and the importance of it. As such it *is treated as a fundamental right subject to interference only when a compelling state interest is demonstrated.* By inserting clear and specific language regarding this right into the Constitution, your Committee intends to alleviate any possible confusion over the source of the right and the existence of it.

Accordingly, your Committee of the Whole recommends the adoption of Comm. Whole Rep. No. 15 and consideration of the passage of Com. P. No. 15 ... on second reading.

Comm. Whole Rep. No. 15, *reprinted in* 1 Proceedings at 1024 (emphases added).

For present purposes, as was true of the CBRSE's Standing Committee Report No. 69, a correct understanding of Committee of the Whole Report No. 15 is essential for several reasons. First, by (1) "reiterating" and "elaborating" on "certain matters" contained in Standing Committee Report No. 69 and (2) recommending the passage of the CBRSE's Committee Proposal No. 15 (including the new article I, section 6), the 1978 Constitutional Convention, sitting as a committee of the whole, was demonstrably *endorsing* Standing Committee Report No. 69, as it pertained to the proposed article I, section 6, in its *entirety.* In this regard, absolutely no disapproval of or disagreement with Standing Committee Report No. 69 appears in Committee of the Whole Report No. 15. This fact is critical to an appreciation of this court's strained and parsimonious reading in *State v. Mueller,* 66 Haw. 616, 671 P.2d

---

**45.** The privacy provision contained in article I, section 7 of the Hawai'i Constitution is now "limit[ed in] its application to criminal cases[.]" Stand. Comm. Rep. No. 69, *reprinted in* 1 Proceedings ... at 674 (1980). "Privacy," within the meaning of the *Katz* test and as subsumed within article I, section 7 "is not a fundamental

right but [rather] a test of whether the prohibition against unreasonable searches and seizures applies." Comm. Whole Rep. No. 15, *reprinted in* 1 Proceedings at 1024.

*Wallace,* 80 Hawai'i at 393, 910 P.2d at 706 (footnote omitted) (brackets in original).

1351 (1983), quoted at length *infra* in section II.B.1, of the history underlying the promulgation of article I, section 6 and the consequent scope of the fundamental constitutional right to privacy contained in it.

Second, by "reiterating" that the Convention's intent, "for purposes of constitutional analysis," was "to insure that privacy is treated as a fundamental right," which could be not be abridged absent a showing by the state of "a compelling state interest," the Convention was making it crystal clear that no law impinging upon the protections contained in the new article I, section 6 could be presumed constitutional and that such a law would be subject to strict scrutiny review. As early as 1990, this court recognized as much in *McCloskey*, 71 Haw. at 576, 799 P.2d at 957.

Third, by repeating that the fundamental right at issue would be "subject to *interference* only when a compelling state interest is demonstrated" (emphasis added), the 1978 Convention evinced its implicit awareness of the inextricable interrelationship between the state's police power (which, after all, can only manifest itself through governmental "interference" with the unfettered "liberty" of the individual to do, or forbear from doing, what he or she pleases, *see supra* note 5), on the one hand, and the implementation of the right to privacy, on the other. In so doing, the Convention underscored the obvious, namely, that it is impossible to ascertain the parameters of the constitutional right to privacy without also considering the constitutional limits imposed upon the state's police power.

And finally, fourth, by declaring that the right to privacy envisioned by article I, section 6 was "similar" to the right discussed in cases "such as" *Griswold*, *Eisenstadt*, and *Roe*, "etc.," it is clear that the 1978 Convention was enumerating these decisions only by way of illustration and not as an exclusive list of the cases delineating *all possible applications* of the fundamental right. This is significant because later, in *Mueller*, this court would mistakenly suggest that article I, section 6 was *coextensive* in all respects with the right described in those three cases, *see infra* section II.B.1, a view that this court correctly repudiated four years later in *Kam*, *see infra* section II.B.2.

Thus, it is apparent, at least to me, that article I, section 6, as ultimately proposed by the 1978 Constitutional Convention and ratified by the electorate, embodied the fundamental right to privacy as originally described in the CBRSE's Standing Committee Report No. 69, which, as had been demonstrated, reaffirmed this court's collected jurisprudence in *Kraft*, *Lee*, and *Cotton*, as well as the opinions of the "*Kantner* trio." It is equally apparent, at least to me, that, following the adoption of article I, section 6 in 1978, *Baker*, *Renfro*, and *Bachman*—as vehicles for constitutional interpretation—were dead letters.

B. *Yin, Yang, And "Something Else"—Mueller, Kam, And Baehr*

1. *Schizophrenia—State v. Mueller* [46]

*State v. Mueller, supra*, 66 Haw. 616, 671 P.2d 1351 (1983), accorded this court its first opportunity to construe the limits of the state's police power to criminalize conduct in light of the constraints imposed upon it by the recently adopted article I, section 6.[47] In *Mueller*, the defendant (Mueller) was charged with prostitution in violation of HRS § 712–1200 (Supp.1982), for having "engage[d] in, or agree[d] to engage in, sexual conduct with another person, in return for a fee." Mueller

---

46. The term "schizophrenia," as originally coined, was

meant to designate ... one of the fundamental characteristics of patients so diagnosed, namely, the splitting off of portions of the psyche, which portions may then dominate the psychic life of the subject for a time and lead an independent existence even though these may be contrary and contradictory to the personality of the whole....

*Psychiatric Dictionary* at 644.

47. Approximately a year and a half earlier, in *State v. Lester*, 64 Haw. 659, 649 P.2d 346 (1982), this court had held, *inter alia*, that the warrantless recordation of a murder defendant's conversation with a co-indictee did not violate the defendant's right to privacy, as guaranteed by article I, section 6. Accordingly, *Lester* was addressing the right to privacy in the "informational sense."

moved to dismiss the charge asserting a "constitutional right to privacy for activities that were conducted in the privacy of her own home." At the hearing on the motion[,] the parties entered into a stipulation of facts, agreeing that the activity in question took place in ... Mueller's apartment, the participants were willing adults, and there were "no signs of advertising" anywhere in the apartment building.

*Mueller*, 66 Haw. at 618–19, 671 P.2d at 1354. Mueller's argument was twofold: (1) that "the activity's private setting and the absence of public solicitation set her apart 'from every other prostitution case' "; and (2) that "a decision to engage in sex with 'a voluntary adult companion' was 'well within her constitutional right to privacy.' " *Id.* at 619, 671 P.2d at 1354. The district court denied Mueller's motion to dismiss, ruling that "the State has a 'compelling interest in controlling prostitution in private residences as well as on the streets,' " and convicted her of the offense charged. *Id.*

With the caveat that "[o]ur opinion ... is limited to the question of whether the right to privacy guaranteed by [a]rticle I, section 6 of the Hawaii Constitution is broad enough to include a decision to engage in prostitution," *id.* at 630 n. 9, 671 P.2d at 1360 n. 9, this court affirmed Mueller's conviction.[48] While I make no definitive judgment as to the correct ness of the *Mueller* court's judgment of affirmance, I have much to say about the

path by which the court reached its result. That path was as follows:

The Supreme Court teaches us "that *a right to personal privacy, or a guarantee of certain areas or zones of privacy,*" *is implicit in the United States Constitution,* Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973); [a]rticle I, [s]ection 6 of the Hawaii Constitution explicitly declares that *"[t]he right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest."* ... Mueller (the defendant) claims the State invaded a constitutionally protected area of privacy when it prosecuted her for prostitution on the basis of sexual conduct involving two consenting adults and occurring in her home. *But we are not convinced a decision to engage in sex for hire is a fundamental right in our scheme of ordered liberty,* and we affirm her conviction.

....

The sole issue posed on appeal is whether the proscriptions of ... [ ]HRS[ ] § 712–1200 may be applied to an act of sex for a fee that took place in a private apartment. With Roe v. Wade, supra, as the point of departure, [Mueller] argues the privacy guaranteed by the federal and state constitutions prevented a valid application of the statute to the act in question. We begin our analysis by examining the sources and scope of the federally protected right to personal privacy.

---

48. Concurring separately in the judgment, Justice Padgett took the position that the appeal did not implicate the right to privacy at all, not to mention (which he did not) the limits of the state's police power:

The constitution limits us to deciding actual cases or controversies. The actual case before us involves a "hooker" who, while in her apartment, was contacted by telephone by a "john" who, unbeknownst to her, was a police officer. Over the telephone she agreed to have sex with him in her apartment for $100.

[Mueller] contends that her right to privacy under the state and federal constitutions protected her commercial sexual activity since it was conducted in her apartment and without advertising. The argument is novel, ingenious and insubstantial.

To quote the title of a famous madam's published memoirs[,] "A house is not a home." The rights of privacy guaranteed by the federal and state constitutions do not bar the State from

prohibiting, by statute, commercial sexual activities even if they are conducted, without advertising, as a cottage industry.

*Mueller*, 66 Haw. at 631, 671 P.2d at 1360–61 (Padgett, J., concurring).

Assuming, *arguendo*, that Mueller's argument was ingenious (which, in my opinion, gives it more credit than it is due), it certainly was not novel, growing organically, as it did, out of the reasoning underlying this court's decisions in *Kraft, Lee,* and *Cotton,* as well as the views of Justices Abe and Levinson as expressed in *Lee, Cotton,* and *Kantner.* That being the case, I would not characterize the argument as insubstantial either. And insofar as Justice Padgett's views were grounded in the commercial character of the sexual activity at issue, I suggest that they are fundamentally incompatible with this court's unanimous opinion in *Kam, see infra* section II.B.2, notwithstanding the *Kam* court's unsatisfying stab at distinguishing *Mueller.*

. . . .

The United States Constitution contains "no express provisions guaranteeing to persons the right to carry on their lives protected from the 'vicissitudes of the political process' by a zone of privacy or a right of personhood." L. Tribe, *American Constitutional Law* 893 (1978). But in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Supreme Court found "that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance," 381 US. at 484, 85 S.Ct. at 1681, and concluded "[v]arious guarantees create zones of privacy." *Id.* The marriage relationship, it held, was one "lying within the zone of privacy created by several fundamental constitutional guarantees." 381 U.S. at 485, 85 S.Ct. at 1682. And the Connecticut statute forbidding the use of contraceptives was struck down as being "repulsive to the notions of privacy surrounding the . . . relationship." 381 U.S. at 486, 85 S.Ct. at 1682.

Thus the privacy accorded constitutional protection by *Griswold* inhered in the marital relationship. But when the Court subsequently invalidated a Massachusetts law regulating the distribution of contraceptives in *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), it recognized that this right also existed apart from marriage. For as the Court explained, "[i]f the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusions into matters so fundamentally affecting a person as the decision whether to bear or beget a child." 405 U.S. at 453, 92 S.Ct. at 1038 (emphasis in original).

Whether the right is broad enough to accommodate a woman's decision to seek an abortion was the question in *Roe v. Wade, supra*. The Court observed that earlier decisions made "it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), are included in this guarantee of personal privacy." Roe v. Wade, 410 U.S. at 152, 93 S.Ct. at 726. That the guarantee had been extended to activities relating to marriage, procreation, contraception, family relationships, and child rearing and education was also noted. *Id.* at 152–53, 93 S.Ct. at 726–27. And the Court concluded "[t]his right of privacy, whether it be founded in the [f]ourteenth [a]mendment's concept of personal liberty and restrictions upon state action . . . or . . . in the [n]inth [a]mendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Id.* at 153, 93 S.Ct. at 727. However, it ruled "this right *is not unqualified and must be considered against important state interests in regulation*." *Id.* at 154, 93 S.Ct. at 727.[49]

The Court has also spoken very clearly in another area of intimate decision. The issue in *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), was whether "the Georgia obscenity statute, insofar as it punishes mere private possession of obscene matter, violates the [f]irst [a]mendment, as made applicable to the States by the [f]ourteenth [a]mendment." *Id.* at 559, 89 S.Ct. at 1244. The appellant's thesis was characterized as "asserting the right to read or observe what he pleases—the right to satisfy his intellectual and emotional needs in the privacy of his own home." *Id.* at 565, 89 S.Ct. at 1248. Though it acknowledged "the States retain broad power to regulate obscenity," the Court nevertheless held that the "power simply does not extend to mere possession by the individual in the privacy of his own home." *Id.* at 568, 89 S.Ct. at 1250.[50]

. . . .

---

**49.** In this respect, I suggest that the *Roe* Court was merely acknowledging the self-evident proposition that there is a line demarcating the individual's right of privacy/personal autonomy from the state's police power to interfere with—*i.e.*, to regulate and, in the extreme, to criminalize—the individual's conduct.

**50.** Thus, *Stanley* represents another recognition that the state's police power has finite limits.

But there has been no clear and binding judicial statement on the matter of our present concern....

. . . .

We turn from privacy as expounded by the Supreme Court to the right of privacy that has been written into the Hawaii Constitution.... Couched in the terse language characteristic of constitutions, the provision itself gives no clue of its intended breadth. We therefore look to an obvious extrinsic aid to construction, its history, for direction.

. . . .

The language at bar was added to the Hawaii Bill of Rights during the most recent decennial review of our fundamental law. The suggestion to adopt a specific right to privacy was offered by the [CBRSE] of the Constitutional Convention of Hawaii of 1978 as one of several proposals related to the Bill of Rights. *See* Comm. P. No. 15, [*reprinted in* 1] Proceedings ... at 825–27. The report [*i.e.*, Standing Committee Report No. 69] accompanying Committee Proposal No. 15 discussed the proposals at length, and the discussion on the proposed privacy right furnished an insight to what was meant to be covered.

. . . .

The [CBRSE] believed "this right of privacy ... [should include] the right of an individual to tell the world to 'mind your own business.'" [Stand. Comm. Rep. No. 69, *reprinted in* 1 Proceedings at 674.] It cited with approval the proposition that "the right to be left alone ... [is] the most comprehensive of rights and the right most valued by civilized men." *See Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (Brandeis, J., dissenting). The intended privacy, it said, gave "each and every individual the right to control certain highly personal and intimate affairs of his own life." Stand Comm. Rep. No. 69, *supra,* at 674. "The right to personal autonomy," it made clear,

was to be "included in this concept of privacy." *Id.* "Whether an individual's desire to engage in a particular activity is protected by this aspect of the right to privacy, (the right to personal autonomy)," however, was deemed "a matter for the courts." *Id.* at 675.

. . . .

... Sitting as a committee of the whole, the convention discussed the proposal at length and thereafter adopted a committee report reflecting the consensus of the assembly. [The *Mueller* opinion then quotes Committee of the Whole Report No. 15 at length, but omits the paragraph beginning with the sentence, "To make clear its intent, your Committee would like to reiterate and elaborate on certain matters contained in Stand. Comm. Rep. No. 69." *See supra* section II.A.2.]

*Thus, we are led back to Griswold, Eisenstadt, and Roe and appear to have come full circle in our search for guidance on the intended scope of the privacy protected by the Hawaii Constitution.*

. . . .

[Mueller] asserts *Griswold, et al.,* and the State Constitution placed the act for which she was prosecuted beyond the reach of HRS § 712–1200 because it was sexual activity carried on in private between two consenting adults and it was not preceded by public solicitation. There was, she claims, no state interest that compelled her prosecution under these circumstances.[51]

Since the guaranteed freedom from intrusion extends to sexual activity among unmarried adult couples as *Eisenstadt v. Baird* suggests and to autoeroticism in the home as *Stanley v. Georgia* implies, *we would have to agree that there is room for argument that the right encompasses any decision to engage in sex at home with another willing adult.* Moreover, as [Mueller] reminds us, the commentary on HRS § 712–1200 evidences that the drafters of the Penal Code found the usual

---

**51.** In other words, Mueller was arguing that, inasmuch as her fundamental right to privacy, as guaranteed by article I, section 6, was implicated in the proceedings, HRS § 712–1200 was subject to strict scrutiny review, thus obligating the prosecution to demonstrate a compelling state interest in the infringement of that right.

reasons for suppressing prostitution "are less than convincing." *Still, every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. [Mueller] has not met this burden, for she has not demonstrated in a convincing manner that a decision to engage in prostitution has been recognized as a fundamental right.*

. . . .

"[O]ne aspect of the 'liberty' protected by the Due Process Clause of the [f]ourteenth [a]mendment is 'a *right of personal privacy,*' " *Carey v. Population Services International,* 431 U.S. [678,] 684, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 [ (1977) ] (quoting *Roe v. Wade,* 410 U.S. at 152, 93 S.Ct. at 726), which *includes "the interest in independence in making certain kinds of important decisions." Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). "While *the outer limits of this aspect of privacy have not been marked by the Court,* it is clear that *among the decisions* that an individual may make without unjustified government interference are personal decisions 'relating to marriage . . ., procreation . . ., contraception . . ., family relationships . . .,

and child rearing and education. . . ." *Roe v. Wade, supra,* [410 U.S.] at 152–153, 93 S.Ct. at 726–27." *Carey v. Population Services International,* 431 U.S. at 684–85, 97 S.Ct. at 2015–16 (citations omitted). It is also clear that *state laws "that burden an individual's right to decide" in the foregoing areas may be justified only by a compelling state interest. Id.* at 688, 97 S.Ct. at 2018.

But state regulation need not meet this standard " 'whenever it implicates sexual freedom' " or " 'affect[s] adult sexual relations.' " *Id.* at 688 n. 5, 97 S.Ct. at 2018 n. 5.[52] For as we noted earlier, "*only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,"* Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), are included in the guarantee of personal privacy." Roe v. Wade,* 410 U.S. at 152, 93 S.Ct. at 726.

*[Mueller] has directed us to nothing suggesting a decision to engage in sex for hire at home should be considered basic to ordered liberty.* . . . [But] until we learn from the Court's pronouncements that we have been misinformed, *we* shall continue to *assume there is a "social interest in order and morality,"* [53] *Chaplinsky v.*

---

**52.** This is a mischaracterization of footnote 5 in *Carey,* which stated in relevant part that " 'the Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating [private consensual sexual] behavior among adults,' n.17 *infra,* and we do not purport to answer that question now." *Carey,* 431 U.S. at 688 n. 5, 97 S.Ct. at 2018 n. 5 (brackets in original).

**53.** How the maintenance of social "order" relates to "an act of sex for a fee that [takes] place in a private apartment," *see Mueller,* 66 Haw. at 620, 671 P.2d at 1354, is anybody's guess. As the commentary on HRS § 712–1200 demonstrates, *see infra* note 55, what the drafters of the Hawai'i Penal Code meant by "the need for public order"—on the basis of which it purportedly justified the existence of the statute—was "the widespread belief" that "prostitution should be suppressed entirely or that it should be so restricted as not to offend those members of society who do not wish to consort with prostitutes or to be affronted by them[,] . . . thereby protecting those segments of society which are offended by its open existence." I therefore assume that a "social interest in . . . morality," *see Mueller,* 66 Haw. at 628, 671 P.2d at 1359, refers

to what Professor Feinberg has characterized as "grounds for 'enforcing morality' . . . that do not include an independent need to arrest social change." *Harmless Wrongdoing* at 43.

> The *psychic aggression thesis* and the *social disintegration thesis,* for example, when applied to the enforcement of moral codes . . . appeal to certain indirectly harmful consequences of tolerating otherwise harmless conventional immoralities. The former rests on the dubious empirical premise that deviations from conventional morality even in private are threats to the mental health of others; the latter rests on the even more dubious sociological premise that conventional immoralities threaten every individual with the disintegration of his society and ensuing anarchy. . . .

*Id.* (emphases in original).

I submit that these "theses" are antithetical to the "direct harm to others" principle developed in *Kraft, Lee,* and *Cotton;* they are certainly anathema to the "Abe thesis," which was expressly imported into article I, section 6. *See supra* sections II.A.1 and 2. Professor Feinberg explains why:

> The son's interest in how he lives his own life is more important than the father's interest in

*New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) (quoted in *Roth v. United States,* 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957), *that enables a state legislature to act in this area. Cf. Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 57–69, 93 S.Ct. 2628, 2635–42, 37 L.Ed.2d 446 (1973) (States have a legitimate interest in regulating commerce in obscene material, even among consenting adults).[54] *The validity of the action, of course, is contingent upon the presence of a rational basis therefor.*

> how another person lives his life, other things being equal, because the life in contention is *his* life, not someone else's. I don't think this judgment is strictly *ad hoc,* having as its sole merit that it eliminates some harm-principle support for the legal enforcement of conventional morality.... Rather I strongly suspect that this judgment derives from a moral consensus of persons on both sides of the controversy over the legal enforcement of morality, at least insofar as they attach preponderant value to personal autonomy.... To the believer in *de jure* personal autonomy (and that includes most of us, at least implicitly) he is the "right owner" of his own life, and even the genuine interest of other parties in how he lives his life in private ... is of comparatively little importance.
> ... When two persons each have interests in how one of them lives his life, the interests of the one whose life it is are the more important. I should think that the denial of this judgment is virtually tantamount to a denial that personal autonomy, so long celebrated by philosophers of diverse sorts, has very great moral relevance.... *Harmless Wrongdoing* at 60–61 (emphases in original). Lord Devlin is an archetypal proponent of the opposing point of view. *See generally* Patrick Devlin, *The Enforcement of Morals* (Oxford Univ. Press 1965).

54. For purposes of the Hawai'i Constitution, the state may have a "legitimate" interest, but it is not "compelling." *See Kam,* discussed thoroughly *infra* in section II.B.2.

55. As the *Mueller* court noted, the commentary on HRS § 712–1200 states in relevant part:

> Our study of public attitude in this area revealed the widespread belief among those interviewed that prostitution should be suppressed entirely or that it should be so restricted as not to offend those members of society who do not wish to consort with prostitutes or to be affronted by them. Making prostitution a criminal offense is one method of controlling the scope of prostitution and thereby protecting those segments of society which are offended by its open existence. This "abolitionist" approach is not without its vociferous detractors. There are those that con-

. . . .

The drafters of the Hawaii Penal Code justified the enactment of HRS § 712–1200 on "the need for public order."[55] We would not dispute that it was reasonable for the legislature to act on that basis. A large segment of society undoubtedly regards prostitution as immoral[56] and degrading, and the self-destructive or debilitating nature of the practice, at least for the prostitute, is often given as a reason for outlawing it.[57] *We could not deem these views irrational. . . .*

> tend that the only honest and workable approach to that problem is to legalize prostitution and confine it to certain localities within a given community. While such a proposal may exhibit foresight and practicality, the fact remains that a large segment of society is not presently willing to accept such a liberal approach. Recognizing this fact and the need for public order, the Code makes prostitution and its associate enterprises criminal offenses,

While "[m]aking prostitution a criminal offense" is clearly "one method of controlling [its] scope ... and thereby protecting those segments of society which are offended by its *open* existence" (emphasis added), the observation merely begs the question whether, as a matter of state constitutional law, the sovereign police power, as circumscribed by article I, section 6, extends to the *criminalization* of an act of sex for a fee, the solicitation and consummation of which takes place in a private apartment and is thus not in the "open." In this connection, I reiterate Justice Levinson's observation in *Kantner* that "[r]egulation and prohibition are not coextensive." *Kantner,* 53 Haw. at 346, 493 P.2d at 317.

56. *See supra* note 52.

57. This is a real "stretch." Unless I'm missing something, subjecting a prostitute to criminal punishment on the sole basis that her behavior is perceived as being "self-destructive" or self-"debilitating" would seem to contravene the "fundamental tenet"—developed in *Kraft, Lee,* and *Cotton*—that the state's police power to criminalize conduct is limited to that which *directly* harms *others* and that "the relationship between the individual and the state leaves no room for regulations which have as their purpose and effect *solely* the protection of the individual from his own folly." *Cotton,* 55 Haw. at 139, 516 P.2d at 710 (emphasis in original).

> Without an aggrieved victim, ... it is doubtful that the moral evil of a "harmless" action can ever be serious enough to counterbalance the loss of freedom to do it. Whatever the reader may think of the intuitive case for that comparative judgment, he will probably agree that the

. . . .

Having found that [Mueller's] decision, though arguably an intimate one, has yet to be drawn into a federally protected zone of privacy, we now consider the decision to have sex for a fee in the light of the special recognition accorded privacy by the Hawaii Constitution. Our duty is "to give effect to the intention of the framers and the people adopting" the provision. *HGEA v. County of Maui*, 59 Haw. 65, 80–81, 576 P.2d 1029, 1039 (1978).

*While the report that brought the proposal to the floor of the convention in 1978 may be read as envisioning a broader right to privacy*, what was approved by the framers "is similar to the privacy right discussed in cases such as *Griswold v. Connecticut*, . . . *Eisenstadt v. Baird*, . . . *Roe v. Wade*, . . ., etc." Comm. Whole Rep. No. 15, [*reprinted in*] [1] Proceedings . . . at 1024 (citations omitted). Thus, *a purpose to lend talismanic effect to "the right to be left alone," "intimate decision," or "personal autonomy," or "personhood" cannot be inferred from the State provision, any more than it can from the federal decisions. However described, a freedom that is protected thereunder must still be one "ranked as fundamental" in the concept of ordered liberty that underlies our society. Palko v. Connecticut*, 302 U.S. at 325, 58 S.Ct. at 152 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)). We see no evidence that we are dealing with one.

Though the trial court denied [Mueller's] motion to dismiss the charge on grounds that a compelling state interest had been shown, the denial was a correct result. We therefore affirm [Mueller's] conviction of prostitution.

*Mueller*, 66 Haw. at 618–30, 671 P.2d at 1353–60 (some citations and internal quotation marks omitted) (footnotes omitted)

intuitive case for the intrinsic unfittingness of *punishment* for such acts is a good deal weaker still.

*Harmless Wrongdoing* at 164 (emphasis in original). "Remonstrating" or "reasoning" with the prostitute, or "persuading" or "entreating" her to do what would "be better for [her] to do," *see*

(some emphases, brackets, and ellipsis points in original and some added).

What I find most notable about the *Mueller* decision's approach to article I, section 6 is the pervasive ambivalence with which the decision is imbued, both in the literal sense, to the extent that it exhibits a recurring "uncertainty or fluctuation . . . caused by . . . a simultaneous desire to say or do two opposite things," *see Webster's Encyclopedic Unabridged Dictionary of the English Language* 46 (1989), and in the metaphorical, psychological sense, to the extent that it exhibits "the coexistence within an individual of positive and negative feelings toward the same . . . object . . ., simultaneously drawing him in opposite directions," *see id.* On the one hand, the *Mueller* decision concedes its acute awareness that article I, section 6 protects a fundamental "right of personal privacy, . . . the outer limits" of which "have not been marked," but "which includes the interest in independence in making certain kinds of important decisions" and which state law may justifiably burden "only by a compelling state interest." 66 Haw. at 627, 671 P.2d at 1358–59 (citations and internal quotation marks omitted). On the other hand, by misapplying the presumption that "every enactment of the legislature is . . . constitutional" and, therefore, wrongly invoking the principle that "a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt," *see supra* section II.A.1; *McCloskey*, 71 Haw. at 576, 799 P.2d at 957, the *Mueller* decision (similarly to *Baker* before it, *see supra* section I.C.2.a) was able to stand constitutional analysis on its head and thereby topple the "straw person" that it had created by proclaiming that "the defendant has not met this burden, for she has not demonstrated in a convincing manner that a decision to engage in prostitution has been recognized as a fundamental right." *Mueller*, 66 Haw. at 626–27, 671 P.2d at 1358

*On Liberty* at 22, is one thing; depositing her in prison (hardly an ideal school for self-improvement) as an "outlaw" solely for the sake of her own betterment is quite another. I rather suspect that the legislature was not placing the prostitute's best interests and personal growth at a premium when it enacted HRS § 712–1200.

(citations and internal quotation marks omitted).

Put succinctly, *Mueller* is a perfect illustration of what I call the "fallacy of trivialization." *Of course* the "decision to engage in sex for hire," in and of itself, is no more "a fundamental right in our scheme of ordered liberty," *see id.* at 618, 671 P.2d at 1353–54, than is the decision to *use* contraceptives as a birth control device, the criminalization of which was struck down in *Griswold,* or the decision to *distribute* contraceptives for birth control purposes, the criminalization of which was struck down in *Eisenstadt,* or the decision to seek an abortion as a method of birth control, the criminalization of which was struck down in *Roe,* or the decision to sell or privately to possess contraband pornography for purposes of engaging in "autoeroticism in the home," *see Mueller,* 66 Haw. at 626, 671 P.2d at 1358, the criminalization of which was struck down by this court in *Kam* (discussed at length *infra* in section II.B.2).

The *real* issue in *Mueller,* however, was not whether the defendant had a fundamental constitutional right, in and of itself, to be a "house prostitute" and to engage in what Justice Padgett facetiously referred to as a "cottage industry." *See supra* note 48. Rather, the issue, as the *Mueller* court framed it in its forthright mode, was whether "the State invaded a constitutionally protected area of privacy when it *prosecuted* her for prostitution on the basis of sexual conduct involving two consenting adults and occurring in her home." *Mueller,* 66 Haw. at 618, 671 P.2d at 1353 (emphasis added). In other words, the real issue was whether engaging in consensual sex in the home, for consideration or otherwise, fell within the ambit of personal adult conduct protected by article I, section 6 of the Hawai'i Constitution—the scope of which is discussed exhaustively *supra* in sections II.A.1 and 2—and was therefore beyond the sovereign police power of the state to criminalize (as opposed to regulate by other reasonable means, *see supra* note 55), absent the most narrowly drawn and least drastic means for effectuating the state's objectives and a compelling interest perceived as a result of strict-scrutiny.

In the end, and without regard to any possible alternative modes of analysis, the *Mueller* court appears to have arrived at its holding—namely, that prosecuting the defendant for violating HRS § 712–1200 did *not* infringe her fundamental constitutional right to privacy—by incorrectly (1) resorting to the fallacy of trivialization, (2) misreading the intent of the 1978 Constitutional Convention and thereby equating, in all respects, the scope of the independently fundamental right to privacy expressly enunciated in article I, section 6 of the Hawai'i Constitution with the derivative and "penumbral" right of privacy discerned by the United States Supreme Court in the emanations of the federal bill of rights,[58] (3) applying the presumption that

58. The intent of the 1978 Constitutional Convention is extensively addressed *supra* in sections II.A.1 and 2. The *Mueller* decision finesses the intent of the framers by way of a three-step process. First, by misreading Committee of the Whole Report No. 15, *Mueller* concluded that "we are led back to *Griswold, Eisenstadt,* and *Roe* and appear to have come full circle in our search for guidance on the intended scope of the privacy protected by the Hawaii Constitution." 66 Haw. at 626, 671 P.2d at 1358. Put differently, *Mueller* posited that the *intended scope* of article I, section 6 was defined by, and therefore coextensive in all respects with, the scope of the federal constitutional right to privacy as described in *Griswold, Eisenstadt,* and *Roe.* Second, *Mueller* quoted *Roe,* 410 U.S. at 152, 93 S.Ct. at 726, for the proposition that, with respect to the *federal* constitutional right to privacy, "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), are included in this guarantee of personal privacy." 66 Haw. at 621, 671 P.2d at 1355. (I readily acknowledge that, within the context of the United States Constitution, the "*Roe* principle" makes sense, inasmuch as the right to privacy is nowhere expressly stated in that document but, rather, is perceived to have "emanated" from the "penumbra" surrounding other *enumerated* rights contained in the Bill of Rights, all of which are, themselves, "fundamental" or "implicit in the concept of ordered liberty." I also acknowledge that the "*Roe* principle" governs *certain* applications—not material here—of article I, section 6.) And, third, because the *Mueller* court had already proclaimed that article I, section 6 was circumscribed in part by *Roe,* it deemed the "*Roe* principle" equally applicable to article I, section 6. 66 Haw. at 628, 671 P.2d at 1359. In this way, the *Mueller* court laid the foundation for its trivialization of the question before it by framing it as whether "a decision to engage in sex for hire at home should be considered basic to ordered liberty." *Id.*

the challenged statute was constitutional and imposing on the defendant the burden of proving otherwise beyond a reasonable doubt, and (4) employing "rational basis"—rather than "strict scrutiny"—review. These mistakes would not be repeated in *Kam*.

### 2. *"Getting it"—State v. Kam*

If *Mueller* was "Yin," *State v. Kam, supra,* 69 Haw. 483, 748 P.2d 372 (1988)—in which this court next explored the interrelationship between the state's police power to criminalize conduct, on the one hand, and the individual's right to privacy "in the personal autonomy sense," as expressly codified in article I, section 6, on the other—was "Yang." In *Kam*, the defendants (two salesclerks employed by different adult bookstores) sold "adult" magazines to undercover police officers and were charged with promoting pornography in violation of HRS § 712–1214(1)(a) (1985), *i.e.*, with having disseminated pornographic material for monetary consideration, knowing the material's content and character. The defendants moved to dismiss the complaints on the ground, *inter alia*, that HRS § 712–1214(1)(a) violated the right to privacy guaranteed by article I, section 6 of the Hawai'i Constitution. *Kam*, 69 Haw. at 485, 748 P.2d at 374. The prosecution opposed the motions, *inter alia*, on the bases that (1) obscene items had no constitutional protection, (2) the right to privacy did not apply to the commercial sale of pornography, and (3) the statute was facially valid. *Id.*

The district court denied the defendants' motions, and the cases were consolidated for trial. At the close of the evidence, the district court found that the magazines in question "were pornographic, patently offensive, [and] violated the prevailing community standards" and, accordingly, convicted the defendants as charged. *Id.* at 486, 748 P.2d at 374.

On appeal, the defendants reasserted, *inter alia*, their position that the pornography statute violated article I, section 6 of the Hawai'i Constitution. The unanimous *Kam* court "agree[d] that HRS § 712–1214(1)(a) infringes on the right to privacy and therefore reverse[d] the [defendants'] convictions." *Id.* at 485, 748 P.2d at 374. The court's thought process, however, could hardly have been predicted from a reading of *Mueller:* [59]

The regulatory scheme under HRS §§ 712–1210 to 712–1214 (1985) conforms to the standards set by the United States Supreme Court in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419, *reh'g denied,* 414 U.S. 881, 94 S.Ct. 26, 38 L.Ed.2d 128 (1973). *Miller* held that *obscenity is not protected by the [f]irst [a]mendment* and defined the constitutional parameters into which a state's statutory regulation must fit. 413 U.S. at 23–24, 93 S.Ct. at 2614–15. It follows that those statutes which meet the requirements of *Miller* will not infringe on any constitutionally protected rights under the [f]irst [a]mendment. HRS § 1210(6) recites the three-prong test established in *Miller.*

... *State v. Manzo,* 58 Haw. 440, 573 P.2d 945 (1977) ... adopted the reasoning of *Miller:*

... *We interpret [a]rticle I, [s]ection [4] of the Hawaii Constitution*[60] *as excluding obscenity from protected speech.*

...

58 Haw. at 444, 573 P.2d at 949[.]

Therefore, the constitutionality of HRS § 712–1214(1)(a) has been firmly established pursuant to a free speech analysis, and hence is not [violative of] the [f]irst [a]mendment. HRS § 712–1214(1)(a), however, was not then subjected to a right of privacy scrutiny.

....

In *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), the United States Supreme Court held that a distributor of contraceptives, who had been convicted of violating a state law restrict-

---

**59.** Justice Nakamura, who authored *Mueller,* was recused from hearing the appeal in *Kam*. The *Kam* decision was written by Justice Hayashi, who had joined in the opinion of the court in *Mueller.*

**60.** Article I, section 4 of the Hawai'i Constitution (1978) (which, prior to 1978, was denominated article I, section 3) provides in relevant part that "[n]o law shall be enacted ... abridging the freedom of speech...."

ing the dissemination of contraceptive products, had the standing to assert the rights of unmarried persons who had been denied access to contraceptives. The Court ruled that enforcement of the disputed statute "materially impair[ed] the ability of single persons to obtain contraceptives." *Id.* at 446, 92 S.Ct. at 1034. By analogy, *implementing HRS § 712–1214(1)(a) against the sellers of pornography severely reduces the ability of persons to read or view pornographic material in the privacy of the home.*

. . . .

The materials in question[ ] were found to be "pornographic" pursuant to the *Miller* three-prong test. [The] State, however, would not be able to prohibit an individual from possessing and viewing such pornographic materials in the privacy of his or her own home. *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). Herein lies the paradoxical conflict. Is an individual's fundamental privacy right to own and view pornographic material violated when he or she is effectively denied the right to obtain such material (since[,] generally, pornography is bought for private use at home)? This is the threshold issue of this appeal. *The question is what should take precedence: [the] State's police power to regulate obscene material versus an individual's fundamental privacy right to have pornography at home?* [61]

The United States Supreme court has effectively ruled "that the protected right to possess obscene material in the privacy of one's home does not give rise to a correlative right to have someone sell or give it to others." *United States v. 12 200–Ft. Reels of Super 8mm Film,* 413

U.S. 123, 128, 93 S.Ct. 2665, 2669, 37 L.Ed.2d 500 (1973). Furthermore, *United States v. Orito,* 413 U.S. 139, 143–44, 93 S.Ct. 2674, 2677–78, 37 L.Ed.2d 513 (1973)[,] held that (emphasis added):

> Congress may regulate on the basis of the natural tendency of material in the home being kept private and the contrary tendency once material leaves that area, regardless of a transporter's professed intent. Congress could reasonably determine such regulation to be necessary to effect permissible *federal control of interstate commerce* in obscene material, based as that regulation is on a legislatively determined risk of ultimate exposure to juveniles or to the public and the harm that exposure could cause.

*See United States v. Reidel,* 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971).

. . . .

*The United States Supreme Court caselaw [sic] is premised on the [f]irst [a]mendment. The Hawaii Constitution article I, section 6, though, affords much greater privacy rights than the federal right to privacy, so we are not bound by the United States Supreme Court precedents.*[62] As the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawaii Constitution, we are free to give broader privacy protection than that given by the federal constitution. *See State v. Kim,* 68 Haw. 286], 711 P.2d 1291 (1985); *State v. Wyatt,* 67 Haw. 293, 687 P.2d 544 (1984); *State v. Kaluna,* 55 Haw. 361, 520 P.2d 51 (1974); *see also State v. Enos,* 68 Haw. 509], 720 P.2d 1012 (1986).

. . . .

---

61. I submit that this is exactly how Justices Abe and Levinson would have framed the issue with which the *Kam* court was presented. This is hardly surprising in light of the incorporation of the "Abe thesis" into article I, section 6. *See supra* section II.A.

62. Contrary to *Mueller,* 66 Haw. at 626, 671 P.2d at 1358, it appears that we are *not,* for all purposes, ineluctably "led back to *Griswold, Eisenstadt,* and *Roe* . . . in our search for guidance on the intended scope of the privacy protected by the Hawaii Constitution," as expressly codified in

article I, section 6. This is not front page news. By its plain and unambiguous language, the history underlying the promulgation of article I, section 6, *see supra* section II.A, reflected exactly what the *Kam* court saw—that, for some purposes, "article I, section 6 . . . affords much greater privacy rights than the federal right to privacy" and, therefore, that this court is "not bound by the United States Supreme Court precedents." *Kam,* 69 Haw. at 491, 748 P.2d at 377.

The Hawaii Constitution article I, section 6 reads (emphasis added):

> The right of the people to privacy is recognized and shall not be infringed *without the showing of a compelling state interest.* The legislature shall take affirmative steps to implement this right.

The Hawaii Constitution must be construed with due regard to the intent of the framers and the people adopting it. The fundamental principle in interpreting a constitutional provision is to give effect to that intent.

The privacy provision was drafted by the 1978 Constitutional Convention and incorporated into the Hawaii Constitution by the general election that year. The Convention's [CBRSE] recommended passage of the proposed article I, section 6 by stating that:

> Perhaps the most important aspect of privacy is that it confers upon people the most important right of all—the right to be left alone. As Justice Brandeis said in his now celebrated and vindicated dissent in *Olmstead v. U.S.*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928):

> > "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."

> *It gives each and every individual the right to control certain highly personal and intimate affairs of his own life. The right to personal autonomy, to dictate his lifestyle, to be oneself are included in this concept of privacy.* As Justice Abe stated in his concurring opinion in *State v. Kantner*, 53 Haw. 327, 493 P.2d 306 (1972): each person has the

> "fundamental right of liberty to make a fool of himself as long as his act does not endanger others, and that the state may regulate the conduct of a person under pain of criminal punishment only when his actions affect the general welfare— that is, where others are harmed or likely to be harmed."

> . . . .

> It should be emphasized that this right is not an absolute one but, because similar to the right of free speech, *it is so important in value to society that it can be infringed upon only by the showing of a compelling state interest. If the State is able to show a compelling state interest, the right of the group will prevail over the privacy rights or the right of the individual.* However, in view of the important nature of this right, the State must use the least restrictive means should it desire to interfere with the right.

Stand. Comm. Rep. No. 69, [*reprinted in*] 1 Proceedings ... at 674–75 (1980) (emphasis added).

After extensive debates, the Convention's Committee of the Whole adopted the proposal and concluded that:

> this privacy concept encompasses the notion that in certain highly personal and intimate matters, the individual should be afforded freedom of choice absent a compelling state interest. This right is similar to the privacy right discussed in cases such as *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)[,] *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), etc. It is a right that, though unstated in the federal Constitution, emanates from the penumbra of several guarantees of the Bill of Rights. Because of this, there has been some confusion as to the source of the right and the importance of it. As such, *it is treated as a fundamental right subject to interference only when a compelling state interest is demonstrated.* By inserting clear and specific language regarding this right into the Constitution, your

502

Committee intends to alleviate any possible confusion over the source of the right and the existence of it.

Committee of the Whole Rep. No. 15, *supra*, at 1024 (emphasis added).

Based on the clear and unambiguous reports, "a compelling state interest" must exist before the government may intrude into those "certain highly personal and intimate affairs of [a person's] life."[63] The personal decision, therefore, to read or view pornographic material in the privacy of one's own home must be afforded the protection of the Hawaii Constitution article I, section 6 from government interference.

Reading or viewing pornographic material in the privacy of one's own home in no way affects the general public's rights.[64] Anyone who is offended by pornography need not be subjected to it so long as others confine their taste for it to their homes....

....

*Because the enforcement of HRS § 712–1214(1)(a) has a ... detrimental impact on privacy rights, [the] State must demonstrate a compelling governmental interest exists to prohibit the sale of pornographic material.* [The] State, however, has not met its burden.

[The] State cites to *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446, *reh'g denied*, 414 U.S. 881, 94 S.Ct. 27, 38 L.Ed.2d 128 (1973), to support its contention that there is a legitimate state interest to regulate the commerce in obscene material. This ruling, like that of *Orito* [] and *12 200–Ft. Reels of Super 8mm Film*, however, was pursuant to a "rational basis" analysis. The Hawaii State Constitution article I, section 6, on the other hand, demands "the showing of a compelling state interest." Therefore, *unless the State can point to a compelling government interest, the right to privacy is infringed upon by the prohibition against the sale of sexually explicit adult material.* Since a person has the right to view pornographic items at home, there necessarily follows a correlative right to purchase such materials for this personal use, or the underlying privacy right becomes meaningless. *See Orito*, 413 U.S. at 146, 93 S.Ct. at 2679 (Brennan, J., dissenting); *[United States v.] Thirty–Seven Photographs*, 402 U.S. [363,] 381, 91 S.Ct. 1416, 1416, 28 L.Ed.2d 822 (Black, J., dissenting)[, *reh'g denied*, 403 U.S. 924, 91 S.Ct. 2221, 29 L.Ed.2d 702 (1971) ].[65]

[The] State also mistakenly cites *State v. Mueller*, 66 Haw. 616, 671 P.2d 1351 (1983), as authority for the proposition that the government may regulate obscenity despite the right to privacy provisions. *Mueller*, however, 1) accepted the rationale of *Stanley*; but 2) upheld the authority of the legislature to prohibit *prostitution* even in the privacy of one's own home, because prostitution was not protected by the right to privacy, and therefore the government was not required to prove a compelling state interest. 66 Haw. at 630, 671 P.2d at 1360. The Hawaii Constitution article I, section 6, by contrast, encompasses the privacy right to read or view pornographic material in one's own home.

....

Because of our invalidation of HRS § 712–1214(1)(a) ..., ... [the defendants'] convictions are reversed.

*Kam*, 69 Haw. at 487–96, 748 P.2d at 375–80 (footnote and some citations omitted) (some

---

**63.** Notice that the *Kam* court is quoting from the CBRSE's Standing Committee Report No. 69 at this point, rather than from Committee of the Whole Report No. 15, for purposes of setting out the intent of the 1978 Constitutional Convention regarding the scope of article I, section 6. So much for the *Mueller* court's claims (1) that Committee of the Whole Report No. 15 "trumped" Standing Committee Report No. 69, thereby replacing it as the true expression of the intent of the framers regarding the parameters of article I, section 6 and (2) that the report of the committee of the whole was more restrictive than that of the CBRSE.

**64.** This is pure Millian "direct harm to others" analysis, as developed in *Kraft, Lee, Cotton,* and the opinions of the *"Kantner"* trio.

**65.** Note that the analysis in this paragraph is directly contrary to that of *Mueller*. *See supra* section II.B.1 and note 53.

emphases, ellipsis points, and brackets added and some in original).

It is no coincidence that the penultimate paragraph quoted above contains the *Kam* opinion's *only* reference to *Mueller,* in which *Mueller* is distinguished as being inapposite. The paragraph is cursory, dismissive, and framed almost as an afterthought. In substance, the *Kam* court says of *Mueller,* "*Mueller* is different from this case because (1) the *Mueller* court held that consensual sex in the home for a fee did *not* fall within the ambit of personal conduct protected by article I, section 6 and therefore *was* within the sovereign police power of the state to criminalize, whereas (2) we, in *Kam,* are holding that possession of constitutionally unprotected pornographic contraband in the home, purchased for the purpose of engaging in autoeroticism, *does* fall within the ambit of personal conduct protected by article I, section 6 and therefore *is not* within the sovereign police power of the state to criminalize, the state having failed to demonstrate a compelling state interest in doing so." That sounds to me like "*Mueller* is different from *Kam* because we say so, and, therefore, *Mueller* is different from *Kam* because it is." That's pretty circular.

The fact is that there was not much the *Kam* court could have done with *Mueller* other than what it did, except to overrule the decision, which it seemingly was unwilling to do. Nevertheless, it is apparent to me that the *Kam* court abandoned—indeed, renounced—the *Mueller* analysis for purposes of resolving the issue before it. Had the *Kam* court tracked the reasoning of *Mueller,* its decision would have read something like this:

> The sole question presented on appeal is whether the proscriptions of HRS § 712–1214(1)(a) may be applied to the sale of constitutionally unprotected pornographic contraband that is foreseeably destined to be used for autoerotic purposes in the home. In order to answer the question, we must determine whether such use of that otherwise constitutionally unprotected pornographic contraband is protected by article I, section 6 of the Hawai'i Constitution.

Article I, section 6 was proposed by the 1978 Constitutional Convention and ratified by the electorate in the same year. The framers of article I, section 6 intended that the parameters of the new section of the Bill of Rights be coextensive in all respects with the United States Supreme Court's view of the nature of the derivative and penumbral federal right to privacy, as reflected in *Griswold, Eisenstadt,* and *Roe.*

*Roe* teaches, with regard to the federal right to privacy, that "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty' are included in this guarantee of personal privacy." Accordingly, only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty" are included within article I, section 6 of the Hawai'i Constitution. We note that pornographic material is expression unprotected either by the first amendment to the United States Constitution or by article I, section 4 of the Hawai'i Constitution. Therefore, only a deranged idiot would regard the right to sell constitutionally unprotected pornographic contraband for autoerotic use in the home as "fundamental" or "implicit in the concept of ordered liberty." That being the case, there is no fundamental constitutional right, protected by article I, section 6, to engage in such sales.

All legislative enactments are presumptively constitutional, and the appellants have the burden of proving unconstitutionality beyond a reasonable doubt. There being no fundamental right to sell constitutionally unprotected pornographic contraband for autoerotic use in the home, the legislature need only have had a "rational basis" for proscribing it. The legislature, in fact, had a rational basis for doing so because, without the power to proscribe its sale, nothing would prevent the interstate trafficking and widespread dissemination (to juveniles and others) of this unprotected, destructive, debilitating, degrading, and immoral smut. Therefore, the appellants have failed to rebut the statute's presumptive constitutionality, and their convictions are affirmed.

Of course, that is not the opinion that this court wrote in *Kam*. As actually written, I suggest that the *Kam* decision can be paraphrased as follows:

The core issue presented on appeal is whether the proscriptions of HRS § 712–1214(1)(a) infringe the right to privacy, as guaranteed by article I, section 6 of the Hawai'i Constitution (1978). In order to resolve the issue, we must answer the threshold question, "When in conflict, does the individual's fundamental privacy right to possess pornography at home, as guaranteed by article I, section 6, take precedence over the sovereign police power of the state to regulate obscene material?" Because we answer the threshold question in the affirmative, we hold that HRS § 712–1214(1)(a) is, indeed, violative of article I, section 6 of the Hawai'i Constitution.

We note at the outset that the district court found that the magazines that the defendants were convicted of selling were pornographic, patently offensive, and contrary to prevailing contemporary community standards. Accordingly, we assume that the magazines were, in fact, obscene for purposes of our analysis. We further note that obscenity (and, thus, "pornographic" material) is protected neither by the first amendment to the United States Constitution nor by article I, section 4 of the Hawai'i Constitution. Obviously, then, there can be no "fundamental right," in and of itself, to sell, purchase, possess, or use the magazines in question for autoerotic purposes. Correlatively, there can be no doubt that the state may, in *some* fashion, regulate the mode of access to, and the manner of use or display of, pornographic material. Thus, as noted, the question before us is whether the police power of the state encompasses the *criminalization* of the magazines' sale, on the one hand, or whether the statute contravenes the right to privacy contained in article I, section 6, on the other.

The framers of article I, section 6 intended to confer on the people the most important right of all—the right to be let alone. This right gives to each and every individual the right to control certain high-

ly personal and intimate affairs of his own life. The right to personal autonomy, to dictate his lifestyle, and to be himself are included in this concept of privacy. In this respect, article I, section 6 codified the position of Justice Abe, as stated in *State v. Kantner*, that each person has the "fundamental right of liberty to make a fool of himself as long as his act does not endanger others, and that the state may regulate the conduct of a person *under pain of criminal punishment* only when his actions affect the general welfare—that is, where others are harmed or likely to be harmed." (Emphasis added.) We should emphasize that the right to be let alone/personal autonomy/privacy is not absolute. But because it is a fundamental right, on a par with the right of free speech, it may be infringed through the state's police power *only* if the state is able to demonstrate both that there is a compelling state interest in doing so and that the interference caused thereby employs the least restrictive means available.

Based on the clear and unambiguous history underlying the promulgation of article I, section 6, we hold that the personal decision to read or view pornographic material in the privacy of one's own home is protected by article I, section 6 of the Hawai'i Constitution. We further hold that such activity does not affect the general welfare—*i.e.*, the general public's rights—inasmuch as it does not harm others or create a likelihood of harm. In other words, we hold that such activity does not implicate a "state interest," much less a "compelling" one, and that the state may not criminalize it.

Our preliminary holding, however, is not dispositive of the ultimate issue presented in this appeal because it is the *sale* of pornographic material, rather than its mere private possession, that HRS § 712–1214(1)(a) criminalizes. In this connection, the United States Supreme Court has ruled, under the federal constitution, that the right to possess obscene material in private does not give rise to a correlative right to have someone sell or give it to others. Specifically, the high court has

held that Congress may regulate the sale of pornography on the basis of the natural tendency of such material to exceed the bounds of privacy and the concomitant risk of ultimate harmful exposure to juveniles or the public at large.

Article I, section 6 of the Hawai'i Constitution, however, affords much greater privacy rights than the federal right to privacy, which merely emanates from the penumbra of other expressly enumerated fundamental rights set forth in the federal bill of rights. Under the Hawai'i Constitution, a "rational basis" for a statute infringing the protections of article I, section 6 is insufficient; rather, it must be supported by a compelling state interest and employ the least restrictive means available. We are therefore not bound by the precedents of the United States Supreme Court.

It is self-evident that enforcing HRS § 712–1214(1)(a) against the sellers of pornography severely reduces the ability of persons to read or view pornographic material in private and, thus, has a chilling effect upon activity expressly protected by article I, section 6. In this way, HRS § 712–1214(1)(a) infringes upon the individual's personal autonomy to engage in activity protected by an expressly enumerated, fundamental constitutional right. We therefore hold that, notwithstanding the otherwise unprotected status of pornographic material, the privacy interest of the individual in the mere personal possession and use of such material outweighs the state's interest in criminalizing its sale through the exercise of the sovereign police power.

For the foregoing reasons, we hold that HRS § 712–1214(1)(a) violates article I, section 6 of the Hawai'i Constitution. Accordingly, the appellants' convictions thereunder are reversed.

I do not believe that stasis can be achieved as between the *Mueller* and *Kam* analyses. As I have demonstrated, *Mueller* is pure *Baker/Renfro/Bachman, see supra* section I.C.2, which were implicitly repudiated by the framers of article I, section 6. *See supra* section II.A.2. *Kam*, on the other hand, remains faithful to the intent of the framers, insofar as it balances rights protected by

article I, section 6, into which the "Abe thesis" was directly imported, *see supra* section II.A, against the circumscribed prerogative of the state to exercise the sovereign police power. In this respect, *Kam* is pure *Kraft /Lee / Cotton /"Kantner* trio." *See supra* sections I.A, I.B, and I.C.1. I am aware that there has been a scholarly attempt to reconcile the two decisions; in particular, it has been suggested that,

> [r]eading *Mueller* and *Kam* together, one could predict that in the future the Hawaii Supreme Court will use federal case law in determining what is a fundamental right but may go beyond federal case law in extending the right of privacy to protect non-fundamental activities which are necessary to the exercise of fundamental rights.

Nancy Neuffer and Gaye Y. Tatsuno, Note, *State v. Kam : The Constitutional Status of Obscenity in Hawaii,* 11 U. Haw. L.Rev. 253, 271 (1989). The same could be said, however, by reading *Kam* alone, without reference to *Mueller*.

### 3. "A Different Story": Baehr v. Lewin

The plurality expresses the view that a "distinct approach[ ] to the right to privacy ... was applied by this court in ... *Mueller* ... and later by the plurality in *Baehr v. Lewin,* 74 Haw. 530, 852 P.2d 44, *reconsideration granted in part,* 74 Haw. 650, 875 P.2d 225 (1993)." Plurality opinion at 443, 950 P.2d at 181. The "*Mueller /Baehr* approach," as the plurality calls it, has "in the past" been "applied ... in rejecting claims that certain acts are protected by the right to privacy." *Id.* at 443, 950 P.2d at 181. The plurality therefore applies the "*Mueller /Baehr* approach" to conclude "that the right to possess and use marijuana cannot be considered a 'fundamental' right that is 'implicit in the concept of ordered liberty' " and that smoking marijuana is not "a part of the 'traditions and collective conscience of our people.' " *Id.* at 445, 950 P.2d at 183.

I do not wish to regurgitate my analysis of the *Mueller* decision's misreading of the constitutional history underlying the promul-

gation of article I, section 6 or its misguided use of the "fallacy of trivialization," both of which are set forth *supra* in section II.B.1. But because I authored the plurality opinion in *Baehr*, I feel compelled to express and explain my view that the plurality is misapplying *Baehr* and unfairly linking it to *Mueller* for purposes of this appeal.

As I stated at the outset of this opinion, the core question presented by this appeal is whether, as a matter of constitutional law, the police power of the state extends to criminalizing mere possession of marijuana for personal use. The core issue in *Mueller* was whether "the State invaded a constitutionally protected area of privacy when it *prosecuted* [the defendant] for prostitution on the basis of sexual conduct involving two consenting adults and occurring in [the defendant's] home." *Mueller*, 66 Haw. at 618, 671 P.2d at 1353 (emphasis added). Thus, the matter of the constitutional limitation on the sovereign police power of the state to *criminalize* purely "self-regarding" conduct, as further circumscribed by the expressly enumerated, fundamental constitutional right to privacy, was central to the resolution of *Mueller*, just as it is to the present appeal.

The significance of the privacy analysis in *Baehr*, however, was quite different. For present purposes, the relevant issue in *Baehr* was *not* whether the state's police power permitted the *criminalization* of any particular conduct, but "whether the 'right to marry' protected by article I, section 6 of the Hawaii Constitution *extend[ed]* to same-sex couples." *Baehr*, 74 Haw. at 552, 852 P.2d at 55 (emphasis added). At stake was *affirmative access* by same-sex couples to marriage as "a state-conferred *legal status*, the existence of which gives rise to rights and benefits reserved exclusively to that particular relationship." *Id.* at 559, 852 P.2d at 58 (emphasis added). In this connection, *Baehr* recognized that the police

> power to *regulate* marriage is a sovereign function reserved exclusively to the respective states. By its very nature, the power to *regulate* the marriage relation includes the power to determine the requisites of a valid marriage contract and to control the qualifications of the contracting parties,

the forms and procedures necessary to solemnize the marriage, the duties and obligations it creates, its effect upon property and other rights, and the grounds for marital dissolution.

> ... So zealously has this court guarded the state's role as the exclusive progenitor of the marital partnership that it declared, over seventy years ago, that "common law" marriages—*i.e.*, "marital" unions existing in the absence of a state-issued license and not performed by a person or society possessing governmental authority to solemnize marriages—would no longer be recognized in the Territory of Hawaii.

*Id.* at 558–59, 852 P.2d at 58 (citations and footnote omitted) (emphases added).

In construing the application of article I, section 6 to the precise question presented, *Baehr* reviewed the constitutional history underlying the promulgation of article I, section 6, *id.* at 551–52, 852 P.2d at 55, and came to the conclusion that, "*at a minimum*, article I, section 6 of the Hawaii Constitution encompasses all of the fundamental rights expressly recognized as being subsumed within the privacy protections of the United States Constitution." *Id.* at 552, 852 P.2d at 55 (emphasis added). Correlatively, *Baehr* observed that "the United States Supreme Court has declared that 'the right to marry is part of the fundamental "right of privacy" implicit in the Fourteenth Amendment's Due Process Clause.'" *Id.* (quoting *Zablocki v. Redhail*, 434 U.S. 374, 384, 98 S.Ct. 673, 680, 54 L.Ed.2d 618 (1978)). In reviewing the high court's relevant case law "for guidance" on the subject, *Baehr* acknowledged the indisputable fact that "the federal construct of the fundamental right to marry—subsumed within the right to privacy implicitly protected by the United States Constitution—presently contemplates unions between men and women." *Id.* at 552, 555, 852 P.2d at 55–56.

Thus, *Baehr* characterized "the precise question facing this court" as "whether we will extend the *present* boundaries of the fundamental right of marriage to include same-sex couples, or, put another way, whether we will hold that same-sex couples possess a fundamental right to marry." *Id.* at 555, 852 P.2d at 56–57 (emphasis in origi-

nal). Within this context, *Baehr* adopted the approach articulated by Justice Goldberg, concurring in *Griswold,* for "determining which rights are fundamental," namely, that courts must look

> "to the 'traditions and [collective] conscience of our people' to determine whether a principle is 'so deeply rooted [there] ... as to be ranked as fundamental.' ... The inquiry is whether a right involved 'is of such a character that it cannot be denied without violating those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions"....' "

*Id.* at 556, 852 P.2d at 57 (quoting *Griswold,* 381 U.S. at 493, 85 S.Ct. at 1686 (Goldberg, J., concurring) (citations omitted)) (brackets and ellipsis points in original). Based on Justice Goldberg's conceptual framework, *Baehr* stated that

> we do not believe that a right to same-sex marriage is so rooted in the traditions and collective conscience of our people that failure to recognize it would violate the fundamental principles of liberty and justice that lie at the base of all our civil and political institutions. Neither do we believe that a right to same-sex marriage is implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it were sacrificed. Accordingly, *we hold that the applicant couples do not have a fundamental constitutional right to same-sex marriage arising out of the right to privacy or otherwise.*

*Id.* at 556–57, 852 P.2d at 57 (emphasis added).

I believed in *Baehr,* and I continue to believe, that Justice Goldberg's construct, as delineated in *Griswold,* was the correct yardstick by which to glean the existence of a *newly perceived and constitutionally fundamental right of affirmative access* to a *legal status* that is within the state's exclusive police power to *regulate.* This belief is consistent with my concession, *see supra* note 58, that the "*Roe* principle" makes sense when applied to the United States Constitution, inasmuch as the right of privacy is nowhere expressly stated but, rather, is perceived to have emanated from the penumbra

surrounding other enumerated rights contained within the federal bill of rights, all of which are, themselves, "fundamental" or "implicit in the concept of ordered liberty."

I repeat, however, Justice Levinson's self-evident observation that, with respect to the extent of the state's police power, "[r]egulation and prohibition are not coextensive." *Kantner,* 53 Haw. at 346, 493 P.2d at 317 (Levinson, J., dissenting). I also reiterate what was amply demonstrated *supra* in section II.A, namely, that it is apparent from the history of the genesis of article I, section 6 that the newly expressed fundamental constitutional right to privacy was intended to protect the rights of the individual to "personal autonomy," to dictate his or her own lifestyle, and to "selfhood"—rights that were deemed by the framers to be "highly personal and intimate affairs" of a person's life and that are subsumed within the general "right to be left alone." The right to be let alone, by its very nature, is a right to be free from the unwarranted exercise of the awesome police power of the state.

> It has been reported that
>
> every survey of adult Americans willing to identify themselves as lesbian or gay finds that a majority or near majority are living currently with a partner. Increasing numbers of these couples are celebrating their relationships in ceremonies of commitment. Those who participate commonly refer to the ceremonies as weddings and to themselves as married, even though they know that the ceremonies are not legally recognized by the laws of any state.

David L. Chambers, *What If? The Legal Consequences of Marriage and the Legal Needs of Lesbian and Gay Male Couples,* 95 Mich. L.Rev. 447, 449 (1996) (footnotes omitted). *See generally Lesbian and Gay Marriage: Private Commitments, Public Ceremonies* (Suzanne Sherman ed., Temple Univ. Press 1992). Such weddings are often performed by ordained clergy. *See e.g., Lesbian and Gay Marriage* at 241–79.

Suppose that the legislature were to enact a statute that sought to subject the participants in such "single most significant communal ceremon[ies] of belonging," *see What*

508

*If?* at 450, to criminal penalties. Would the plurality cite *Baehr*—as, by its attempted analogy, it conceivably could cite *Mueller*—as authority for upholding the constitutionality of the statute, as a legitimate exercise of the state's police power, on the basis of *Baehr's* holding that there is no "fundamental constitutional right to same-sex marriage arising out of the right to privacy or otherwise"? I hope and think not.

III. *THE STATE'S POLICE POWER, AR-TICLE I, SECTION 6, AND THE COR-RECT RESOLUTION OF THE PRES-ENT APPEAL*

As the plurality notes, "Mallan was arrested in the parking lot of the Waikīkī Shell after Honolulu police officers, attracted by the odor of burning marijuana, found a partially burnt marijuana cigarette in Mallan's automobile." Plurality opinion at 442, 950 P.2d at 180. At trial, the prosecution did not dispute Mallan's contention that there was no one in the vicinity of his automobile at the time he lit up. No one was forced to breathe his secondhand smoke. Mallan was not operating his vehicle or otherwise engaging in hazardous activity while "under the influence" of the intoxicant. In short, at the time of his arrest, Mallan was harming no one.

In this case, Mallan was not charged with driving under the influence of drugs, in violation of HRS § 291–7. *See supra* note 4. Nor was he charged with the functional equivalents—which, to my knowledge, do not exist in this jurisdiction—of consuming or possessing intoxicating liquor while operating a motor vehicle, in violation of HRS § 291–3.1 (1993), or consuming or possessing intoxicating liquor while a passenger in a motor vehicle, in violation of HRS § 291–3.2 (1993). Rather, he was charged with and convicted of the crime of mere unadorned possession of marijuana in any amount. *See supra* note 2.

At the hearing on his motion to dismiss, the parties stipulated to the testimony of Mallan's expert witnesses. The witnesses would have testified that, in their opinion, marijuana is not addictive and that there is no proof that the use of marijuana is harmful to the user or to others. However, the witnesses would also have testified that the

effects of marijuana have been the subject of debate. The experts would further have testified that, in their opinion, the studies concluding that marijuana has harmful effects are speculative and flawed.

Plurality opinion at 442, 950 P.2d at 180. The prosecution "did not present any evidence [bearing upon] the constitutionality of the marijuana possession statute." ICA's decision at 2. Instead, the prosecution simply argued—reminiscent of the Richardson/Marumoto plurality opinion in *Kantner, see supra* section I.C.1—that the fact, in and of itself, that the harmful effects of marijuana were a matter of controversy provided a sufficient basis upon which the district court could uphold the constitutionality of HRS § 712–1249.

The district court obliged. In rejecting Mallan's position, the district court

ruled that "possession and use of marihuana ... does not rank as any kind of fundamental freedom" and that the statute need only be supported by a rational basis [and] not a compelling state interest[,] ... noted that the question whether marijuana has harmful effects is ... controversial ... [,] noted that, according to the stipulated evidence, some literature supports the conclusion that marijuana is harmful, while other literature supports the conclusion that it is harmless[,] ... [and] ruled that, in applying the rational basis test, the statute [was] constitutional.

Plurality opinion at 442, 950 P.2d at 180 (some ellipsis points in original and some added). In so doing, the district court followed the Richardson/Marumoto plurality opinion in *Kantner*, as well as *Baker, Renfro, Bachman,* and *Mueller* right down the line. Those authorities, however, do not reflect the current law of this state.

Consonant with *Kraft, see supra* section I.A, *Lee, see supra* section I.B.1, "the Abe thesis" first articulated in the *Lee* dissent, *see supra* section I.B.2, *Cotton, see supra* note 8, the "*Kantner* trio," *see supra* section I.C.1, the history underlying the adoption of article I, section 6 of the Hawai'i Constitution, *see supra* section II.A, and *Kam, see supra* section II.B.2, I would hold as follows: (1) whol-

ly separate and apart from any consideration of the constitutional right to privacy, the "harm to others" principle circumscribes the exercise of the state's police power to criminalize conduct in Hawai'i; [66] (2) article I, section 6, creating an express constitutional right to privacy, confers upon people "the right to be left alone," which gives to all individuals the right to personal autonomy, to dictate his or her own lifestyle, and to be oneself, and which further constrains and limits the state's exercise of the police power; (3) the right to be left alone/personal autonomy/privacy, expressly enumerated in article I, section 6, is a "fundamental" right—subject, not merely to "rational basis" review, but to "strict scrutiny"—that cannot be abridged absent a showing by the government that there is a compelling state interest justifying the abridgment and that the statute infringing the fundamental right is narrowly drawn to avoid unnecessary abridgments of constitutional rights; [67] (4) HRS § 712–1249 infringes the fundamental constitutional right to privacy in the personal autonomy sense; (5) Mallan's fundamental pri-

vacy right to possess marijuana for personal use is in conflict with the sovereign police power to regulate the use of and trafficking in drugs; (6) the prosecution failed to demonstrate either that HRS § 712–1249 furthers a compelling state interest in the infringement or that the interference with the fundamental constitutional right employs the least restrictive means available; and, therefore, (7) HRS § 712–1249 is an unconstitutional infringement of the right to be left alone/personal autonomy/privacy, as guaranteed by article I, section 6 of the Hawai'i Constitution (1978).

Accordingly, I would reverse the ICA's decision, vacate Mallan's judgment of conviction, and remand to the district court for the entry of an order granting Mallan's motion to dismiss.

KLEIN, Justice, concurring,
NAKAYAMA, Justice, joins.

I concur in the result reached by the plurality, but disagree with its suggestion that

**66.** The plurality, dismissing this proposition as echoing views "reminiscent of courts in the early part of this century," plurality opinion at 452–453, 950 P.2d at 190–191, attempts to transform my opinion in the present matter into a clone of *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). *Id.* at 453–454, 950 P.2d at 191–192. *Lochner,* which is a jurisprudential "dirty word," has come to be a symbol of callous and regressive narrow-mindedness. I hope that if my opinion has accomplished anything, it has demonstrated that the "harm to others" principle with which Hawai'i criminal law is imbued does not derive from a *Lochner*esque exaltation of the "right" to be an indentured servant, but rather, *inter alia,* from *Lee, Cotton,* and the *Kantner* trio—decisions generated by a court in the "late part of this century"—as well as the framers of the 1978 Hawai'i Constitution.

**67.** The plurality "believe[s] that the police power doctrine ... should be regarded as an aspect of the rational basis test." Plurality opinion at 451, 950 P.2d at 189. Thus, according to the plurality, "under minimum rationality due process analysis," a criminal statute invariably lies within the ambit of the state's sovereign police power if it is "rationally related to the public health, safety, or welfare." *Id.* at 451–452, 950 P.2d at 189–190 (citing *In re Applications of Herrick and Irish,* 82 Hawai'i 329, 922 P.2d 942 (1996)). And, as the plurality correctly observes, "in applying the rational basis test, courts in modern times have given great deference to legislative

enactments." *Id.* at 452, 950 P.2d at 189. Accordingly, such "[s]tatutes are subject to a presumption of constitutionality and the burden of demonstrating that the statute lacks *any* rational basis lies with the challenger." *Id.* at 452–453, 950 P.2d at 189–190 (emphasis in original).

Suppose that the legislature were to enact a statute providing that a person committed a class C felony if he or she knowingly possessed peanuts in any amount. Suppose that the report of the conference committee considering the bill had expressed a legislative intent to further the public health by discouraging the consumption of peanuts—which, according to testimony submitted to the committee, were high in fat and low in fiber content—and thereby encouraging the consumption of more nutritious nuts and legumes. Suppose that standing committee reports of the House Agriculture Committee and the Senate Economic Development Committee added their views that the bill would have the collateral effect of enhancing the public welfare by promoting the state's macadamia nut industry. Would the statute be presumptively constitutional? Would it lack *any* rational basis or relationship to the public health and welfare? Could a criminal defendant challenging a conviction under the statute successfully meet his or her burden of demonstrating the statute's unconstitutionality beyond a reasonable doubt? I suggest that the plurality's analysis renders all of these questions problematic.

**510**

Mallan's privacy claim or any future right to privacy claim in article I, section 6 of the Hawai'i State Constitution must be analyzed under the *"Mueller/Baehr"* approach and the *"Stanley/Kam"* approach as "an initial step in the analysis." I also disagree that "the question remains whether we should adopt another, completely new approach not based on federal case law." Plurality opinion at p. 448, 950 P.2d at p. 186.

This state's constitution was amended after the 1978 Constitutional Convention by adding the specific right to privacy provision set forth in article I, section 6. There is no question that the right of privacy embodied in article I, section 6 is a *fundamental right in and of itself.* Any infringement of the right to privacy must be subjected to the compelling state interest test. Thus, the *only* analysis this court need utilize when testing a right to privacy claim such as Mallan's is whether the conduct prohibited by law is entitled to protection under article I, section 6. A law prohibiting protected conduct must pass muster under the compelling state interest test to survive constitutional challenge. There is no issue in this case about a "completely new approach not based on federal case law" because federal case law interpreting the federal constitution represents a search for protected, fundamental privacy rights *not explicitly found* in the federal constitution. Federal privacy rights emanate from "penumbras" created by specific guarantees in the Bill of Rights according to the United States Supreme Court in *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965).

Once the citizens of this state approved article I, section 6, our courts were relieved of the responsibility of casting about blindly in the "penumbras" of our constitution to find rights protected as private. We should not revisit those days past by adopting a constitutional calculus for testing privacy claims under article I, section 6 requiring the use of both *Mueller* and *Kam.* Neither case is particularly instructional anymore and both should be dispatched as interesting historic footnotes. Federal case law is not apt either, except that where a new fundamental right is discovered in the shadowy universe of the Bill of Rights by the United States Supreme Court, this court must protect it.

The issue is not whether we *should* adopt a new approach divorced from federal case law, but rather *what* new approach must we utilize in order to give voice to the fundamental right to privacy our citizens have incorporated as one of their explicit constitutional protections. The only approach that makes sense is to analyze the conduct itself and the circumstances under which it is prohibited to determine whether it is reasonable to give the conduct constitutional protection.

Although I disagree with the plurality's analysis, I cannot agree with the dissent that Hawai'i's right to privacy is so broad that it protects the use and possession of marijuana for recreational purposes. In effect, the dissent's reasoning decriminalizes the use and possession of virtually all contraband drugs used within the home or wherever a person senses being "in private." To this extent I agree with the cogent reasoning of the plurality in Part III. B of its opinion citing statements from the delegates to the Constitutional Convention.

In light of that debate, I am not convinced that it was the intent of the framers of article I, section 6 that the right of privacy envisioned by them would protect an individual from criminal prosecution for the possession and use of marijuana, or *any* contraband drug bought, sold, or used privately.

Therefore, I cannot agree with the dissent's unbridled interpretation of Hawai'i's constitutional right of privacy. In my opinion, this right is not so broad that it protects the use and possession of marijuana (and virtually all presently contraband substances) for recreational purposes. In my view, the dissent's apologia for the protection of contraband drugs (as well as other private activity including, presumably, in-house prostitution) from the ambit of law enforcement, cannot be justified as constitutionally protected under the right of privacy.

For the foregoing reasons, I concur in the result of the plurality but do not join the dissent.